IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


AMANDA BOSARGE, ET AL                    PLAINTIFFS

VS.                                      CIVIL NO. 1:22CV233

DANIEL P. EDNEY, IN HIS OFFICIAL
CAPACITY AS THE STATE HEALTH
OFFICER, ET AL                           DEFENDANTS



MOTION FOR PRELIMINARY INJUNCTION HEARING


BEFORE THE HONORABLE  HALIL S. OZERDEN
UNITED STATES DISTRICT JUDGE

APRIL, 17, 2022
GULFPORT, MISSISSIPPI


REPORTED BY:  SHERRI L. PENNY, RPR, FCRR
              Mississippi CSR #1609
              2012 15th Street, Suite 403
              Gulfport, Mississippi  39501
              (228) 563-1781

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFFS:**

4     WALKER D. MOLLER, ESQUIRE
      AARON SIRI, ESQUIRE - PHV
5     SIRI & GLIMSTAD, LLP
      745 FIFTH AVENUE, SUITE 500
6     NEW YORK, NEW YORK  10151
      212-532-1091
7          AND
      CHRISTOPHER WIEST, ESQUIRE - PHV
8     ATTORNEY AT LAW
      25 TOWN CENTER BOULEVARD, SUITE 104
9     CRESTVIEW HILLS, KENTUCKY  41017

10   **FOR THE DEFENDANT, LYNN FITCH:**

11    REX M. SHANNON, ESQUIRE
      DOUGLAS T. MIRACLE, ESQUIRE
12    MISSISSIPPI ATTORNEY GENERAL'S OFFICE
      550 HIGH STREET, SUITE 1100
13    JACKSON, MISSISSIPPI  39205
      601-3595654

14

15   **FOR THE DEFENDANT, DR. DANIEL P. EDNEY:**

16     MICHAEL J. BENTLEY, ESQUIRE
       BRADLEY ARANT BOULD CUMMINGS, LLP - JACKSON
17     188 EAST CAPITOL STREET, SUITE 1000
       JACKSON, MISSISSIPPI  39201
18     601-948-3000

19

20                                    - - -

21

22

23

24

25

# TABLE OF CONTENTS

**PLAINTIFFS' WITNESSES:**

DR. JEANA ERICKSON STANLEY

   Direct Examination By Mr. Wiest   ........................8

PAUL PERKINS

   Direct Examination By Mr. Moller   ......................18

BRANDI RENFROE

   Direct Examination By Mr. Siri   ........................29

      Exhibits P1, 2 AND 3   ..............................46

Court Reporter's Certificate ............................103

                           - - -

1        **THE COURT:**  We're here this morning in civil matter

2   1:22cv233, Amanda Bosarge, et al, versus Daniel P. Edney, in

3   his official capacity as State Health Officer, et al, scheduled

4   for a hearing on the plaintiffs' motion for a preliminary

5   injunction.  Would counsel please make their appearances for

6   the record.

7        **MR. SIRI:**  Good morning, Your Honor.  Aaron Siri on

8   behalf of the plaintiffs.  I am here with my co-counsel, Chris

9   Wiest, as well as colleagues, we're at the same firm together,

10  Walker Moller and Susie Heywood.

11       **THE COURT:**  Good morning.

12       **MR. SIRI:**  Thank you.  Good morning, Your Honor.

13       **MR. SHANNON:**  Good morning, Your Honor.  I am Rex

14  Shannon with the Mississippi Attorney General's Office.  I am

15  here with co-counsel, Doug Miracle, on behalf of defendant,

16  Lynn Fitch in her official capacity as Attorney General of

17  Mississippi.

18       **THE COURT:**  Good morning, Counsel.

19       **MR. MIRACLE:**  Good morning, Your Honor.

20       **MR. BENTLEY:**  Good morning, Your Honor.  Michael

21  Bentley on behalf of Dr. Daniel Edney, State Health Officer.

22       **THE COURT:**  Good morning.  Before we get started,

23  just a couple of, I guess, procedural points I want to make

24  sure we're clear on.  We have one defendant in this case,

25  Allison Merit, North Bay principal, who it appears to me was

1    served with process but has never appeared.  Does anybody have

2    any update on what's going on with her, what her status is?

3              **MR. SIRI:**  Your Honor, we have never received any

4    communication from any potential counsel or from her.  So our

5    understanding she was properly served and never appeared.

6              **THE COURT:**  Anyone have any insight on that?

7              **MR. SHANNON:**  Your Honor, we have heard nothing from

8    anyone claiming to represent her.

9              **MR. BENTLEY:**  No, Your Honor.

10             **THE COURT:**  And it does appear to me, just to be sure

11   we're all on the same page, I know there are some other

12   defendants who are represented by some other counsel, Ashley

13   Blackmon by a Bryan Nelson firm, and then Ashley Allred and

14   Doug Tynes.  I don't see anyone here for them.  Has anyone

15   heard anything from them?  Now, my appreciation was they have

16   all agreed to be bound by whatever happens, so they probably

17   don't need to be here, but I want to be sure I am clear on that

18   or am I missing something?

19             **MR. WIEST:**  Yes, Your Honor.  So all of the other

20   defendants have agreed to be bound by whatever ruling Your

21   Honor issues.  The only other party, one was Will Morgan, we

22   did dismiss.  He was represented by a Bethany Tarpley, and so I

23   think that accounts for all the other defendants, Your Honor.

24             **THE COURT:**  Okay.  Is that y'all's understanding as

25   well, counsel?

 1          **MR. SHANNON:**  That comports with our understanding

 2   Your Honor.

 3          **MR. BENTLEY:**  Yes, Your Honor.

 4          **THE COURT:**  All right.  We kind of took care of those

 5   housekeeping matters then.  As I mentioned at the outset, we're

 6   here on a motion for preliminary injunction.  There were some

 7   initial rounds of briefs filed on a number of motions, which

 8   the Court resolved with the exception of this one request.  And

 9   after that was done, the Court had a short phone conference

10   with counsel where I requested some supplemental briefing,

11   focused solely on the question of preliminary injunction and

12   the appropriate standard and related facts on those issues.

13   And I have received that briefing, I have read it, I have

14   considered it, and we're here today for purposes of this

15   hearing.

16      So counsel, since it is plaintiffs' burden at this stage,

17   I will call on you to see if you have any evidence or witnesses

18   you wish to present on your motion.

19          **MR. WIEST:**  We do, Your Honor.  And we're going to

20   present three witnesses this morning.  We'd like to start with

21   Dr. Jeana Stanley.

22          **MR. SHANNON:**  Your Honor, at this time the Attorney

23   General would invoke Rule 615.

24          **THE COURT:**  That was my next question.  The rule will

25   be invoked.  So any witnesses need to remain outside the

1    courtroom until they are called to testify.  Anyone here who is

2    going to testify needs to wait outside until you are called in.

3          And your first witness, counsel, if you would like, she

4    may approach up here to the witness stand.  If you will come up

5    here, ma'am.  If you would please, I would like you to place

6    your left hand on the Bible, raise your right hand and take the

7    oath here.

8          (Oath Administered)

9                **THE COURT:**  Please have a seat in the witness box.

10                **MR. WIEST:**  Your Honor, would you prefer --

11                **THE COURT:**  At the podium, if you would please.

12          Ma'am, you will see a microphone there in front of you.  I

13    need you to speak slowly and speak into it so the court

14    reporter can hear what you are saying.  She also cannot type

15    two people talking at once, so you need to let the lawyers

16    finish talking before you start answering.  Also, she cannot

17    type a shake or a nod of the head, or an uh-huh or nuh-uh, so

18    you must verbalize all answers with a yes or no, do you

19    understand that?

20                **THE WITNESS:**  Yes, sir.

21                **THE COURT:**  Please begin by stating your full name.

22                **WITNESS:**  Dr. Jeana Erickson Stanley.

23                **THE COURT:**  Counsel, whenever you're ready.  For all

24    of you counsel, just so you are aware, if you need to approach

25    at some point to hand an exhibit or evidence, fine, just

1    request leave, but do not talk walking back and forth because

2    these microphones will not pick you up, and the court reporter

3    won't be able to hear you, all right?

4              **MR. WIEST:**  Very good.

5              **THE COURT:**  You may proceed.

6                   **DR. JEANA ERICKSON STANLEY,**

7    **having first been duly sworn, testified as follows:**

8                      **DIRECT EXAMINATION**

9    **BY MR. WIEST:**

10   Q.  Dr. Stanley, where do you live?

11   A.  Grand Bay, Alabama.

12   Q.  Are you married?

13   A.  Yes, sir.

14   Q.  How many children do you have?

15   A.  I have five children.

16   Q.  What are their ages?

17   A.  Eight, seven, six and twin three-year-olds.

18   Q.  How many of them are in school right now?

19   A.  All five of them.

20   Q.  I am going to talk about that in some detail in a minute.

21   Let me just get a little bit more background from you.  Where

22   were you born and raised?

23   A.  Biloxi, Mississippi.

24   Q.  And did you go to church in Biloxi, Mississippi?

25   A.  Yes.

1   Q.   Where did you go to church in Biloxi, Mississippi?

2   A.   Fatima Catholic Church.

3   Q.   Do you still have a home church in Mississippi?

4   A.   Yes.

5   Q.   Where is that?

6   A.   Fatima Catholic Church.

7   Q.   You said you live in Alabama.  Where do you work?

8   A.   I work in Biloxi, Mississippi.

9   Q.   Doing what?

10  A.   I am a doctor of physical therapy.

11  Q.   How long have you been doing that?

12  A.   Nine years.

13  Q.   How long have you worked in Biloxi, Mississippi?

14  A.   All nine years.

15  Q.   Where does your husband work?

16  A.   In Biloxi, Mississippi, as well.

17  Q.   What does he do?

18  A.   He is a director of funeral services for Bradford O'Keefe

19  Funeral Home.

20  Q.   How long has he been doing that?

21  A.   Ten years.

22  Q.   Where is your family or parents located?

23  A.   Biloxi, Mississippi.

24  Q.   How long have they lived there?

25  A.   For at least 50 years.

1    Q.   How about your husband's family, where is he from?

2    A.   Gulfport, Mississippi.

3    Q.   And are his parents also in Gulfport?

4    A.   Yes.

5    Q.   Do you own real property in Mississippi?

6    A.   Yes.

7    Q.   Where do you own real property in Mississippi?

8    A.   Biloxi, Mississippi.

9    Q.   And do you own that house free and clear?

10   A.   Yes.

11   Q.   You indicated that you own, or I am sorry, that you

12   currently reside in Grand Bay, Alabama.  Do you own that house

13   free and clear?

14   A.   No.

15   Q.   Are you paying a mortgage on that?

16   A.   Yes.

17   Q.   Where are you currently registered to vote?

18   A.   I am registered to vote in Mobile County, Alabama.

19   Q.   And where is your driver's license?

20   A.   Mobile County, Alabama.

21   Q.   And that was so you could establish residency there?

22   A.   Yes.

23   Q.   For your children to be able to attend school there?

24   A.   Yes.

25   Q.   How about your husband, where is he registered to vote?

1   A.   In Harrison County, Biloxi, Mississippi.

2   Q.   And where does he have his driver's license?

3   A.   In Harrison County, Biloxi, Mississippi.

4   Q.   How about your children's friends, where are they located?

5   A.   Most of their friends are on the Mississippi Gulf Coast.

6   Q.   Do they do any sports or camps in Mississippi?

7   A.   Yes.

8   Q.   Where?

9   A.   They have participated in the Gulfport High School

10  baseball camps, the Marine Mammal Institute Sea Camps.  They go

11  to Shuckers games and things like that.

12  Q.   So that begs the question, why are you currently living in

13  Alabama?

14  A.   The only reason we moved to Alabama was so our children

15  could attend schools without having to have vaccinations.

16  Q.   Have you completed a religious exemption process in

17  Alabama for the children?

18  A.   Yes.

19  Q.   And they granted that to you in Alabama?

20  A.   Yes.

21  Q.   If your children were permitted to attend school with

22  religious exemption in Mississippi, would you return to

23  Mississippi and immediately enroll them in school?

24  A.   Immediately, yes.

25  Q.   And why would you do that?

1   A.   Our support system is here on the Mississippi Gulf Coast,

2   and our jobs, our livelihood is on the Mississippi Gulf Coast

3   in Biloxi, specifically.

4   Q.   By the way, what state do you pay income taxes to?

5   A.   Mississippi.

6   Q.   And your husband, too?

7   A.   Yes.

8   Q.   What religion do you associate with?

9   A.   We are practicing Catholics.

10   Q.   I understand that the defendants are not going to really

11   contest this, but you and your husband have a sincerely held

12   religious belief against vaccinating your children?

13   A.   Yes.

14   Q.   So sincere, in fact, that you have had to move out of the

15   state, at least temporarily?

16   A.   Yes.

17   Q.   And has that been a burden on you?

18   A.   Absolutely.

19   Q.   How has that been a burden on you?

20   A.   Financially, emotionally.  We're not able to see our

21   family near as much.  We don't have our support system around

22   us.  Just having to move to a new city where we have literally

23   no one and start our kids in school there when all of our

24   family is back here.

25   Q.   Let me ask, if it came to it would you go to prison rather

1   than vaccinating your children?

2   A.   Yes.

3   Q.   Mississippi does not have a religious exemption process

4   like Alabama and almost every other state, right?

5   A.   No, it does not.

6   Q.   They do allow for medical exemptions?

7   A.   Yes.

8   Q.   Your children don't not qualify for medical exemption?

9   A.   No.

10   Q.   How often are you and your husband commuting to and from

11   Mississippi because of this onerous vaccine requirement?

12   A.   Every day, minus weekends, but every day for work.

13   Q.   And I know you indicated this, but you're a working parent

14   and your husband is obviously working, too?

15   A.   Yes, sir.

16   Q.   Has that put a strain because of the distance from the

17   grandparents to be able to help you out?

18   A.   Yes.

19   Q.   How often do the grandparents get to see their

20   grandchildren because of the fact that you are at least

21   temporarily located in Alabama?

22   A.   Once every few months.

23   Q.   By the way, where are you currently -- do you temporarily

24   attend church anywhere in Alabama?

25   A.   Yes.

```
1    Q.   Where?
2    A.   St. John the Baptist Catholic Church in Grand Bay,
3    Alabama.
4    Q.   Did your husband used to be able to attend church with the
5    family when you were living in Mississippi?
6    A.   Yes.
7    Q.   Just for the record, when did you have to move to Alabama
8    to enroll your children in school?
9    A.   When my oldest turned school age.
10   Q.   Which was what year?
11   A.   2017.
12   Q.   So before then, you were a permanent resident and citizen
13   of Alabama?
14   A.   Yes, sir.
15   Q.   And when that happened, would your husband meet you for
16   church from work?
17   A.   Yes.
18   Q.   He would take off for his lunch break?
19   A.   Yes.
20   Q.   Can't do that anymore?
21   A.   He works every third weekend, so on weekends he doesn't
22   work he is able to attend church with us, but on that third
23   weekend he is not able to because he can't make the drive back
24   and forth.  He was previously able to do that.
25   Q.   Mississippi is your home church?
```

1    A.   Yes.

2    Q.   Is that where you do the Christmas and Easter services?

3    A.   We did up until a few years back.  It just became too

4    much.

5    Q.   Do you still do events with the Mississippi church?

6    A.   Yes.  Our children were all baptized there.

7    Q.   What's been the expense to your family in terms of this

8    scenario that you are living under right now?

9    A.   Mortgage-wise, we could've saved up what I estimated was

10   approximately $200,000 in the last six years of living in

11   Alabama.  Just having to pay a mortgage versus not having to

12   pay one, that's not including the mileage and gas money to

13   drive each day to and from work for my husband and myself.  And

14   then, obviously, visiting family and friends over here.

15   Q.   Has Mississippi's vaccine regime, have you felt a coercive

16   of pressure to vaccinate your children to reenroll them in

17   Mississippi?

18   A.   Yes.

19   Q.   And would you agree that Mississippi has burdened your

20   religious exercise by putting you to the choice of literally

21   having to move out of the state?

22            **MR. SHANNON:**  Object to the leading, Your Honor.

23            **THE COURT:**  Let's rephrase the question.

24            **MR. WIEST:**  Certainly, Your Honor.

25   **BY MR. WIEST:**

1   Q.  Did you feel coerced to have to move out of the state

2   because of the vaccine regime?

3   A.  Yes.

4   Q.  And the alternative to that would be vaccinating your

5   children?

6   A.  Yes.

7   Q.  And you weren't going to do that, why?

8   A.  I have prayed about this subject for multiple years, and I

9   have -- I apologize.  I have been so convicted to not despite

10  the trials and tribulations that it's caused our family.

11  Q.  Ma'am, are you aware of anyone else besides your family

12  that's in this situation?

13  A.  Yes.

14  Q.  How many other folks are in the same situation?

15  A.  Multiple.

16  Q.  Some of whom are sitting in the audience?

17  A.  Yes.  Too many to name.

18          **MR. WIEST:**  Nothing further, Your Honor.

19          **THE COURT:**  Counsel, any cross-examination?

20          **MR. SHANNON:**  No, Your Honor.  We would reserve any

21  questions at this time for this witness.

22          **THE COURT:**  Any cross?

23          **MR. BENTLEY:**  No, Your Honor.

24          **THE COURT:**  All right.  Can she be excused or is she

25  subject to recall?

 1              **MR. WIEST:**  Excused from our perspective, Your Honor.

 2              **MR. SHANNON:**  She may be excused, Your Honor.

 3              **MR. BENTLEY:**  Excused is fine, Your Honor.

 4              **THE COURT:**  Ma'am, you are excused.  You may step

 5    down.  That means you can remain in the courtroom, all right?

 6              **WITNESS:**  Thank you.

 7              **THE COURT:**  Who is next?

 8              **MR. MOLLER:**  We'd like to call Pastor Paul Perkins,

 9    Your Honor.

10              **THE COURT:**  All right, let's bring him in.

11         Sir, if you would, please, come up here in the front.

12    Come up here, place your left hand on the Bible here, raise

13    your right hand and face the clerk and take the oath.

14         (Oath Administered)

15              **THE COURT:**  If you would, sir, please have a seat in

16    the witness box.  You will see a microphone there in front of

17    you.  I need you to speak into it and speak slowly so the court

18    reporter can type down everything you're saying.  She can't

19    type two people talking at once, so you have to let the lawyers

20    finish talking before you start answering.  Also, she cannot

21    type shakes or nods of the head or an uh-huh or nuh-uh, so you

22    must verbalize all answers yes or no; do you understand that,

23    sir?

24              **THE WITNESS:**  Yes, sir.

25              **THE COURT:**  Please state your full name for the court

1    reporter.

2              **WITNESS:**  Paul Matthew Perkins.

3              **THE COURT:**  Whenever you're ready, counsel.

4                        **PAUL PERKINS,**

5    **having first been duly sworn, testified as follows:**

6                     **DIRECT EXAMINATION**

7    **BY MR. MOLLER:**

8    Q.  Pastor Perkins, where do you currently live?

9    A.  Vancleave, Mississippi.

10   Q.  And who lives there with you?

11   A.  My wife and two of our children.

12   Q.  And what are the ages of your children?

13   A.  We have five children, 27, 25, 22 and 18 and 10.

14   Q.  Is your 18 year old in school?

15   A.  He is in a gap year right now.  He will be going to

16   college this fall.

17   Q.  And what grade is your ten year old in?

18   A.  Fifth grade.

19   Q.  And where does she attend school?

20   A.  She is homeschooled.

21   Q.  Where were you born and raised?

22   A.  I was born in Warsaw, Indiana, and raised in the

23   northeast, I went to college in Boston, moved to Ocean Springs

24   in 1989.

25   Q.  And have you been in Mississippi since 1989?

1    A.   From '95 we surrendered to be missionaries.  So from 1997

2    until 2007, we lived in the Philippines.

3    Q.   And when did you come back to Mississippi?

4    A.   In February of 2007.  And we came back, and then I became

5    the pastor of Grace Baptist Church in August of 2007, so that's

6    when it was more permanent.

7    Q.   Where is Grace Baptist Church?

8    A.   Ocean Springs.

9    Q.   Ocean Springs.  And can you describe how you came back and

10   became the pastor at Grace Baptist?

11   A.   We had served at the church and youth ministries and music

12   ministries and then became missionaries.  We came home after

13   Hurricane Katrina.  It had affected our support level, and we

14   needed to check on family and see how things were here and then

15   replace some of the support that we had lost.

16   Q.   And you mentioned Grace Baptist school.  Is that a

17   Christian school?

18   A.   Yes, Grace Baptist Academy is a ministry of our church,

19   Grace Baptist Church.  It's located on the same property.

20   Q.   On the same property.  What's your day-to-day role at

21   Grace Baptist?

22   A.   I am the headmaster and I teach two classes.

23   Q.   Does your wife work?

24   A.   My wife homeschools our daughter, and she helps to take

25   care of her mom who just came out of a rehab, and also with my

```
 1   mom who is in stage 4 or 5 Parkinson's.  She takes care of some
 2   of the elderly folks in our church helping different needs that
 3   they have.  Sometimes they will call her in moments of anxiety.
 4   And one of our elder senior saints, Mr. Al, who just lost his
 5   wife, he'll work himself into high blood pressure, heart rate
 6   going up.  So my wife may talk to him for an hour.  So she is
 7   not in a paid position, but she does work.  She is the church
 8   pianist, helps teach in classes and stays pretty busy.
 9   Q.  Understood.  Your daughter, where do most of her friends
10   attend school?
11   A.  Most of her friends either attend school at Grace Baptist
12   Academy or are homeschooled, and they all go to church
13   together.
14   Q.  And would you say she interacts with them pretty regular?
15   A.  Yes.
16   Q.  What religion do you belong to?
17   A.  Christian.
18   Q.  What denomination?
19   A.  Baptist.
20   Q.  And how long have you been a Christian?
21   A.  I became a Christian in July of 1979.
22   Q.  Would you say religious beliefs are an essential part of
23   your life?
24   A.  Yes, sir.
25   Q.  How do your religious beliefs impact your life on a
```

1   day-to-day basis?

2   A.   We try to live in following what the Bible would teach us,

3   so simple things such as seeking the Lord early, spending time

4   in devotional Bible reading prayer times.  And then, of course,

5   being a pastor, it involves my trips to the hospital.  Saturday

6   morning one of our senior saints passed away at Ocean Springs

7   Hospital.  So I get a phone call, and family has been called

8   in, so it might be something to that extent.  It might be

9   counseling families, being in their homes.  We are involved in

10   a lot of different ministries of the church, sometimes it's at

11   George County jail.  But overall, how we live, how we treat

12   people, respect others.  We try to follow the teachings that we

13   learn from the Bible.

14   Q.   And do your religious beliefs inform how you educate your

15   children?

16   A.   Yes, sir.

17   Q.   And how you run Grace Baptist Academy?

18   A.   Yes, sir.  We want to obviously teach math and sciences

19   and history and all, but we want to teach it with a God world

20   view.  Obviously, we believe that God created from scripture.

21   And, of course, we teach the evolution and the other things,

22   but we want our children to understand they're created in the

23   image of God and he has a plan for their lives.

24   Q.   It's our understanding that the Attorney General is not

25   going to be questioned in the sincerity of your religious

1    beliefs with regard to vaccination.  But I do want to ask, do

2    your religious beliefs prohibit you from vaccinating your

3    children?

4    A.  Yes, sir.

5    Q.  Does your wife share those religious objections?

6    A.  Yes, she does.

7    Q.  Do you have religious objections to all vaccines or just

8    to some vaccines?

9    A.  To all.

10   Q.  Why is your daughter not enrolled at Grace Baptist

11   Academy?

12   A.  Because of the Mississippi State vaccine requirements.

13   Q.  Would you say that Mississippi's vaccination requirements

14   are substantially burdening your religious beliefs?

15            **MR. SHANNON:**  Object to the leading, Your Honor.

16            **THE COURT:**  Let's rephrase the question, counsel.

17   **BY MR. MOLLER:**

18   Q.  Are your religious beliefs burdened by that vaccination

19   law?

20   A.  Yes, sir.

21   Q.  Do you feel coerced by the state to abandon your religious

22   beliefs against vaccinations?

23   A.  Yes, sir.

24   Q.  Has the state's vaccination laws created tension between

25   your educational mission as the headmaster of Grace Baptist

1    Academy in upholding your religious beliefs?

2    A.  Yes, sir.

3    Q.  How so?

4    A.  We have families that would desire to put their children

5    in a Christian school, Christian environment.  And when we are

6    asked, where do you stand with immunizations and vaccines and

7    such, we have to tell them that we are following the

8    Mississippi State requirements.  And so if a child enrolls,

9    they have to bring an immunization record with them.  And

10   parents who are not in agreement with that, will walk away and

11   not put their children in our school.

12   Q.  So families in Mississippi have attempted -- with

13   unvaccinated children have wanted to enroll at Grace Baptist,

14   but you had to turn them away?

15   A.  Yes, sir.

16   Q.  Sir, I want to just briefly discuss the impacts the

17   mandatory vaccination laws have on your family.  Can you please

18   explain how it's affecting your family?

19   A.  Because of being involved in ministry, our lives are

20   hectic at times, often.  And so my daughter, Tessa, is a little

21   behind in her math and her homeschooling.  My wife, this past

22   week, for example, spent overnight with her mom at the CRC in

23   Singing River Hospital in Pascagoula.  And so she was out of

24   the home for a couple of days last week, and so we have to try

25   to figure out how to get classes together, when to do that.

1   Some of her classes were at the hospital, and that's not the
2   greatest setting, but trying to do that.
3         For my wife, she has wanted to be a doula and began to
4   study that with a midwife friend of hers, but having to
5   homeschool kind of curtailed that thought for her in her life.
6   And then myself, I have a Christian school that I teach in, I
7   participate in it.  And I can't enroll my daughter in that
8   school because of these requirements.
9   Q.  And would your daughter enroll in this school if she was
10  able to obtain a religious exemption?
11  A.  Yes, sir.  She wants to be there.
12  Q.  She wants to be there.  And you mentioned your son is
13  going to college in Indiana; is that correct?
14  A.  Yes, sir, he is, in the fall.
15  Q.  Did he consider furthering his studies in Mississippi?
16  A.  Yes, sir.  I had a pastor friend that sent me an email
17  that Mississippi College was offering scholarships to Baptist
18  preachers' kids if they could enroll by January of '23.  But
19  because of the vaccine requirements I knew that they would
20  have, we did not accept that scholarship that would've been
21  very beneficial for our family.  So we'll be paying for college
22  in Indiana.
23  Q.  Does he share similar religious beliefs as you and the
24  rest of your family against vaccinations?
25  A.  Yes, sir.

1    Q.   When did you become the headmaster of Grace Baptist?

2    A.   2007.

3    Q.   Anytime since you have been the headmaster there, have

4    unvaccinated children ever been enrolled at this school?

5    A.   Yes, sir.   When I first arrived, I didn't think about it

6    or research it, I just accepted the flow of what was going on

7    in the school when I arrived.   So we didn't ask about

8    immunization records when students would come, and then I had a

9    pastor friend in Gulfport say, hey --

10          **MR. SHANNON:**   Object to the hearsay, Your Honor, move

11   to strike.

12          **THE COURT:**   I'll sustain.   See if you can rephrase

13   the question.

14   **BY MR. MOLLER:**

15   Q.   Can you describe the situation of when children were

16   enrolled and you had to disenroll them without speculating

17   about their beliefs?

18   A.   When we learned the law, we met with the parents of the

19   school and said, we have not been asking about immunization

20   records, the law says that we are required, we will be in the

21   future, and so if you choose not to be a part of that, then

22   we'll have to not allow you to come back to the school.

23   Q.   And did you have to kick children out of the school?

24   A.   Yes, sir.   There were students that did not come back.

25   One family moved to Florida, the others chose to homeschool.

1    Q.   And are there any unvaccinated children enrolled at Grace

2    Baptist now?

3    A.   No, sir.

4    Q.   And why is that?

5    A.   Because of the Mississippi state law.

6    Q.   You understand that because you are the headmaster of

7    Grace Baptist school, the Attorney General and her prosecutor

8    can subject you to criminal prosecution?

9              **MR. SHANNON:**  Objection, leading, lack of foundation.

10   **BY MR. MOLLER:**

11   Q.   You understand if you violate Mississippi's Compulsory

12   Vaccination Law in your role as the headmaster, that you could

13   be subjected to criminal prosecution?

14   A.   Yes, sir.

15   Q.   Did the possibility of prosecution by the State of

16   Mississippi factor into your decision to remove your

17   unvaccinated children from school?

18   A.   Yes, sir.

19   Q.   Can you state it louder for the record?

20   A.   Yes, sir.

21   Q.   How many children are enrolled at Grace Baptist right now?

22   A.   I believe it's 45 right now.

23   Q.   And you described a situation where children had to

24   disenroll from the school, how many was that?

25   A.   Either nine or ten.  I'd have to go back and look.

1     Q.   Forty-five, has that number stayed relatively constant

2     around that number, forty-five?

3     A.   It's up and down.

4     Q.   At the time that ten left the school, how many would you

5     estimate were total in the school?

6     A.   Probably 50, between 50 and 60 then.

7     Q.   So it was a significant number of children that left?

8     A.   Yes, sir.

9     Q.   Other than your daughter, are there other unvaccinated

10    children you are aware of who would like to enroll at Grace

11    Baptist school right now?

12    A.   Yes, sir.

13    Q.   And do these families have religious beliefs that preclude

14    them from vaccinating their children?

15    A.   Yes, sir.

16    Q.   If a religious exemption were available in Mississippi,

17    have any of them told you that they would like to enroll their

18    children at Grace Baptist?

19              **MR. SHANNON:**  Objection, hearsay.

20              **THE COURT:**  Sustained.  See if you can rephrase it,

21    counsel.

22              **MR. MOLLER:**  Yes, sir.

23    BY MR. MOLLER:

24    Q.   Are you aware of families with unvaccinated children that

25    would enroll at Grace Baptist Academy?

1   A.  Yes, sir.

2   Q.  And they would seek the religious exemption if one were

3   available?

4   A.  Yes, sir.

5              MR. MOLLER:  That's all I have, Your Honor.

6              THE COURT:  Any cross-examination?

7              MR. SHANNON:  Your Honor, we would reserve our

8   questions for this witness at this time.

9              THE COURT:  Counsel?

10             MR. BENTLEY:  No cross, Your Honor.

11             THE COURT:  Do you want him -- is he allowed to

12  remain in the courtroom if you are reserving your questions?  I

13  guess I should've asked this earlier.  You excused the previous

14  witness, so I assume that means you aren't concerned --

15             MR. SHANNON:  I think with regard to this witness, we

16  prefer that he remain excluded.

17             THE COURT:  All right.  Sir, you can step down, but I

18  will ask that you please remain outside the courtroom in case

19  you are called again by the defense.

20        Who would be the next witness for the plaintiffs?

21             MR. SIRI:  Next witness, Your Honor, would be Brandi

22  Renfroe.

23             THE COURT:  We'll have her come in.

24        Ma'am, if you will come up to the front here.  If you

25  would, please, come here, place your left hand on the Bible,

1    raise your right hand and take the oath.

2        (Oath Administered)

3            **THE COURT:**  Please have a seat in the witness box.

4    You will see a microphone there in front of you.  I need you to

5    speak into it and speak slowly so the court reporter can type

6    down everything you're saying.  She cannot type two people

7    talking at once, so you have to let the lawyers finish talking

8    before you start answering.  She also cannot type a shake or a

9    nod of the head or an uh-huh or nuh-uh, so you must verbalize

10   all answers yes or no, do you understand that, ma'am?

11           **WITNESS:**  Yes, sir.

12           **THE COURT:**  Please begin by stating your full name

13   for the court reporter.

14           **WITNESS:**  My name is Brandi Senseney Renfroe.

15           **THE COURT:**  Counsel, whenever you're ready.

16          **MR. SIRI:**  Thank you, Your Honor.

17                        **BRANDI RENFROE,**

18   **having first been duly sworn, testified as follows:**

19                     **DIRECT EXAMINATION**

20   BY MR. SIRI:

21   Q.  Good morning, Ms. Renfroe.

22   A.  Good morning.

23   Q.  Where do you currently live?

24   A.  In Grand Bay, Alabama.

25   Q.  And are you married?

1    A.  I am married.

2    Q.  Do you have children?

3    A.  I do.

4    Q.  How many?

5    A.  Two.

6    Q.  And what are their ages and grade levels?

7    A.  Their ages are 11 and 9, and they are in the fourth and

8    fifth grades.

9    Q.  I am going to ask you a few questions about your ties to

10   Mississippi for a minute.  Where were you born and raised?

11   A.  I was born and raised in Ocean Springs, Mississippi.

12   Q.  And were you raised going to church in Mississippi?

13   A.  I was.

14   Q.  What church did you go to?

15   A.  St. Alphonsus Catholic Church.

16   Q.  Did other members of your family go there?

17   A.  Yes, all.

18   Q.  Everybody?

19   A.  Everybody.

20   Q.  Do you still go to that church?

21   A.  I do.

22   Q.  You are currently living in Grand Bay, Alabama, you said.

23   How far over the border in Alabama do you live from

24   Mississippi?

25   A.  I live just a few minutes over the state line.

1    Q.   And where do you currently work?

2    A.   I work in Mississippi.

3    Q.   And what do you do?

4    A.   I am a court reporter.

5    Q.   And where does your husband work?

6    A.   He works in Mississippi, also, Bay St. Louis, Mississippi.

7    Q.   And what does he do?

8    A.   He is a realtor.

9    Q.   Presumably, you and your husband have to commute into

10   Mississippi every day and back; right?

11   A.   That's correct.

12   Q.   Where are all your husband's and family friends?

13   A.   All in Mississippi.  All the families are in Mississippi

14   for both of us.

15   Q.   And all of your children's friends?

16   A.   That is correct.

17   Q.   Also in Mississippi?

18   A.   Yes, also Mississippi.

19   Q.   If you didn't have to move to Alabama, would your commute

20   to work be shorter?

21   A.   Yes, significantly.

22   Q.   And your husband's commute to work?

23   A.   Yes, also significantly.

24   Q.   How about the commute to go see your family and friends?

25   A.   Yes, it is definitely longer.

1    Q.   Has the fact that you live in Alabama made it so that you

2    missed out on opportunities to be able to see family and

3    friends?

4    A.   A lot.  A lot.

5    Q.   Is that true for your children as well?

6    A.   Yes, it is.  It's too far to just swing by and have a

7    playdate or visit with family a lot of times.

8    Q.   And none of your family is in Alabama; correct?

9    A.   No.

10   Q.   Everybody is in Mississippi?

11   A.   Everyone is in Mississippi.

12   Q.   And why do you live in Alabama?

13   A.   Because we do not have an option for a religious exception

14   in Mississippi.

15   Q.   When you say not an option for religious exemption, do you

16   mean to attend school in Mississippi?

17   A.   That is correct.

18   Q.   In Alabama, your children, you said, attended school.  Do

19   they attend school with a religious exemption to vaccination?

20   A.   They do.

21   Q.   Can you apply for a religious exemption in Alabama?

22   A.   Yes, I did.

23   Q.   Was it a process for obtaining that exemption?

24   A.   There was a process for obtaining it.

25   Q.   And you were approved?

1   A.   Yes, I was.

2   Q.   Can you tell me any of the things that your children do in

3   Mississippi even though they live in Alabama?

4   A.   Yes.  They are both on Mississippi baseball teams, both of

5   them.  One is on, actually, two baseball teams in Mississippi,

6   league and travel ball.  They are both on travel ball in

7   Mississippi, so...

8   Q.   And the baseball season, how long is that?

9   A.   It starts in August, and we have a little break over the

10  holidays, and then spring picks up, and it probably ends around

11  the end of June.

12  Q.   So nine months out of the year?

13  A.   Or longer.

14  Q.   Or longer.  How many days per week on average during the

15  nine months of the baseball season do your children travel into

16  Mississippi to play in the baseball league or in one of the

17  baseball activities?

18  A.   Between both of them, it's almost daily.

19  Q.   So pretty much every day one of your children is coming to

20  Mississippi to play baseball?

21  A.   Yes.

22  Q.   Other than coming to Mississippi to play baseball -- let

23  me ask you this:  And when they do that, I assume they are

24  interacting with other children in Mississippi?

25  A.   Yes.

1    Q.   And those children, to your knowledge, are they typically

2    children who live in Mississippi?

3    A.   Yes, they all live in Mississippi.   These are Mississippi

4    baseball teams.

5    Q.   And other than coming into Mississippi for baseball, do

6    your children come into Mississippi to engage in any other

7    activities?

8    A.   Yes, to visit with family and friends.   And we go fishing

9    in Mississippi, boating.   We're members of the yacht club in

10   Pascagoula, Mississippi, so we're over there often, especially

11   during the summer, boating, playing tennis, swimming, fishing

12   off the piers.

13   Q.   How often do you go to the yacht club during the course of

14   the year?

15   A.   Several times a week, including the weekends.

16   Q.   All year long?

17   A.   More in the summer.

18   Q.   And do they play with other children at the yacht club?

19   A.   Yes.   Most of their friends are at the yacht club.

20   Q.   How about holidays with family, do you come to Mississippi

21   to spend time in Mississippi with family?

22   A.   Every holiday.

23   Q.   And how big is your family?

24   A.   My dad is one of ten and my mom was one of six, and

25   cousins and -- there are a lot.   We have a big family.

1    Q.  Most of them still in Mississippi?

2    A.  Yes.

3    Q.  So when you have these family gatherings, it sounds like

4    there would be a lot of kids running around?

5    A.  Yes.

6    Q.  And your kids play with all the other kids?

7    A.  Yes.

8    Q.  Their cousins, effectively?

9    A.  Right, correct.

10   Q.  And you mentioned earlier you attend church in Mississippi

11   still?

12   A.  That's correct.

13   Q.  And you come with your husband and your kids to church?

14   A.  Yes.

15   Q.  How about anything else like just normal routine affairs

16   like haircuts and so forth, do you do those in Alabama or do

17   you still come to Mississippi for those?

18   A.  We do those in Mississippi.  We come over to eat, we come

19   over to hang with the friends and do activities in Mississippi.

20   Q.  So when did you move to Alabama?

21   A.  We moved to Alabama when my oldest was five, and he is 11

22   now.

23   Q.  So about six years ago, okay.  And before you moved to

24   Alabama, I guess it was during preschool, did your children

25   attend school anywhere?

1   A.   Preschool, they attended in Grand Bay, Alabama, but we

2   lived in Mississippi because it was a private school, and we

3   drove them daily for a year and a half to preschool.

4   Q.   How long is that drive?

5   A.   40 minutes.

6   Q.   Each way?

7   A.   Each way.

8   Q.   So for about a year and a half you drove 40 minutes each

9   way from Mississippi to Alabama to put your children in

10  preschool?

11  A.   That's correct, so they could have the experience of

12  preschool.

13  Q.   And they weren't able to attend preschool in Mississippi,

14  was that because they didn't receive the vaccines that are

15  required?

16  A.   That's correct.  We were denied.

17  Q.   When you think of home, where do you think of home?   In

18  your mind when you think of home, where do you think of?

19  A.   Home is Mississippi.

20  Q.   Do you own a house in Mississippi?

21  A.   Yes, we do.

22  Q.   Is that the house you think of when you think of home?

23  A.   That would be our home if we could live in Mississippi.

24  Q.   Do you spend summers there?

25  A.   We do.

1    Q.   Holidays?

2    A.   All holidays.

3    Q.   Important family events, is that where you have those?

4    A.   Birthdays.

5    Q.   And when your kids think of home, where do they think home

6    -- where do they think of home?

7    A.   Mississippi.

8    Q.   And your husband?

9    A.   Mississippi, definitely.

10   Q.   What state is your driver's license from?

11   A.   Mississippi.

12   Q.   And what city are you registered to vote in?

13   A.   Mississippi.

14   Q.   If your children were permitted to attend school with a

15   religious exemption for the mandate of vaccines, would you

16   return to Mississippi?

17   A.   Absolutely.

18   Q.   What religion do you associate with?

19   A.   Catholicism.

20   Q.   How long would you say you have been a practicing

21   Catholic?

22   A.   Since I was born.  I was baptized into the Catholic church

23   at St. Alphonsus.

24   Q.   Did you have religious education of any kind, like a

25   Sunday school?

1   A.   Yes, we had CCD every Sunday.   I attended that from first

2   grade through 12th grade.

3   Q.   And where did you receive your first reconciliation,

4   communion, confirmation?

5   A.   At St. Alphonsus Catholic Church in Ocean Springs.

6   Q.   What about your children?

7   A.   Same, they have both received -- they were both baptized

8   in the church at St. Alphonsus, and they have both received

9   their first reconciliation and first communion at St.

10  Alphonsus?

11  Q.   Would it be fair to say that your religious beliefs are a

12  central part of your daily life?

13  A.   Absolutely.

14  Q.   Does it dictate how your daily and weekly habits in terms

15  of what you do and what you think?

16  A.   Yes.

17  Q.   Does it guide how you raise your family?

18  A.   It absolutely does.

19  Q.   Do you engage in any type of daily prayers?

20  A.   I do.

21  Q.   Could you describe some of those?

22  A.   Sure.   When I am driving, I like to say the rosary daily.

23  I pray with my kids.   We pray before games or big events, or if

24  they have a test, and before they leave for school we'll say a

25  small prayer, and then we pray at night before they go to bed.

1    Q.   So is the prayer a daily event in your house?

2    A.   Yes, it is.

3    Q.   So it's every evening.   Is it every morning, too?

4    A.   Sometimes.   Like I said, if they have a test at school or

5    something going on, we may say a prayer before they head out

6    the door.

7    Q.   Do your children pray as well?

8    A.   Yes, they do.

9    Q.   Do they ever ask you to pray on anything?

10   A.   Yes.   As a matter of fact, my son came to me this morning

11   and asked me to pray.

12   Q.   Is there any type of religious symbols or items in your

13   home?

14   A.   Yes, we have -- I have several crosses in the home all

15   over.   I have Mary statues inside and in the garden.   I have

16   the "Our Father" prayer, each of my grandmother's "Our Father"

17   plates displayed.

18   Q.   And I assume you -- I am assuming you observe Lent, Easter

19   and Christmas and all the other --

20   A.   Yes, we observe all that.

21   Q.   Have you been a member of any type of religious groups?

22   A.   I am currently in a rosary prayer group that I have been

23   in since 2002, local ladies along the Gulf Coast.   We get

24   together.

25   Q.   And what do you do in this group?

1    A.   We get together and we pray for anything that needs to be

2    prayed for.   And we always end with saying the rosary for those

3    that we pray for, things that we need to pray.

4    Q.   Can you please explain some of the harms that you believe

5    have resulted from your children not being able to attend

6    school in Mississippi?

7    A.   Well, they have missed out tremendously on things that

8    their friends get to do.   As they're getting older now, they're

9    recognizing these issues and they get upset about it.   So their

10   friends had spring break, a different spring break than ours

11   and couldn't do the things they wanted to do with them when all

12   the friends were getting together, and they recognize this now.

13   It's upsetting for them.   So we just miss out on a lot.   We

14   can't just swing by for a minute and hang out and play like we

15   used to do.   It's a process.   And more than likely, we can't do

16   it.   It's just -- it's too much.   It's too far to run by

17   someplace.   But we used to live in the middle of everything

18   where you could run here, run there.   It's not like that

19   anymore, and we don't have the friends and the family and

20   connections over there like we do in Mississippi, so that's why

21   we basically sleep and go to school in Alabama and everything

22   else is in Mississippi.

23   Q.   Lost time with family because you have had to move to

24   Alabama?

25   A.   Absolutely we have lost time.   We used to spend a lot of

1  time -- people just stopping by.  We have a really big family,

2  a very close family, and we have not been able to have that.

3  It would go from living in Mississippi, we would see our

4  parents every couple days, at least, to maybe every couple

5  weeks now or three weeks.  And we just lost a lot of good time

6  when we had to move.  We have lost that and we can't get that

7  back.

8  Q.   The defendants here have agreed not to -- they're not

9  contesting sincerely the nature of your religious beliefs that

10  are contrary to the practice of immunization.  But I will just

11  ask, is it because of the sincere nature of your beliefs and

12  your religious beliefs contrary to vaccination that you have

13  endured all the hardships you have just described?

14  A.   Yes, that is correct.

15  Q.   But for your religious beliefs with regards to

16  vaccination, would you otherwise be able to meet the

17  requirements of Mississippi and attend -- your children to

18  attend school here?

19  A.   Yes.

20  Q.   But based on the mandatory vaccine statute in Mississippi,

21  you can't enroll your children in Mississippi; correct?

22  A.   That is correct.

23  Q.   Has Mississippi's vaccination requirements burdened your

24  religious exercise by forcing you to choose between residing

25  and educating your children in the state or undertaken

1    vaccination that's inconsistent with your beliefs?

2    A.  Yes.

3    Q.  Does Mississippi's vaccination requirement, if you

4    complied with them, substantially burden your religious

5    beliefs?

6    A.  Yes.

7    Q.  If it came to it, would you go to prison before

8    vaccinating your children?

9    A.  Of course.

10   Q.  Ms. Renfroe, if Mississippi had a vaccination -- had a

11   religious exemption to the vaccination requirements here in the

12   state, would you immediately bring your family back and enroll

13   your children in school in Mississippi?

14   A.  Yes, immediately, I would.

15           **MR. SIRI:**  Your Honor, I have a number of exhibits

16   I'd like to show the witness.

17           **THE COURT:**  All right, you may approach.  I assume

18   counsel for defense has seen these?

19           **MR. SHANNON:**  Your Honor, the plaintiffs' counsel has

20   provided us with a binder with three exhibits in it.  I assume

21   that's what he is referencing.

22           **MR. SIRI:**  Yes.

23           **THE COURT:**  Okay.

24   BY MR. SIRI:

25   Q.  Ms. Renfroe, have you visited the Mississippi Department

1  of Health's website?

2  A.  I have.

3  Q.  Can you please turn to tab 1 of the binder that's been

4  provided to you?

5  A.  Okay.

6  Q.  Have you seen this document before that is in tab 1 of the

7  binder?

8  A.  Yes, I have.

9  Q.  Would it be correct to say that this is the Mississippi

10  Department of Health's medical exemption form for the vaccine

11  mandate for kindergarten through 12th grade that is available

12  on the Mississippi Department of Health's website?

13  A.  Yes, it is.

14  Q.  In looking through the Department of Health's website and

15  otherwise, to your knowledge, are you aware of any religious

16  exemption form that exists to the vaccine requirements in the

17  State of Mississippi?

18  A.  No, there is not one.

19  Q.  Anything at all similar for this exemption form that they

20  have for medical exemptions that they might have for religious

21  exemptions?

22  A.  None.

23  Q.  Can you please turn to tab 2 of the binder?

24         **THE COURT:**  Let me ask, counsel, are you offering

25  these in evidence or are these just for identification?

1          **MR. SIRI:**  I was going to offer them at the end, Your

2     Honor.

3               **THE COURT:**  Go ahead.

4     **BY MR. SIRI:**

5     Q.   Similarly, Ms. Renfroe, turning to tab 2, have you seen

6     this web printout of a web page before from the Mississippi

7     Department of Health website?

8     A.   Yes, I have.

9     Q.   And is it correct -- would it be correct to say that this

10    is a printout of the Department of Health's website which

11    reflects the available medical exemption process to the vaccine

12    mandates in Mississippi for kindergarten through 12th grade

13    education?

14    A.   Yes, it is.

15    Q.   Have you ever seen anything on the Mississippi Department

16    of Health website that provides for any type of exemption

17    process for religious reasons?

18    A.   No, I have not.

19    Q.   Can you please turn to the third page of Exhibit 2.  Do

20    you see the bold text, black bolded text on that page?

21    A.   Yes.

22    Q.   Have you seen that?  It's on tab 2, the third page.  Let

23    me know when you found it.

24    A.   Yes, I'm there.

25    Q.   Great.  Do you see the black bolded text right there?

1    A.   I do.

2    Q.   Have you ever seen that language before?

3    A.   Yes, I have.

4    Q.   Can you please read that out loud?

5    A.   Yes.

6         **THE COURT:**  Let me stop you.  Technically, if it's

7    not in evidence you shouldn't be reading from it.  So do you

8    want to --

9         **MR. SIRI:**  Thank you, Your Honor.  Your Honor, I

10   would like to move exhibits -- I'd like to move the documents

11   in this binder into evidence.  They are -- they all are

12   government documents from the Mississippi Department of

13   Health's website.  They are all government documents, and Your

14   Honor could take judicial notice of it.

15        **THE COURT:**  This is offered as P-1, 2 and 3 then; is

16   that right counsel?

17        **MR. SIRI:**  Yes, Your Honor.

18        **THE COURT:**  Any objection?

19        **MR. SHANNON:**  None from the Attorney General, Your

20   Honor.

21        **MR. BENTLEY:**  Your Honor, on behalf of Dr. Edney, we

22   don't have any objections.  I agree that these are all taken

23   from the Department of Health's website and they are publicly

24   available documents.

25        **THE COURT:**  All right.  Based on that, the Court will

1    admit them.  P-1, 2 and 3 are admitted.  Does the deputy clerk

2    have originals of these, counsel?

3                   **MR. SIRI:**  No, Your Honor.

4                   **THE COURT:**  Present her with the originals so she can

5    mark and admit them and then you may proceed.

6                   **MR. SIRI:**  May I approach, Your Honor?

7                   **THE COURT:**  Yes.

8         (EXHIBITS P1, 2 AND 3 MARKED)

9    **BY MR. SIRI:**

10   Q.  Ms. Renfroe, can you kindly read the bolded text on the

11   third page of what's been marked as P-2?

12   A.  Yes.  "Exemption from required immunizations for

13   religious, philosophical or conscientious reasons is not

14   allowed under Mississippi law."

15   Q.  Thank you.  Ms. Renfroe, could you kindly turn to the

16   third tab which has been marked P-3?

17   A.  Okay.

18   Q.  Have you seen this document before?

19   A.  Yes, I have.

20   Q.  Is it correct to state that this is a report that reflects

21   hundreds of medical exemptions that the State of Mississippi

22   has granted to the vaccine mandates for kindergarten through

23   12th grade education in Mississippi?

24   A.  Yes, it does.

25   Q.  Does this report, to your knowledge, reflect any harm that

1   granting these secular exemptions for kindergarten through 12th

2   grade education has caused?

3           MR. SHANNON:  Objection to the extent it would call

4   for an expert opinion, Your Honor.

5           THE COURT:  Response?

6           MR. SIRI:  Your Honor, I asked to her knowledge.  I

7   am asking not about whether or not -- I am asking her whether

8   or not she is aware that the report itself evidences that there

9   is any harm that's been caused.  I think she has the ability to

10  assess that with looking at the report, Your Honor.

11          THE COURT:  Rephrase the question and be a little bit

12  more clear about that.

13          MR. SIRI:  Sure.

14  BY MR. SIRI:

15   Q.  Upon reviewing this report, Ms. Renfroe, did you see

16  anything in this report that reflected any harm that accrued

17  from granting these medical exemptions within the State of

18  Mississippi?

19          MR. SHANNON:  Objection, Your Honor.  The document

20  speaks for itself.

21          THE COURT:  Well, he is asking her about her review

22  of the document, so I will overrule it.  She can answer.

23   A.  I did not.

24  BY MR. SIRI:

25   Q.  But again, Mississippi does not permit a religious

1   exemption; correct?

2   A.   Correct, they do not.

3   Q.   Ms. Renfroe, are you aware of other families in

4   Mississippi that can't send their children to school because

5   they object to vaccination for religious reasons?

6   A.   Yes.

7   Q.   Are you involved with a group that seeks to restore

8   religious exemption to vaccination in Mississippi?

9   A.   I am.

10   Q.   How many families would you estimate are part of that

11   group?

12   A.   At least a couple hundred.

13   Q.   And these are all families that are in Mississippi or

14   would like to be in Mississippi to your knowledge?

15   A.   Yes, that's correct.

16   Q.   Do many of those families, based on your direct knowledge,

17   have sincerely held religious beliefs that prevent them from

18   vaccinating their children?

19   A.   Yes.

20        **MR. SHANNON:**  Objection, Your Honor, that would call

21   for speculation.

22        **THE COURT:**  Lay more of a foundation of how she would

23   know that answer to that question.

24        **MR. SIRI:**  Thank you, Your Honor.

25   **BY MR. SIRI:**

1    Q.   Have you had discussions with members of this group that

2    we have just been talking about?

3    A.   Yes.

4         **MR. SHANNON:**   Object to the extent he is getting into

5    hearsay, Your Honor.

6         **MR. SIRI:**   I didn't ask about the substance of the

7    communications, I just asked if she had communications, Your

8    Honor.

9         **THE COURT:**   Overruled.

10   A.   Yes, I have.

11   **BY MR. SIRI:**

12   Q.   And during -- and have you interacted with many of those

13   families over the course of the years?

14   A.   Yes, I have.

15   Q.   Over the course of how many years have you interacted with

16   the families that are members of this group that you described?

17   A.   Approximately ten years.

18   Q.   And through those interactions with the families that are

19   members of this group, have you come to have an understanding

20   -- during those discussions, did you discuss -- did the topic

21   of discussion involve religious beliefs?

22   A.   Yes.

23   Q.   Did the topics of discussion include your religious

24   beliefs?

25   A.   Yes.

1    Q.   As well as the religious beliefs of those families?

2    A.   That's correct.

3    Q.   Based on those ten years of interactions with members of

4    the group, is it your understanding that many members of this

5    group have religious beliefs that prevent them from vaccinating

6    their children?

7              MR. SHANNON:   Object to hearsay.

8              THE COURT:   Overruled.   He has laid an adequate

9    foundation in the Court's view.   You may answer the question.

10   A.   Yes.

11   BY MR. SIRI:

12   Q.   But they don't have a process for obtaining a religious

13   exemption to vaccination in Mississippi; correct?

14   A.   That's correct.

15   Q.   They are all in the same boat as you; correct?

16   A.   That's correct.

17             MR. SIRI:   Thank you, Ms. Renfroe.   Your Honor, I

18   have no further questions.

19             THE COURT:   Any questions from the defense?

20             MR. SHANNON:   We reserve our questions for her, Your

21   Honor.

22             MR. BENTLEY:   No questions, Your Honor.

23             THE COURT:   Same question, can she be excused and

24   remain in the courtroom or does she need to remain outside

25   subject to recall?

1         **MR. SHANNON:**  It's fine with us for her to remain in

2  the courtroom, Your Honor.

3         **THE COURT:**  Can she be excused, Mr. Siri?

4         **MR. SIRI:**  Yes, Your Honor.

5         **THE COURT:**  Ma'am, you're excused, you may step down.

6  You may remain in the courtroom.

7         **MR. WIEST:**  Your Honor, the plaintiffs have no more

8  witnesses and we rest our proof, obviously, subject to argument

9  on the motion.

10         **THE COURT:**  All right.  Does the Attorney General

11  have any evidence to offer?

12         **MR. SHANNON:**  No, Your Honor.

13         **THE COURT:**  How about Dr. Edney?

14         **MR. BENTLEY:**  No, Your Honor.

15         **THE COURT:**  Well, the Court would consider the record

16  closed in terms of the evidence.  I will certainly give you a

17  chance to argue.  How much time are you looking for to argue?

18  You have done a pretty good job briefing, I understand the

19  issues, but how much time would you like?

20         **MR. WIEST:**  Your Honor, 15 minutes each, we can do 10

21  and rebut in five.

22         **MR. SHANNON:**  I think 20 minutes would be adequate.

23         **MR. WIEST:**  No objection.

24         **THE COURT:**  Mr. Edney, or counsel?

25         **MR. BENTLEY:**  That's fine, Your Honor, 20.

1          **THE COURT:**  I'll give you 20 minutes each.  How much

2     do you want to reserve for your rebuttal?

3          **MR. WIEST:**  Five minutes, Your Honor.  Judge, we do

4     have Pastor Perkins out in the hall still.  We'd like to bring

5     him back in since the proof is closed.

6          **THE COURT:**  Yes, since the record is closed he is

7     finally excused.  He may return to the courtroom.

8        Let me ask before we get into argument, we have been going

9     about an hour, does anybody need a comfort break before we get

10    into that?  20 minutes each may take us about an hour.

11         **MR. WIEST:**  Five minutes will be fine for that, thank

12    you.

13         **THE COURT:**  Let's take a short five-minute break and

14    court will resume with closings at that time.

15         **(RECESS TAKEN AT 10:33 A.M. UNTIL 10:46 A.M.).**

16         **THE COURT:**  All right.  Back on the record.  Counsel,

17    you may proceed.  The way this works, the way I'll usually do

18    is I'll give you -- you have 15 minutes initially, I will give

19    you a five-minute warning and a one-minute warning that you

20    time is about up.  I am not going to cut you off in

21    mid-sentence, but that's your signal to start kind of wrapping

22    things up, okay?  You may proceed when you're ready.

23         **MR. WIEST:**  Your Honor, may it please the Court?

24         **THE COURT:**  Yes, sir.

25         **MR. WIEST:**  We are here this morning to argue the

1     issue of a preliminary injunction.  And based on the papers and

2     the submissions, I think when you look at the four factors, is

3     there substantial likelihood of success on the merits.  Your

4     Honor, there's no real dispute between the parties on that, nor

5     should there be.

6         Is there a substantial threat of irreparable injury if the

7     injunction is not issued.  Our reading of the papers indicates

8     that the Attorney General is contesting that.  I am going to

9     address that thoroughly in this argument.

10        And as to the remaining two factors, those merge,

11    particularly whereas here we have a constitutional violation.

12        Your Honor, and I am just going to briefly touch on the

13    nature of what we're seeking here.  We are seeking a mandatory

14    injunction.  We are requesting a religious exemption process.

15    And we're simply asking the State of Mississippi, and in

16    particular I suppose the Health Department -- I know we're

17    going to talk about, perhaps, whether the Attorney General is a

18    proper party or not.  Even if she's not, the Health Department

19    can create the form and the process and that would be fine with

20    us, too.  But we're looking for a process by which the

21    plaintiffs, and frankly everyone else whose constitutional

22    rights are being violated, which is a regular parent that has a

23    sincerely held religious belief against vaccination, that they

24    have a process just like Mississippi affords a medical process.

25    And you saw the exhibits that got entered today.  They have a

1    process for medical exemptions.  In fact, on the website they

2    have got the form, they talk about how it's available.  They

3    also talk about, by the way, that there is no religious

4    exemption that at least the Department of Health currently will

5    accept.

6         Briefly on the likelihood of success, Your Honor.  I think

7    it comes down to *Fulton vs. the City of Philadelphia*.  That's a

8    recent U.S. Supreme Court case where, effectively, the Supreme

9    Court said, look, a law is not generally applicable if it

10   invites the government to consider particular reasons for a

11   person's conduct by providing a mechanism for individualized

12   exemptions.  That's what we've got here.

13            **THE COURT:**  Slow down, counsel, so she can keep up

14   with you.

15            **MR. WIEST:**  Yes, Your Honor.  We have that here under

16   *Fulton*.  There is a mechanism for individualized secular

17   exemptions for medical reasons.  There is a form and there's a

18   process for it.  And because there is, that also requires a

19   religious process.  And the state has to afford the same

20   process to religious adherence that they afford to secular

21   individuals that are seeking a medical exemption.

22        I think when you look at, even back to *Employment Division*

23   *versus Smith*, the government, quote, may not refuse to extend

24   that exemption system in the cases of religious hardship

25   without a compelling reason.  And if the state can accommodate

1   medical exemptions, they can accommodate religious exemptions.

2   How many?  You saw in Exhibit 3 there's been over 400 that were

3   granted a medical exemption-wise in 2022 alone.

4       Because the Attorney General has contested the irreparable

5   harm here, Your Honor, I want to spend some time on that in

6   this argument.  And, really, there are three cases that I think

7   are primarily dispositive of the irreparable harm, two from the

8   Fifth Circuit and one from the United States Supreme Court, and

9   I wanted to focus in on those.

10       In *BST Holdings vs. Occupational Safety & Health*

11   *Administration*, that was a 2021 Fifth Circuit case.  The Fifth

12   Circuit acknowledged, quote, to substantially burden the

13   liberty interest of reluctant individual recipients put a

14   choice between their job and their jabs.  Well, here the choice

15   is between parents' ability to educate their children and take

16   advantage of the state educational system, publicly.  Or as was

17   the case with Pastor Perkins, even private schools are not

18   permitted to avoid vaccination.  Even private religious schools

19   cannot avoid this mandatory vaccination requirement even if, as

20   the case with Pastor Perkins, it substantially burdens the

21   religious belief.

22       So the same coercion that was present in *BST*, the same

23   coercion by the way, Your Honor, that the Fifth Circuit

24   addressed in 2022 in *U.S. Navy Seals 1-26 vs. Biden* where the

25   Fifth Circuit mentioned that the harm is irreparable or there's

 1    no adequate remedy at law.  And also acknowledged that the loss
 2    of First Amendment freedoms even for minimal periods of time
 3    unquestionably constitutes irreparable injury.  This principle
 4    applies with equal force to the First Amendment.
 5          And a base here as in *Navy Seals*, these plaintiffs are
 6    staring down even more than a choice between their job and
 7    their jabs, here it is their ability to educate their children
 8    in a public or private school setting in the State of
 9    Mississippi and their religious beliefs.  And that is
10    fundamentally coercion.
11          Finally, Your Honor, *Tandon vs. Newsom*, which was a U.S.
12    Supreme Court case in 2021 where the Supreme Court acknowledged
13    that First Amendment rights cannot be burdened even -- that
14    includes free exercise rights, for even minimal periods of
15    time.  Well, here, there has been a burdening of those rights
16    for substantial periods of time, and you heard some of that
17    with the three plaintiffs.
18          Your Honor, on the weighing of harms and public interests.
19    Again, those factors merge when the government, the opposing
20    party, that's the *Nken vs. Holder*, we cited that.  And the
21    injunction does not disserve the public interest where it
22    will, quote, prevent constitutional deprivations.  And that
23    comes right out of the Fifth Circuit decision in *Jackson*
24    *Women's Health Org. v. Currier*, that is a 2014 case that was
25    cited in our papers.

1          Your Honor, I did want to address the scope of the

2     injunction.  And I know we made a supplemental filing this

3     morning with an *en banc*, recent *en banc* decision out of the

4     Fifth Circuit in *Feds for Medical Freedom vs. Biden*.  There was

5     also a vaccine mandate case in the review of what, effectively,

6     was a national injunction that the Fifth Circuit ended up

7     upholding.  Now, we're not seeking a national injunction here,

8     we're seeking a one-state injunction.

9          Again, it's not fully in the F.4th because it's a very,

10    very recent case.  But in the Lexis citation in 48 to 49, the

11    Fifth Circuit is speaking about the scope of the injunction and

12    they're saying, look, if it causes confusion or it's going to

13    be difficult to enforce, you are perfectly within your right

14    and, frankly, you should extend the injunction to be broad

15    enough to afford a remedy to those that are injured.  And here,

16    the testimony that you have heard is that this injury extends

17    beyond the named plaintiffs.  If you're going to grant

18    injunctive relief for Ms. Renfroe or Dr. Stanley, well how

19    effectively do you do that if you don't extend it statewide?

20    How are they going to do that?  Are they going to bring in the

21    injunction papers to each school and say, please let us in

22    because our children are moving schools?

23          I think *Feds for Medical Freedom* stands for the

24    proposition that a statewide injunction is appropriate against

25    this law.  We're not asking to strike down the state mandatory

1   vaccination law.  We are asking that the Department of Health

2   and others acting in concert with it be required to offer a

3   medical exemption process just like they do -- I mean, a

4   religious exemption process just like they do a medical

5   exemption process.

6       This is the kind of case that the U.S. Supreme Court has

7   mentioned may well be a hybrid case under *Citizens United vs.*

8   *FEC*, under *John Doe 1 vs. Reed*, where this distinction between

9   as-applied and facial is a little blurred because this statute

10  as applied to anyone that's in these plaintiffs' shoes who have

11  a sincerely held religious belief against vaccination, which is

12  going to be substantially burdened because they can't enroll

13  their kids, is going to have the same relief.

14      In the absence of extending this injunction statewide and

15  requiring the defendants to adopt a process and accept a

16  religious exemption form is going to result in duplicitous

17  litigation or perhaps the amendment of the pleadings to allow

18  for a B2 class.  We don't believe that that was necessary,

19  that's why it's been plead the way it was.  But we're happy to

20  go back and take those steps if the Court feels we need to.  We

21  think the law is pretty clear that because this law is

22  unconstitutional as applied to any religious believer that has

23  their beliefs substantially burdened by this law and the

24  injunctive relief would be narrow in that we're not requiring

25  to actually grant religious exemptions, we're just requiring

1    the defendants to adopt a process that is going to have the

2    state accept those that this is a hybrid case.

3         We would prefer not to get into overbreadth, although

4    that's another route by which the Court could extend injunctive

5    relief, because if we get into overbreadth, you know, that

6    could require the invalidation of the whole law.  We're not

7    sure that that's necessarily a good idea.  Although here, there

8    are a number, substantial number of laws, applications that

9    would be unconstitutional under *United States vs. Stevens*,

10   particularly as to every single religious adherent, and we

11   heard that there's hundreds of them, that are going to be

12   affected and have been affected by this law.  And it's

13   unconstitutional as to all of them.

14        Again, I think you can reach the same result coming at

15   this two or three different ways, and it's the scope of the

16   injunction relief that we're asking, that there be a religious

17   exemption process, perhaps a form that is developed, and that

18   the defendants accept that just as they do medical exemptions.

19             **THE COURT:**  Got about five minutes, counsel.

20             **MR. WIEST:**  Yes, Your Honor.  I did want to allow for

21   questions by the Court in terms of the Attorney General being a

22   proper party.  I know that they have taken umbrage with that.

23   We would rely on our papers for that.  But just to note that

24   plainly Dr. Edney is a proper party, plainly the other

25   defendants are proper parties.  And even if the Attorney

1    General -- by the way, the Attorney General, as I understand

2    it, they are not arguing that they are not a proper party to

3    the case, they are arguing that they may not be a proper party

4    to the injunction because they don't have enough connection

5    with the enforcement of it under *Ex Parte Young*.  We have

6    briefed that extensively.  We'll rely on the papers.  At the

7    end of the day, from the plaintiffs' perspective, whether they

8    are in or out, the Attorney General herself, in terms of within

9    the -- is an enjoined party to the injunction, the result is

10   the same from our perspective.

11       Judge, I did want to reserve the rest of my time for any

12   questions the Court may have on the papers or anything else.

13           **THE COURT:**  Well, I think what I'm going to do is I

14   am going to wait until everybody is finished, and then I have

15   some questions I will pose for everybody to address.

16           **MR. WIEST:**  Absolutely.  With that Your Honor, I'll

17   just reserve the rest of the time for rebuttal.

18           **THE COURT:**  You have got about eight minutes total

19   left.

20           **MR. WIEST:**  Thank you.

21           **THE COURT:**  Counsel?

22           **MR. SHANNON:**  May it please the Court.

23           **THE COURT:**  Yes, sir.

24           **MR. SHANNON:**  Good morning, Your Honor.  Rex Shannon

25   with the Mississippi Attorney General's office.

1            **THE COURT:**  Good morning.  Your Honor, we filed a

2    brief and a supplemental brief in opposition to the plaintiffs'

3    motion for preliminary injunction.  We submit that the motion

4    should be denied because the four governing factors do not

5    support a preliminary injunction.  I am not going to belabor

6    those factors here today.  They have been fully briefed.

7            I would reiterate that we are not here to question the

8    sincerity of any of the plaintiffs' religious beliefs.  I

9    believe the plaintiffs' counsel has somewhat overstated the

10   Attorney General's position on irreparable harm.  Just to

11   clarify, the Attorney General respectfully maintains her

12   position that the school vaccination statute has to be

13   construed in conjunction with Mississippi's Religious Freedom

14   Restoration Act, Mississippi Code 11-61-1.  We believe that

15   when these statutes, the school vaccination statute and state

16   RFRA statute are read holistically, that the school vaccination

17   law does not violate the First Amendment because the RFRA

18   statute requires the State Health Department to offer a

19   religious exemption option to the plaintiffs.  The Attorney

20   General stands on those arguments in her prior briefing.  On

21   that basis, she respectfully submits that the motion for

22   preliminary injunction should be denied.

23           Moving on, Your Honor.  If the Court is inclined to grant

24   a preliminary injunction, the Attorney General submits that it

25   should be limited in scope to the named plaintiffs and directed

1    to the proper defendants.  Before I discuss the scope, I just

2    need to say a word about the distinction between facial and

3    as-applied challenges.  Your Honor, we don't believe the

4    plaintiffs have met the standard for a facial challenge here

5    today.  The cases before you should be viewed as an as-applied

6    challenge exclusively.  It's clear from the case law that the

7    overbreadth doctrine doesn't apply here.  The Supreme Court has

8    never applied it to First Amendment free exercise claims.  We

9    have cited the *Sabri* case in our brief to that effect.  So to

10   succeed in a facial attack, the case law is clear that the

11   plaintiffs have to either show no set of circumstances under

12   which the school vaccination statute would be valid or that the

13   statute lacks any plainly legitimate sweep.  They have not

14   shown either of those things here.

15       Your Honor, they state in their supplemental brief that

16   even if this court grants their request of injunction, it would

17   leave in place the ability to force the school vaccination

18   statute against families who are not asserting a religious

19   objection.  The plaintiffs have thus conceded that there are

20   circumstances in which the school vaccination statute is

21   constitutionally valid, that is it's valid as to the vast

22   majority of school children whose parents do not object to

23   vaccinating their children before enrolling them in school.

24       Additionally, Your Honor, the plaintiffs can't show that

25   the vaccination statute lacks any plainly legitimate sweep

1   here.  For many years, courts have recognized that states have

2   a compelling interest in preventing the spread of communicable

3   diseases through mandatory school vaccination statutes.  We

4   have cited the *Workman* case from the Fourth Circuit to that

5   effect in our brief.

6        Furthermore, Your Honor, the plaintiffs have not

7   established that the vaccination statute is facially

8   unconstitutional because, as I say, they don't account for the

9   effect of Mississippi's RFRA statute.  The RFRA statute

10  requires that they be provided with a religious exemption

11  option.  Your Honor, they simply don't meet the standard for a

12  facial challenge here in our view.  At best, what they could

13  establish here is an as-applied challenge.  At most, their

14  claim is that some defendants are not applying state law

15  consistent with the Attorney General's view of Mississippi's

16  RFRA statute, but that is an as-applied challenge, not a facial

17  challenge.

18       Furthermore, Your Honor, all of the harms that the

19  plaintiffs have sought to demonstrate are individualized harms

20  that are particular to the six named defendants.  That's

21  consistent with the statements they have attached to their

22  complaint which set out very unique individual harms.  It's

23  also consistent with the testimony that Your Honor has heard

24  today, all of which involve very specific unique harms to the

25  individual plaintiffs that testified today.  For all these

1    reasons, Your Honor, we submit that the Court should view this

2    as an as-applied challenge and not a facial challenge.

3           Turning now to the matter of scope.  Your Honor, if the

4    Court is inclined to grant a preliminary injunction, the

5    Attorney General submits that it should be limited in scope to

6    the named plaintiffs and directed to the proper defendants.  We

7    have set out a discussion of that in our supplemental briefing,

8    Your Honor, as a general rule, federal courts lack the

9    authority to enter so-called universal injunctions.  In our

10   supplemental brief, we've discussed all that, and we have cited

11   opinions by folks like Justice Thomas, Justice Gorsuch and

12   others who have outlined problems with universal injunctions in

13   some detail.  The gist of those authorities is that the law

14   already provides a mechanism for universal relief, and that is

15   at Rule 23 class action procedure.

16          In their rebuttal, Your Honor, the plaintiffs attempted to

17   distinguish some of those authorities by characterizing them as

18   applying only to nationwide injunctions.  But Your Honor, the

19   principles that we have invoked that underlie the theory there

20   in our supplemental brief apply to any universal injunction,

21   that is any injunction that extends relief beyond the parties

22   before the Court.

23          Your Honor, even setting aside the matter of universal

24   injunctions, it is settled law in Fifth Circuit that an

25   injunction should be no more burdensome to the defendants than

1    is necessary to provide complete relief to the plaintiffs.

2    That's the Fifth Circuit *Lion Health* case that we cited.  We

3    also cited the *Califano* and *Madsen* cases from the U.S. Supreme

4    Court.  Any preliminary injunction awarded in this case, Your

5    Honor, we submit should be limited to the named plaintiffs for

6    four reasons:  Briefly, number 1, this is not a class action.

7    The plaintiffs have not sought to make it a class action.  It

8    was filed by seven plaintiffs only.  One of those plaintiffs,

9    Mr. Morgan, voluntarily dismissed his claims.  It wouldn't be

10   proper to award the equivalent of class-wide relief when the

11   plaintiffs have not met their requirements for Rule 23.

12        In their rebuttal, Your Honor, here today as well, the

13   plaintiffs have talked about other persons who are not before

14   the Court.  But Your Honor, the Court can almost always

15   envision some other person in a plaintiff's shoes.  But if an

16   attorney's bare assertion about prospective plaintiffs were

17   enough to warrant an award of relief beyond the parties, then

18   Article 3 and equitable limitations on federal courts wouldn't

19   mean a whole lot, practically speaking.  Respectfully, Your

20   Honor, we submit that this Court is bound to deal with the case

21   at hand and the parties before it, not with prospective claims

22   by prospective plaintiffs.

23        Secondly Your Honor, all of the plaintiffs' showings for

24   preliminary injunctive relief are plaintiff-specific tied to

25   individual unique circumstances.

1          Third, Your Honor, a preliminary injunction granted only

2     as to the six plaintiffs would provide full and complete relief

3     here.  The plaintiffs cannot overcome the settled law in the

4     Fifth Circuit that an injunction should be no more burdensome

5     than necessary to provide the named plaintiffs with complete

6     relief.  Your Honor, the plaintiffs have not submitted any

7     authority to refute the *Lion Health*, *Califano* or *Madsen* cases

8     that I mentioned a moment ago, they don't address those

9     authorities in their rebuttal.  They have offered no legitimate

10    reason to deviate from the established principle of law in the

11    Fifth Circuit.

12          Fourth, Your Honor, as I mentioned a moment ago, one of

13    the original plaintiffs, Mr. Morgan voluntarily dismissed his

14    claims, dropped out of the lawsuit altogether.  It wouldn't

15    make sense to award a preliminary injunction to him or to

16    anyone else who hasn't shown or even claimed any entitlement to

17    a preliminary injunction.

18          For all these reasons, Your Honor, any preliminary

19    injunction should be narrowly tailored and limited in scope to

20    the named plaintiffs, that is to require the state health

21    officer and local school authorities to provide a religious

22    exemption option to the six named plaintiffs exclusively.  Your

23    Honor, the injunction should not be so broad that it would

24    apply to non-plaintiffs.

25          If the Court is nevertheless inclined to award a

1   preliminary injunction that is not limited to the named

2   plaintiffs, Your Honor, then in that circumstance we would

3   submit that the State Department of Health should be afforded a

4   reasonable amount of time and discretion to develop a religious

5   exemption policy that is consistent with the religious liberty

6   protections of Mississippi's RFRA statute.

7        Additionally, Your Honor, the Court should take no action

8   to otherwise prohibit or impede the administration or

9   enforcement of the school vaccination scheme set out in the

10  statute.

11       Finally, Your Honor, any preliminary injunction should be

12  directed to the proper defendants.  Plaintiffs have presented a

13  proposed order to the Court that would compel certain actions

14  by the Attorney General within specified time periods.  Your

15  Honor, under Mississippi law the Attorney General has no role

16  in administering or enforcing the school vaccination statute.

17  The school vaccination statute expressly provides that

18  enforcement is the responsibility of the person in charge of

19  each school.  It also gives the state health officer and the

20  local and county health officers some role in administering,

21  enforcing the statute.  But the Attorney General has no role in

22  that process, Your Honor.

23       This Court is no doubt familiar with the Fifth Circuit's

24  opinion in *Okpalobi vs. Foster*.  Under *Okpalobi* and its

25  progeny, principals of standing and sovereign immunity prohibit

1    this Court from enjoining the Attorney General to do anything

2    in this case.  Your Honor, pursuant to *Okpalobi*, a plaintiff

3    lacks standing to obtain injunctive relief against a state

4    official when that official didn't cause the alleged harm and

5    has no legal authority under state law to address the alleged

6    harm.  Both of those things are the case here, Your Honor.  The

7    plaintiffs have not presented any evidence that the Attorney

8    General was involved in causing the alleged harm, the things

9    you heard about here today, nor does she have any authority,

10   more importantly, Your Honor, under state law to address the

11   plaintiffs' alleged harm.  She has no authority under the

12   statute or otherwise to order Dr. Edney or the local school

13   officials to offer a religious exemption option to plaintiffs

14   or to force them to enroll the plaintiffs' children.

15       In *Okpalobi*, Your Honor, the Fifth Circuit held that it is

16   quote, an elemental fact that a state official cannot be

17   enjoined to act in any way that is beyond his authority to act

18   in the first place, end quote.  Therefore, as a matter of law,

19   Your Honor, this court, cannot enjoin the Attorney General to

20   provide a religious exemption option.

21       Your Honor, under *Okpalobi* standing jurisprudence, the

22   plaintiffs cannot show causation or address ability vis-a-vis

23   the Attorney General; therefore, they lack standing to assert

24   any claim for injunctive relief against her.

25       Relatedly, Your Honor, because the Attorney General is not

1    specifically tasked with enforcing the school vaccination

2    statute, she lacks the requisite enforcement connection to

3    support any injunction against her.  For that reason, Your

4    Honor, any claim for injunctive relief against her is also

5    barred by sovereign immunity.  For several years, there has

6    been some confusion in the Fifth Circuit about the meaning of

7    enforcement connection in the sovereign immunity context.

8    However, Your Honor, following a series of recent cases the

9    Fifth Circuit in March of last year provided a list of what it

10   referred to as guideposts for applying the sovereign immunity

11   analysis in this context.  The case I am referring to is *Texas*

12   *Alliance for Retired Americans v. Scott* 28 F.4th 669, 28 F.4th

13   669.  It's a 2022 Fifth Circuit opinion.  In the *Scott* case,

14   Your Honor, the Fifth Circuit held that the enforcement

15   connection that is required to overcome sovereign immunity

16   requires the Court to find three things:  Number 1, that the

17   state official has, quote, more than the general duty to see

18   that the laws of the state are implemented, end quote.

19        Number 2, that the state official has, quote, the

20   particular duty to enforce the statute in question and a

21   demonstrated willingness to exercise that duty, end quote.

22        And number 3, that the state official must, in fact,

23   compel or constrain some other official to obey the challenged

24   law.  And the Fifth Circuit in *Scott* said that the analysis of

25   that second factor is provision by provision, meaning that the

1    state official must enforce, quote, the particular statutory

2    vision that is the subject of the litigation, end quote.

3    Otherwise, Your Honor, any claim for injunctive relief against

4    that official is barred by sovereign immunity.

5           Your Honor, none of these three factors is established

6    here as to the Attorney General.  She is the state's chief

7    legal officer.  She is charged with a general duty to manage

8    litigation on the state's behalf.  But she has no particular

9    duty to enforce the school vaccination statute.  That statute

10   vests enforcement authority solely in the local school

11   officials, the state health officer.  It does not authorize or

12   require enforcement by the Attorney General.  The plaintiffs

13   have not pointed to any statutory authority that charges the AG

14   with the particular duty to enforce the school vaccination

15   statute.

16          Furthermore, Your Honor, the plaintiffs have not presented

17   any evidence that the Attorney General has ever enforced or

18   threatened to enforce the school vaccination requirements

19   against them or anyone else.  Relatedly, Your Honor, she has

20   not compelled or constrained Dr. Edney or any of the local

21   school officials to enforce the school vaccination statute.  I

22   would note as an aside, the Fifth Circuit has been clear that

23   simply offering advice or guidance or interpretive assistance,

24   none of those things constitute a compulsion or constraint in

25   this context.  That's *Richardson v. Flores*, 28 F.4th, 649, a

1    Fifth Circuit case from last year.

2            For all these reasons, Your Honor, pursuant to controlling

3    Fifth Circuit precedent, the plaintiffs claim for injunctive

4    relief against the Attorney General is barred by sovereign

5    immunity.

6            In their rebuttal that they filed last week, the

7    plaintiffs don't separately address standing as the Fifth

8    Circuit did in *Okpalobi*.  Instead, they conflate standing with

9    sovereign immunity and focus exclusively on sovereign immunity.

10   Your Honor, they argue under *Ex Parte Young*, the Attorney

11   General should be subject to an injunction for three reasons,

12   none of which has any merit in light of the *Scott* case that I

13   just discussed, but I will briefly address each one in turn.

14           First of all, Your Honor, they argue that as the state's

15   chief legal officer, the AG has the general duty to enforce the

16   school vaccination statute, notwithstanding the absence of any

17   particular duty imposed by any statute.  In support of that

18   argument, they cited Mississippi Code Section 751, as well as

19   the *City of Austin v. Paxton*, Fifth Circuit case.  Your Honor,

20   Section 751 declares the AG to be the state's chief legal

21   officer.  It gives her the authority to manage all litigation

22   on the state's behalf.  It also charges her with intervening to

23   argue the constitutionality of any statute when notified of a

24   challenge.  But Your Honor, that is a general duty statute.  It

25   says nothing about any particular duty to enforce specific

 1    laws, and certainly nothing about the school vaccination

 2    statute.

 3          Your Honor, the plaintiffs' reliance on the *City of Austin*

 4    case for the proposition they have cited it for is likewise

 5    misplaced.  The Fifth Circuit in *Scott* makes it clear that a

 6    general duty to enforce state law is not enough to overcome

 7    sovereign immunity, rather it must be shown that the Attorney

 8    General has a particular duty to enforce the vaccination

 9    statute, and that she's either exercised that authority or has

10    threatened to exercise it.

11          **THE COURT:**  You have about five minutes, counsel.

12          **MR. SHANNON:**  Thank you, Your Honor.  The plaintiffs

13    simply can't make that showing here, thus their first argument

14    fails.

15          Briefly, Your Honor, the second argument, they say the AG

16    is required to enforce the school vaccination statute at

17    Dr. Edney's request pursuant to Section 7537 of the Mississippi

18    Code.  Again, that is a general duty statute.  It does not

19    impose any particular duty on the AG to enforce the vaccination

20    statute.

21          Your Honor, with regard to the prospect of some

22    enforcement action by a local district attorney, which they

23    have argued in some of their briefing, the Supreme Court has

24    recognized that unlike in the federal system, the Attorney

25    General is not the local D.A.'s boss, that is the AG has no

1    authority to direct or control or override the official actions

2    of a local district attorney and no authority over him or her.

3    That's *Williams v. State*, 184 So.3d, 908, Mississippi Supreme

4    Court case.

5         Your Honor, they cited a Sixth Circuit case, they say it

6    was cited favorably, the *Russell* case.  They say it was cited

7    favorably in the *City of Austin* case, but the Fifth Circuit

8    actually cited *Russell* for an entirely different proposition

9    than the plaintiffs are citing it for here.  It is not

10   controlling in any event and has to yield to the Fifth Circuit

11   opinion in *Scott*.

12        Your Honor, the final argument, though, raises that

13   *Okpalobi's* statement that all that is needed to overcome

14   sovereign immunity is a sufficient indicia of enforcement

15   powers found elsewhere in the laws of the state.

16        Your Honor, unlike the standing analysis in *Okpalobi*, the

17   11th Amendment sovereign immunity analysis in that case only

18   received plurality support.  *Okpalobi* was decided in 2001.

19   It's statement about sufficient indicia has clearly been

20   superceded by the Fifth Circuit's recent line of cases leading

21   up to the *Scott* case from last year that I discussed a moment

22   ago.  Therefore, the plaintiff's final argument for overcoming

23   sovereign immunity likewise fails.

24        Your Honor, for all the reasons that I have just

25   discussed, any injunctive relief against the Attorney General

1   is barred, not only by a lack of standing but also by sovereign

2   immunity.  If a preliminary injunction is granted in this case,

3   it should be directed to the proper defendants, specifically to

4   the state health officer, to offer the named plaintiffs the

5   option of religious exemption to the school vaccination

6   requirement.  It should further direct the applicable county

7   and local health officers and local school officials to honor

8   and recognize any religious exemption so granted to the

9   children of the named plaintiffs.

10          In conclusion, Your Honor, for all these reasons and those

11  set forth in the Attorney General's briefing filed in this

12  matter, she respectfully requests that the Court would deny the

13  motion for preliminary injunction.  Alternatively, Your Honor,

14  if Your Honor is inclined to grant a preliminary injunction,

15  the Attorney General respectfully requests that it be limited

16  in scope, narrowly tailored to award relief to the named

17  plaintiffs only, and that it be directed to the proper

18  defendants exclusively and not to the Attorney General.  Thank

19  you, Your Honor.

20          **THE COURT:**  Thank you.  Anything from Dr. Edney?

21          **MR. BENTLEY:**  Your Honor, as you know Dr. Edney has

22  not participated in the briefing on the preliminary injunction.

23  I don't have any arguments to present.  I do have comments that

24  touch on the scope issue, but that may be better reserved for

25  your questioning than a presentation.

1          **THE COURT:**  Well, let me hear what you have to say on

2     that issue because I have something that's come up.

3          **MR. BENTLEY:**  Good morning, Your Honor, and may it

4     please the Court.

5          **THE COURT:**  Yes, sir.

6          **MR. BENTLEY:**  As I was just saying, Your Honor,

7     Dr. Edney takes his guidance on the interpretation of state law

8     from the Mississippi Attorney General.  The Attorney General

9     has advised us and the Court that the Mississippi Religious

10    Freedom Restoration Act, when construed with the school

11    vaccination act, provides for a religious exemption under

12    Mississippi law.  Dr. Edney does not disagree with that

13    interpretation, obviously.

14         What Dr. Edney has been wrestling with, and that's what I

15    just want to offer the Court, is what an exemption process and

16    procedure might look like.  There were nine bills introduced by

17    the various legislators in this past Mississippi legislative

18    session.  Those bills offer varying procedures and processes

19    from something as simple as a signed statement, to a notarized

20    affidavit, to a form issued by the Department of Health.  Some

21    of the bills would've required education for the parents on the

22    risks to their own children and to other children in not

23    seeking vaccination.  Some would've provided removal authority

24    to exclude unvaccinated children in the event of an outbreak or

25    emergency.  There are some with reporting requirements.  There

1    are some that require the Department of Health to undertake

2    promotional activities in the event a religious exemption is

3    provided to educate and inform people about the risks of not

4    receiving vaccines.  And then there are some that even would

5    provide a moral or philosophical exemption separate and apart

6    from a religious exemption.  So there are a lot of policy

7    considerations that even the legislature wasn't able to agree

8    on this term that Dr. Edney is considering and wrestling with.

9         You also have the issue of 130 school districts across the

10   state that has been discussed would be responsible for

11   enforcing whatever it is that either this Court directs or

12   Dr. Edney would issue under the Mississippi RFRA.  So there are

13   local interests and policy concerns at play as well.

14        And then we have also been looking at what other states

15   have done.  As the plaintiffs have pointed out, over 40 states

16   in the country have a religious, moral or philosophical

17   objection exemption, but those are certainly not uniform.  They

18   all come down to local policy choices, things like I have just

19   been discussing that various states have wrestled with.

20        So I just wanted to offer that because I do think it

21   relates to scope and I am happy to answer any questions that

22   Your Honor has.

23             **THE COURT:**  Just real briefly, and I think you

24   basically said this, but just so we're clear, so none of these

25   proposals passed the legislature, none of them got out?

1          **MR. BENTLEY:**  That is correct.  They all died in

2     committee on the January deadline for reporting out.

3          **THE COURT:**  Okay.  And you mentioned that the health

4     officer has been looking at this issue to try and come up with

5     what a process would look like.  And I think one of the

6     questions that has come up in terms of the scope, I think, as

7     the Attorney General's arguing is if I do grant a preliminary

8     injunction to allow sufficient time for the Department of

9     Health to come up with a process, what kind of timeline you

10    think you're talking about if that's what I end up doing?

11         **MR. BENTLEY:**  I guess without -- I don't know, is the

12    answer to that.  Dr. Edney has not, and his staff have not told

13    me what a reasonable timeline would be.  I guess I would say

14    the 2023/'24 school year is quickly approaching.  That may be

15    something Your Honor is considering.  That would give us

16    roughly three months.  Again, Dr. Edney has not said that he

17    can do it that quickly, but that's something that's in my mind.

18         **THE COURT:**  In terms of, and you may not know the

19    answer to this question, but in terms the way the medical

20    exemption process works, how far in advance are those

21    submitted?  Is there a deadline -- let's say it was going to be

22    from the 2023/2024 school year, how far in advance are the

23    medical exemption requests typically submitted, or is that a

24    rolling process that takes place throughout the year?

25         **MR. BENTLEY:**  As I understand the process, you have

1    to get -- your physician has to issue the letter or the

2    attestation that your child is entitled to an exemption.  You

3    have to get that certification and provide it to the school at

4    the time you submit all the other enrollment application

5    materials, which is really at the end of July for most schools,

6    as I understand it, is sort of the deadline for enrollment

7    applications.

8             **THE COURT:**  Okay.  I may have some more questions

9    when we're finished, but let me have -- let the plaintiffs have

10   their opportunity for rebuttal.  Thank you.

11            **MR. BENTLEY:**  Yes, Your Honor.  Thank you.

12            **THE COURT:**  Counsel, you have eight minutes

13   remaining.

14            **MR. WIEST:**  Thank you, Your Honor.  I think from the

15   plaintiffs' perspective, Your Honor, what we would like to

16   spend just a little bit of time rebutting is the scope issue.

17   And again, I think the driving decision on that literally just

18   came out of the Fifth Circuit about a week and a half ago on

19   March 23rd in *Feds for Medical Freedom vs. Biden*.  And in that

20   case, the Fifth Circuit upheld and, in fact, said it was proper

21   to extend an injunction beyond the named plaintiffs because,

22   frankly, the violation of the law extended beyond the named

23   plaintiffs.  In part, that was due to workability.  Well,

24   there's workability here, workability issues here on how you

25   would do that.

1      I think we have just begun a discussion that's been
2  helpful in terms of the path forward, Your Honor.  And again,
3  we think it's appropriate for Dr. Edney to probably come up
4  with the process and the forms and how to do that.  And I think
5  having that in place prior to the 2023/2024 school year is
6  probably an appropriate deadline.  You know, would some of our
7  named plaintiffs like to move sooner, we would, but we
8  understand we're dealing with government, and government,
9  unfortunately, nothing is fast, and sometimes Dr. Edney may not
10 be the only decision maker.  And I think it makes all the sense
11 in the world, Your Honor, to put a deadline on this by the end
12 of July to have this process in place to allow for enrollment
13 for the 2023/2024 school year.
14     I think Dr. Edney's counsel has appropriately observed
15 that there's a lot of different ways to skin this cat and a lot
16 of states have taken a different approach.  I'm based out of
17 Kentucky, and they have a form and it has to be notarized.
18 Some states it's a written statement.  Some states it's very
19 simple.  There's a process next door in Alabama that some of
20 these plaintiffs have gone through where they have to go to a
21 local health department and fill out a form, sometimes
22 undertake an interview.  There's a lot of ways to do that.  I
23 think the process is what's important, and the fact that it
24 gets done and the fact that the state allows for it in the same
25 way that they allow for the secular exemptions to relieve the

1    constitutional violation.  And the constitutional violation

2    extends to every single religious believer whose beliefs are

3    substantially burdened.

4        The Attorney General has indicated that there's been no

5    proof that it extends beyond the plaintiffs.  Your Honor, that

6    ignores the testimony that's been adduced here today.  You have

7    heard from Pastor Perkins, he has parents that want to enroll

8    their children in his school and they can't do it.  That's an

9    impact to him and that extends beyond him.  You have heard

10   about a large parental group that has been operating in this

11   state attempting to work with the legislature, many of whom are

12   sitting in this courtroom.  Again, the violation extends beyond

13   them and so should the injunctive relief.  And I think we're

14   getting to where, I think, what the Court has wrestled with,

15   which is scope.

16       At the end of the day, sometimes we deal with the

17   situation as constitutional litigators where you name certain

18   defendants in 1983 *Ex Parte Young* prospective relief injunction

19   actions, and this funny thing sometimes happens where they all

20   start pointing the finger at each other where they're saying, I

21   am not the enforcer, he is the enforcer, and there's no

22   enforcer at the end of the day, and we wanted to avoid that.

23       At the end of the day, I don't think from the plaintiffs'

24   perspective whether or not the Attorney General is a party

25   enjoined is a hill that we need to die on.  And we're not --

1    we're asking that -- plainly, everybody agrees Dr. Edney is an

2    appropriate defendant.  The injunctive relief can be primarily

3    directed at her.  Obviously, the local prosecutor is acting in

4    concert.  The local principals acting in concert under Rule 65,

5    that would be sufficient for our purposes.  And I think the

6    timeline that we just discussed to have this in place prior to

7    the 2023/2024 school year at the end of July would be an

8    appropriate timeline that would be acceptable to the plaintiffs

9    as well, Your Honor.

10        Certainly, we think *Feds for Medical Freedom vs. Biden*

11   speaks to these issues, particularly at pages 47 to 50 on the

12   Lexis citation.  It's not been fully published in that 4th yet

13   because it is a recent decision.  I would observe, Your Honor,

14   that that's an *en banc* decision.  As you're aware, that *en banc*

15   decision has substantial weight beyond simply a panel decision.

16   That's the decision of the entire Fifth Circuit, and I think

17   that decision stands for the proposition that the injunction

18   can and in these circumstances should extend to all religious

19   believers.  And frankly, if you're developing a process and

20   Dr. Edney is developing a process for the six named plaintiffs,

21   and Pastor Perkins' school and the families that are going to

22   attend that school, well that same process would work for all

23   the other plaintiffs.  And by the way, everyone agrees that the

24   Attorney General seems to think that RFRA requires a religious

25   exemption process.  Well, you have seen the department's

1   website today, Exhibit 2, plainly, there is no religious

2   exemption process notwithstanding MRFRA that the state

3   currently acknowledges and thus the need for injunctive relief.

4   And, frankly, there's that whole issue with the Mississippi

5   Supreme Court decision to, the *Brown* decision, that also puts a

6   real wrinkle in this, even notwithstanding the Attorney

7   General's opinion, can they do it without a federal court

8   invoking 1983 jurisdiction and saying, yes, you have to have a

9   religious exemption because the Supreme Court of the United

10  States says so under *Fulton* --

11          **THE COURT:**  You've got three minutes.

12          **MR. WIEST:**  So again, Your Honor, I think at the end

13  of the day we're getting to where we need to be.  I am happy to

14  answer any further questions.  We would rely primarily on the

15  briefing that's been already completed and any questions the

16  Court may have.

17          **THE COURT:**  Okay.  Thank you, counsel.  I do have

18  some questions.

19          **MR. WIEST:**  Should I stay up --

20          **THE COURT:**  You can be returned.  They are going to

21  be generally addressed to everybody, some may apply to others,

22  but I'll give each of you a chance to address them as I ask

23  them.

24      One of the issues was just touched upon, and primarily the

25  Attorney General's argument is the scope of this, if there is

1   an injunction granted, should be limited only to the named

2   plaintiffs.  How, in practice, would that work if I decide that

3   it's only something that should be applied for the named

4   plaintiffs, I enter an order, and then all of a sudden the

5   named plaintiffs are allowed to apply for a religious exemption

6   and anyone else who wants one has to file a lawsuit?  How would

7   that work?

8            **MR. SHANNON:**  Your Honor, on behalf of the Attorney

9   General, I think we would just anticipate that the order would

10  be crafted in such a way that the relief granted would

11  specifically be granted only to the named plaintiffs, that it

12  would direct and instruct the state health officer to offer

13  those folks a religious exemption option.  I don't believe, if

14  I read their papers correctly, that they're asking that they be

15  ordered to enroll in school, but merely that they be given the

16  option.  So I think the Court's order could reasonably

17  accommodate that by limiting the relief requested to the

18  specific plaintiffs in the case, Your Honor.

19           **THE COURT:**  Anyone want to comment on that?

20           **MR. WIEST:**  Your Honor, obviously the plaintiffs

21  believe there needs to be a process.

22           **THE COURT:**  Stand up when you're speaking.

23           **MR. WIEST:**  Sorry, Your Honor.  The plaintiffs

24  believe there needs to be a process, and if the process is

25  extended -- and there is a process and there's a form that's

1   developed, for practical reasons there would be no reason to

2   limit it to these six named plaintiffs.  The violation extends

3   to every single religious believer whose rights have been

4   substantially burdened, who the Attorney General believes needs

5   to be -- have that accommodation anyways under MRFRA.  And the

6   notion that we're going to develop a process for six named

7   plaintiffs, and I suppose -- I don't think that that works

8   anyway because we're also dealing with a school here, right,

9   Pastor Perkins' school.  I'm just thinking through this.  As a

10  practical matter, and this is what I think the Fifth Circuit

11  wrestled with *Feds for Medical Freedom vs. Biden* where they

12  said no, no, no, there's no practical way with this vaccine

13  exemption for you not to extend it to everyone.  Are we going

14  to say -- how does Brandi Renfroe go into a Mississippi school

15  and say, I have got this special exemption, I am one of the six

16  people, here is this court order, and the school is going to

17  allow them in.  I'm guessing the school might somehow -- just

18  from an administration perspective, I don't know how you would

19  do that without allowing everyone who is in the same boat to

20  appropriately obtain the same relief.  And if the Mississippi

21  Attorney General is suggesting that it's required under MRFRA,

22  I don't understand why the Mississippi Attorney General would

23  want to deny those same rights and benefits to every other

24  Mississippian whose religious freedom is being equally denied

25  by this process as it exists today.

1          **THE COURT:**  Well, you do make an interesting point as

2     far as Pastor Perkins is concerned.  If it's limited to the

3     named plaintiffs, then that means he can apply to have his

4     child enrolled, while at the same time as headmaster denying

5     that to anyone else in his community who wants to apply to come

6     to school there.  Any comment on that, counsel?

7          **MR. SHANNON:**  Your Honor, on behalf of the Attorney

8     General, we have nothing further to add on this point.  I think

9     we have said everything we want to say in our briefing, Your

10    Honor.

11         **THE COURT:**  Okay.

12         **MR. BENTLEY:**  Your Honor, I guess, a couple things,

13    one just housekeeping.  I did, while you were having that

14    discussion, look at registration dates just for Biloxi public

15    schools, Gulfport public schools.  They are not posted yet for

16    this coming school year, but they were July 15th through 17th,

17    and then drop-dead date of July 31 for this current school

18    year.  So that's probably roughly what they will be.

19         As far as the scope, I guess from Dr. Edney's perspective,

20    again, I would need to consult with him on a timeline and

21    respond to Your Honor.  If you're asking us to create a

22    statewide -- a religious exemption that satisfies and has input

23    from all of the necessary participants or stakeholders, that's

24    a big undertaking.  We can come up with a policy, I think, but

25    then we would need to discuss it with school districts, the

1    Department of Education, other parties that need to be

2    involved.

3              **THE COURT:**  Now, counsel, you mentioned MRFRA.  I

4    want to get back to that.  I believe the Attorney General was

5    taking the position that, at most, what the plaintiffs in this

6    case have is an as-applied challenge because MRFRA, by

7    operation of law, I suppose, creates a religious exemption and

8    therefore there is no challenge to the facial validity of the

9    vaccination statute.  Just to be sure I am clear on your

10   position, you also said in your briefs that without MRFRA, read

11   all by itself, the vaccine law would not survive strict

12   scrutiny.  So isn't this facial argument that you're making,

13   doesn't that hinge entirely on whether MRFRA, in fact, applies

14   by operation of law to fix any problems with the vaccine law?

15             **MR. SHANNON:**  Your Honor, certainly when MRFRA is

16   read in conjunction with the school vaccination statute,

17   there's no question that this law substantially burdens

18   religious freedom.  So under MRFRA, then it implicates strict

19   scrutiny.  We believe there's compelling governmental interest,

20   but we don't believe that it's tailored presently to the least

21   restrictive means based on the presence of the discretionary

22   medical exemption.  We agree with that.

23        Notwithstanding that, we believe even reading the school

24   vaccination statute by itself does not support a facial

25   challenge because in many, many applications, and I would argue

1   the vast majority of applications, the application of that

2   statute is indeed constitutional; in other words, any parents

3   who do not object on religious grounds to vaccinating their

4   children, they would have no problem with that statute.   That

5   statute would not violate their constitutional rights.   The

6   case law is such that if, indeed, there are constitutionally

7   valid applications of the statute, then that precludes any

8   facial challenge.   This challenge would have to be on an

9   as-applied basis.

10          **THE COURT:**   Okay.

11          **MR. SHANNON:**   May I confer, Your Honor?

12          **THE COURT:**   Yes.

13          **MR. SHANNON:**   Your Honor, as well as what I have

14   argued, they have also -- the plaintiffs have also requested

15   that the Court grant them a mandatory injunction to engraft

16   this option, religious exemption option onto the existing

17   statute.   Therefore, we believe it is exclusively an as-applied

18   challenge for all those reasons, Your Honor.

19          **THE COURT:**   Okay.   Counsel?

20          **MR. WIEST:**   A couple points back, Your Honor.   The

21   United States Supreme Court has been very clear, and I am going

22   to quote -- they quote from *United States vs. Stevens* on this

23   facial issue because the Attorney General is applying what I

24   would describe as a general facial challenge that is

25   inapplicable.   Now, they say, well, it doesn't apply to free

1    exercise.  Well, that's not what the United States Supreme

2    Court has said.  The U.S. Supreme Court has said, this facial

3    challenge applies to the entire First Amendment, and I am

4    quoting from *United States vs. Stevens*, 55 U.S. 460 at 473.

5    "In the First Amendment context, however, this court recognizes

6    a second type of facial challenge, and that is when there is a

7    substantial number of its applications that are

8    unconstitutional judged in relation to the statute's plainly

9    legitimate sweep."  They didn't limit it to free speech.  It

10   was "in the First Amendment context."  That's the language we

11   read from *Stevens*.

12        So the test that they are applying for facial I think is

13   inappropriate for First Amendment cases.  But we have

14   identified, and the Supreme Court spoke to this in *Citizens*

15   *United*, the hybrid constitutional challenge.  This statute is

16   unconstitutional as applied to each and every person who has a

17   sincerely held religious belief.  And given that, the

18   appropriate scope of the injunction should extend to all the

19   people to whom it is facially invalid to, which is all the

20   people who have a sincerely held religious belief.

21        I did want to address just briefly, Your Honor, the MRFRA

22   issue.  We would love to agree with the Attorney General that

23   MRFRA requires a religious exemption.  We love to take that

24   position.  We think as a matter of state law, though, they

25   can't get there with the Mississippi Supreme Court having

1    decided that the 14th Amendment doesn't allow for religious

2    exemption to vaccine requirements.  That monkey in the wrench

3    is why I think we're sitting in federal court right now seeking

4    1983 relief on a First Amendment free exercise challenge.

5        And I don't know at the end of the day that absent that

6    kind of injunctive relief third parties that have an interest

7    in maintaining the status quo may very well go into state

8    court, seek to uphold *Brown* and undermine the position the

9    Attorney General has taken on this case.

10       And I would leave the Court with this:  If creating a

11   process for religious exemptions, it is nonsensical if limited

12   to six people.  The relief here is the process.  And the

13   process could only be used -- that process could be used by

14   others.  It's a natural result and would be unnatural to limit

15   it to six plaintiffs for a variety of reasons.  Now, the

16   timing, I think, we understand runway, and I think by mid-July,

17   I think that makes sense.  It makes no sense to have to require

18   all of these other plaintiffs or potential plaintiffs to have

19   to go into court to seek the same exact relief on largely the

20   same facts.  By the way, Your Honor, it doesn't turn on

21   individual circumstances.  It doesn't turn on whether or not

22   Brandi Renfroe has to cross from Alabama to Mississippi every

23   day.  It doesn't.  The fact of the matter is this coercive

24   process applies equally to every single person that has a

25   sincerely held religious belief against vaccination, but no

1   process that similarly granted the medical exemptions.  Again,

2   the violation is not limited to the named plaintiffs, the

3   relief should not be limited to the named plaintiffs either.

4   Thank you, Your Honor.

5           **THE COURT:**  I guess the other question I have is

6   MRFRA, assuming that it means what the Attorney General is

7   saying it means with respect to religious exemptions, why

8   haven't any been granted?  Why are people not getting them?

9           **MR. SHANNON:**  Your Honor, that's a question I would

10  have to refer to Dr. Edney's counsel.

11          **MR. BENTLEY:**  Thank you so much.

12          **THE COURT:**  I figured that might be where this ended

13  up.

14          **MR. BENTLEY:**  Your Honor, I have to say until this

15  litigation began there was no pronouncement about the

16  interaction of Mississippi RFRA and the school vaccination law.

17  That's not a fault of the Attorney General.  No one ever sought

18  a legal opinion.  As far as I can tell, and this is a ripeness

19  or standing issue, I guess, it's not really before the Court,

20  but no one went all the way through the process to exhaust

21  before a school board this question where a school board

22  attorney could say, let's go ask the Attorney General.  If that

23  had happened, I think the process would've played out through

24  the typical opinion writing approach.  It hasn't happened.  We

25  learned about it in this litigation.  And candidly, for the

1    reasons I have discussed, we just haven't been able to snap our

2    fingers and create a policy.

3            **THE COURT:**  You alluded to my next question:  So as

4    far as you know, or the Attorney General, no one has ever asked

5    for an Attorney General opinion on this, on this question?

6            **MR. SHANNON:**  Your Honor, I honestly do not know if a

7    request has been made for an official opinion on that.  I am

8    not aware of one personally.  None has come up in the course of

9    this litigation in the context of any of our research, so I

10   believe the answer would be no.

11           **THE COURT:**  But as counsel for plaintiff pointed out,

12   make sure I am stating this correctly, if I am not, then

13   correct me by all means, but it sounds like even if one had

14   been requested, and one were issued that took the position that

15   you're taking here, you still run into this problem with this

16   earlier state Supreme Court decision, is it *Brown* I think, was

17   it *Brown*, that said allowing a religious exemption violates the

18   14th Amendment?

19           **MR. SHANNON:**  Yes, Your Honor, the *Brown* case.  It's

20   a 1979 Mississippi Supreme Court case, if I'm not mistaken.  I

21   believe we're all in agreement, and our briefing reflects as

22   much, that there's no way *Brown* would be upheld in today's

23   time, particularly in light of the *Fulton* cases and recent U.S.

24   Supreme Court cases that would essentially preempt the holding

25   in *Brown*, Your Honor.  So we don't see *Brown* as an impediment

1    to the view of MRFRA that we have presented to the Court in the

2    case.

3            **MR. WIEST:**   If I may, briefly, respond to that, Your

4    Honor.   We're in federal court, it's Mississippi interpreting

5    Mississippi State law, albeit under a federal standard.   It's

6    been a while since I have looked at this, but I think

7    Mississippi Supreme Court case law is binding as to Mississippi

8    law in federal court until or unless it's actually been

9    overturned by the Mississippi Supreme Court.   So I think we're

10   stuck with *Brown*, which is what we have been wrestling with

11   throughout this litigation.

12           **THE COURT:**   Right.   I guess what I was trying to get

13   at is I don't know that it binds me in the context of what

14   we're talking about here today.

15           **MR. WIEST:**   Right.

16           **THE COURT:**   But it does, I would think, put the

17   Attorney General in a position of -- I mean, we all may agree

18   that it wouldn't survive today, perhaps, but the Attorney

19   General is not at liberty to overrule the state Supreme Court

20   decision, right?

21           **MR. SHANNON:**   That's correct, Your Honor.   I would

22   just add one point of clarification.   In terms of an opinion

23   being requested at this time of the Attorney General regarding

24   this matter, as a matter of policy the Attorney General's

25   office does not issue opinions in matters that are pending in

1    litigation.  So it's not something that could occur right now.

2         **THE COURT:**  As I appreciate the process, someone has

3    to ask for it, it's not something the Attorney General just

4    goes around doing *sua sponte*?

5         **MR. SHANNON:**  That is correct.

6         **THE COURT:**  Let's get back to MRFRA here.  I guess

7    the question of whether it grants or allows a religious

8    exemption, where does the statute specifically say that, that

9    it operates to grant options for religious exemptions to any

10   state law that substantially burdens a person exercising

11   religion?  I don't have the whole statute right in front of me,

12   but I have a couple excerpts here, and I don't see that precise

13   language in MRFRA itself.

14        As I read it, and I am just looking here to point out if

15   -- because I don't have the whole statute in front of me, but

16   11-61-1, subparagraphs 5 and 6.  Paragraph 5 says, the

17   government shall not substantially burden a person's exercise

18   of religion even if the burden results from a rule of general

19   applicability except as provided in paragraph B of this

20   subsection.  Paragraph B says, the government may substantially

21   burden a person's exercise of religion only if it determines

22   that application of the burden to the person is in furtherance

23   of a compelling governmental interest and is the least

24   restrictive means of furthering that compelling governmental

25   interest.

1          Paragraph 6:   A person whose religious exercise has been
2     burdened in violation of this section may assert that violation
3     as a claim or defense in a judicial proceeding and obtain
4     appropriate relief against the government.
5          Again, that's what I am looking at.   I don't have the
6     whole thing in front of me, but to me I don't see where it
7     specifically says -- to me this is written in terms of a
8     prohibition against the government, things it's not supposed to
9     do, or if it's going to do them a burden it has to meet to
10    justify it.   And that if someone feels burdened, they can
11    assert a lawsuit or raise it as a defense to a lawsuit in a
12    judicial proceeding.   And we all know that when we're looking
13    at statutory interpretation we start off with the plain text of
14    the statute.   And I just don't see where it says that there.
15    Is there a part of the statute that specifically says that or
16    was that something that's kind of being read into it in terms
17    of really what the intent was behind it?
18          **MR. SHANNON:**   Your Honor, it's the latter.
19    Obviously, the language does not appear in 11-61-1, which does
20    not expressly reference the vaccination statute in and of
21    itself.   However, as Your Honor rightly points out, Section 5A
22    and B are the sections of the statute that the Attorney General
23    relies upon on the basis of her interpretation that because the
24    lack of a religious exemption obviously substantially burdens,
25    as you've heard here today, religious practice and religious

1     freedom that under the MRFRA statute, the government, the state

2     must show that it satisfies strict scrutiny.  There may be some

3     disagreement over whether this is in furtherance of a

4     compelling governmental interest, but notwithstanding that 5B

5     Subsection 2 says it must be the least restrictive means of

6     furthering that compelling governmental interest.

7          The Attorney General does not view the current statute as

8     being the least restrictive means because it provides for the

9     discretionary medical exemption without the religious

10    exemption, which the *Fulton* case and others lately in these

11    recent times particularly have said does not satisfy strict

12    scrutiny.  So it is an interpretation of Section 5A and B in

13    answer to Your Honor's question.

14         **THE COURT:**  Okay.  Any comment from plaintiffs on

15    that?

16         **MR. WIEST:**  Obviously, Your Honor, MRFRA tracks

17    particularly here because we have got secular exemptions,

18    discretionary secular exemptions.  It really is an overlay of

19    the First Amendment and the *Fulton* requirement.  We agree that

20    plainly this medical exemption discretionary system that they

21    have got in not allowing a religious exemption violates the

22    First Amendment, that's why we're here.

23         There are several problems:  One, to obtain relief under

24    the statute you have to go into court.  Two, the Department of

25    Health, the State Department of Health has not allowed

1    religious exemptions and, in fact, has gone so far as to put in

2    bold on their website you can't get one.  And three we have

3    this entire problem of this application of this statute to

4    vaccines being invalid under binding Mississippi Supreme Court

5    precedent in *Brown vs. Stone*.  So I think there's three

6    responses that we have to it.  I don't think that it's the out

7    the Attorney General thinks for all of those reasons, that's

8    why we're here in federal court seeking an injunction.

9             **THE COURT:**  I guess, and it's been touched upon

10   again, but just so I'm clear on the scope thing.  I am

11   struggling a little bit with the arguments in terms of if, you

12   know, if it's the state's position or the Attorney General's

13   position that MRFRA does apply to create a religious exemption

14   to the vaccine requirement, that's already the law in

15   Mississippi, then why wouldn't that apply to all Mississippians

16   already?  And it just seems to be a little bit of an

17   inconsistent -- kind of meets itself coming and going it seems

18   on that.  And that's one thing I am having a little bit of a

19   struggle with, is if that is the law and if it already provides

20   for that, then why would the injunction -- and you may go back

21   to some of the Supreme Court cases and Fifth Circuit cases you

22   have argued already, but why would the injunction or exemption

23   requirement option for requesting exemption be limited only to

24   the named plaintiffs in this case when the law already says

25   everybody should be allowed to get one?

1          **MR. SHANNON:**  Your Honor, the Attorney General takes

2     the view that the Court is nevertheless bound by Article 3

3     limitations, and limitations on the equitable remedies that a

4     federal district court can provide.  We would stand on those

5     arguments as presented in our briefs to that point, Your Honor.

6          **THE COURT:**  Okay.  Any comment?

7          **MR. WIEST:**  Your Honor, I'm going to go back to *Feds*

8     *for Med. Freedom vs. Biden,* the *en banc*.  And I'm going to read

9     because I think you have just articulated one of the concerns

10    that the Fifth Circuit expressed just a few weeks ago.

11         The government's position on the scope of the injunction

12    also sits awkwardly with its position on the merits.  On the

13    merits, the government wants consistency across government

14    enforcement of this government-wide vaccine policy.  Again, we

15    have just heard MRFRA requires this statewide relief.  And that

16    was one of the reasons the Fifth Circuit upheld, in that case,

17    a national injunction against the Biden administration.  Here

18    what we're seeking is a single-state injunction.

19         You have just literally parroted what the Fifth Circuit *en*

20    *banc* majority described as an issue and a concern of *Feds for*

21    *Med. Freedom vs. Biden* just a few weeks ago.

22         **THE COURT:**  This one last sort of procedural

23    question.  Typically, one of the things I have to look at under

24    Rule 65(c) is if there is going to be an injunction granted

25    whether or not to impose some kind of security.  I'm not sure I

1    really see a reason for a need to post security in this case.

2    Is there any comment on that particular requirement of the rule

3    if I, in fact, grant the relief the plaintiffs are seeking?

4              **MR. SHANNON:**  Your Honor, may we confer briefly?

5              **THE COURT:**  Yes.

6              **MR. SHANNON:**  Your Honor, on behalf of the Attorney

7    General, we don't see any need to impose security.

8              **THE COURT:**  Okay.

9              **MR. SHANNON:**  In the event the Court enters a PI.

10             **THE COURT:**  All right.

11        Those are all the questions I had.  Any other comments

12   anyone wants to make before we wrap up?

13             **MR. WIEST:**  None from the plaintiffs, Your Honor.

14             **MR. SHANNON:**  None from the Attorney General, Your

15   Honor.

16             **MR. BENTLEY:**  Nothing further from Dr. Edney, Your

17   Honor.

18             **THE COURT:**  Here is what I'd like to do.  I'd like to

19   take a recess, it's about lunchtime anyway, and give this some

20   thought and consideration, and, potentially, if I can, give you

21   some kind of a ruling maybe this afternoon.  Whatever I do, I

22   am going to have to follow-up with a more detailed written

23   order, but to at least give you a sense of what the outcome

24   will be so you can plan accordingly.

25        I am going to take a look at everything and see if I think

1    I can be in a position to do that and then we can reconvene and

2    I'll let you know at that time.  Let's say we plan to reconvene

3    at 1:30 this afternoon.  All right.  Court is in recess until

4    1:30.

5              **(RECESS TAKEN AT 11:55 A.M. UNTIL 1:39 P.M.).**

6              **THE COURT:**  For the record, the parties are all

7    present, along with counsel for the parties.  We're back on the

8    record.

9         First of all, I want to compliment counsel for the parties

10   in the manner in which they have briefed and presented and

11   argued this matter today and in earlier briefing.  The parties

12   can rest assured they have all been well represented in this

13   matter.

14        And the matter, of course, now before the Court is the

15   motion for preliminary injunction.  And, of course, I have

16   considered the record in this matter, particularly the

17   submissions of the parties and the evidence presented here

18   today, along with the relevant legal authority.

19        As I indicated before, I will, within the next few days,

20   enter a more fully comprehensive, detailed written order that

21   will explain my reasons for the Court's ruling.  But, I think

22   in fairness, not to leave people in suspense, I am going to at

23   least tell you what I'm going to do so you will have some idea

24   going forward today what to expect.

25        As I said, I have considered the record in this matter.

1    And briefly, in summary, I am of the view that the motion for

2    preliminary injunction should be granted.  I am of the view

3    that the Mississippi Religious Freedom Restoration Act does not

4    operate to create an automatic option for religious exemptions

5    to the state's mandatory vaccine law.  Based upon the plain

6    reading of the statute and standing alone, the vaccine law does

7    not withstand strict scrutiny, and that as to anyone in

8    Mississippi who has a sincerely held religious belief against

9    vaccinating their children for school, the vaccine law violates

10   the free exercise clause of the First Amendment without or

11   unless it provides an option for requesting a religious

12   exemption.

13        Further, the Court finds that for these similar reasons as

14   applied to the plaintiffs, in this case it also violates their

15   free exercise rights without providing an option for a

16   religious exemption.

17        Accordingly, in the Court's view, because it is also the

18   state, or the Attorney General's position, that Mississippi law

19   through the Mississippi Religious Freedom Restoration Act

20   already grants options for religious exemptions to all

21   Mississippians, the Court is of the view that applying the

22   injunction statewide amounts really to an incidental benefit

23   and can be appropriately entered in accord with the recent

24   Fifth Circuit decision, *Feds for Medical Freedom vs. Biden*, 63

25   F.4th 366 from 2023.

1          Accordingly, the injunction shall direct that the enjoined

2     parties shall develop and post on the State Department of

3     Health website a process and any forms by which persons who

4     wish to seek a religious exemption from the vaccine requirement

5     may do so.  I am of the view, for reasons I will detail more

6     fully in my written order, that the injunction would not be

7     directed to the Attorney General or the city prosecutor

8     defendants in this case, that it is directed to and the

9     enjoined parties shall be Dr. Daniel Edney, in his official

10    capacity as the state health officer, and the named defendant

11    school officials, that those are the parties properly enjoined

12    in this matter.

13         Therefore, the Court will order that effective July 15,

14    2023, the enjoined parties shall be enjoined from enforcing the

15    compulsory vaccination law unless they have provided an option

16    for requesting a religious exemption.  By July 15, 2023,

17    defendant, State Health Officer Dr. Daniel Edney in his

18    official capacity, shall develop a process by which persons may

19    request a religious exemption from the compulsory vaccination

20    law, and it shall make that process or any forms related to it

21    available on the State Department of Health website.

22         Thereafter, while the injunction remains in effect, a

23    person may seek a religious exemption or request a religious

24    exemption to the compulsory vaccine law by requesting such

25    exemption pursuant to the process developed by the Mississippi

1    Department of Health.  Based upon the statements of the parties

2    today, and in accordance with Federal Rule of Civil Procedure

3    65(c), the Court will not require the plaintiffs to post any

4    security with respect to this injunction.

5        That will be the ruling of the Court in terms of the

6    outcome just so you know where I am heading with it.  There

7    will be a more detailed order coming out in the next couple of

8    days.  Anything else at this time?

9        **MR. WIEST:**  Not from the plaintiffs, Your Honor.

10   Thank you.

11       **MR. SHANNON:**  Nothing from the Attorney General, Your

12   Honor.

13       **MR. BENTLEY:**  No, Your Honor.

14       **THE COURT:**  All right.  Counsel, thank you very much.

15   You are excused.  This matter is adjourned.

16                   (HEARING CONCLUDED)

17                       - - -

18

19

20

21

22

23

24

25

1

2                      CERTIFICATE OF COURT REPORTER

3

4          I, Sherri L. Penny, RPR, FCRR, Official Court Reporter

5    for the United States District Court for the Southern District

6    of Mississippi, appointed pursuant to the provisions of Title

7    28, United States Code, Section 753, do hereby certify that the

8    foregoing is a correct transcript of the proceedings reported

9    by me using the stenotype reporting method in conjunction with

10   computer-aided transcription, and that same is a true and

11   correct transcript to the best of my ability and understanding.

12         I further certify that the transcript fees and format

13   comply with those prescribed by the Court and the Judicial

14   Conference of the United States.

15

16

17

                         *S/ Sherri L. Penny*
18                       OFFICIAL COURT REPORTER

19

20

21

22

23

24

25