# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**AMANDA BOSARGE, individually and on behalf of their minor children, et al.,**

        *Plaintiffs,*

  -against-

**DANIEL P. EDNEY**, in his official capacity as the State Health Officer, et al.,

        *Defendants.*

Civil Action No. 1:22-cv-00233-HSO-BWR

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR DECLARATORY RELIEF, SUMMARY JUDGMENT, AND PRELIMINARY AND PERMANENT INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

INTRODUCTION ...............................................................................................1

STATEMENT OF FACTS ...................................................................................2

LEGAL STANDARD .........................................................................................11

ARGUMENT .....................................................................................................13

I.    PLAINTIFFS POSSESS CLEAR ENTITLEMENT TO INJUNCTIVE RELIEF UNDER THE FIRST AMENDMENT'S FREE EXERCISE CLAUSE AND HAVE ESTABLISHED THAT THE CHALLENGED LAW FACIALLY VIOLATES THE FIRST AMENDMENT

    A.  The Compulsory Vaccination Law is not Generally Applicable.............................14

       1.  The Compulsory Vaccination Law is not generally applicable because it permits secular conduct but prohibits religious observance............................................14
       2.  The Compulsory Vaccination Law is not generally applicable because it allows for individualized discretionary review....................................................16
       3.  The Compulsory Vaccination Law is not generally applicable because it treats secular conduct more favorably than comparable religious exercise................17

    B.  The Compulsory Vaccination Law is not Neutral....................................................18

       1.  The statute is not neutral because it favors secular conduct above comparable religious exercise............................................................................18
       2.  The statute lacks neutrality because it codified the *Brown* decision, a case that explicitly targeted religious observance for elimination...................................20

    C.  The Compulsory Vaccination Law Will not Survive Strict Scrutiny.....................24

II.   THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR RELIEF

    A.  Plaintiffs have Suffered and Continue to Suffer Irreparable Injury.......................27

    B.  The Balance of Harms and the Public Interest in Protecting Civil Liberties Weigh in Favor of Injunctive Relief.......................................................................29

III.   CONCLUSION...............................................................................30

i

# TABLE OF AUTHORITIES

**Page**

*Amoco Prod. Co. v. Village of Gambell,*
    480 U.S. 531 (1987) ........................................................... 12

*Armstrong v. Bd. of Educ.,*
    323 F.2d 333 (5th Cir. 1963) ........................................... 12

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ...................................... 29

*Boone v. Boozman,*
    217 F. Supp. 2d 938 (E.D. Ark. 2002) ............................ 23

*Brown v. Stone,*
    378 So. 2d 218 (Miss. 1979) ................................... *passim*

*BST Holdings, LLC. v. OSHA,*
    No. 21-60845 (5th Cir. Nov. 12, 2021) .......................... 25

*BST Holdings, LLC. v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) ..................................... 28, 29

*Byrum v. Landreth,*
    566 F.3d 442 (5th Cir. 2009) ........................................... 11

*Canal Authority of the State of Florida v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ........................................... 12

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ........................................................ 13

*Carson v. Makin,*
    142 S. Ct. 1987 (2022) .................................................... 19

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................ 12

*Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................... *passim*

*Clinton Mun. Separate Sch. Dist. v. Byrd,*
    477 So.2d 237 (Miss. 1985) ........................................ 4, 20

*Dahl v. Bd. of Trs. of W. Mich. Univ.*,
    15 F.4th 728 (6th Cir. 2021) ...................................................................9, 17

*Elrod v. Burns*,
    427 U.S. 347 (1976) .........................................................................27

*Employment Div., Dep't of Human Resources of Ore. v. Smith*,
    494 U.S. 872 (1990) ........................................................6, 14, 16, 21

*Everson v. Board of Ed. of Ewing*,
    330 U. S. 1 (1947) ...........................................................................20

*ExxonMobil Pipeline Co. v. Landry*, No.
    15-824-JWD-EWD, 2016 U.S. Dist. LEXIS 8713 (M.D. La. Jan. 26, 2016) .................13

*Fraternal Order of Police v. Newark*,
    170 F.3d 359 (3d Cir. 1999) ..............................................................9

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ................................................................ *passim*

*Goss v. Lopez*,
    419 U.S. 565 (1975) ....................................................................20, 28

*Hawk Aircargo Inc., v. Chao*,
    418 F.3d 453 (5th Cir 2005) ...........................................................10

*Hill v. Rankin County, Miss. Sch. Dist.*,
    843 F. Supp. 1112 (S.D. Miss. 1993) ...........................................20, 28

*Hobbie v. Unemployment Appeals Comm'n*,
    480 U.S. 136 (1987) .........................................................................14

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ............................................................29

*Justin Indus., Inc. v. Choctaw Secs., L.P.*,
    920 F.2d 262 (5th Cir. 1990) ............................................................12

*Klaassen v. Trs. of Ind. Univ.*,
    7 F.4th 592 (U.S. 7th Cir. 2021) ......................................................17

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ....................................................................21

*Marett v. Scott*,
   Civil Action No. 2:99cv244-D-B,
   2000 U.S. Dist. LEXIS 5356 (N.D. Miss. Apr. 7, 2000) ..................................................13

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) ...........................................................................................14, 21

*Nken v. Holder*,
   556 U.S. 418 (2009) .........................................................................................................29

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) ..........................................................................................18

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ...........................................................................................7, 19, 21

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .........................................................................................................19

*Stormans v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ........................................................................................22

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021) ........................................................................................... *passim*

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
   450 U.S. 707 (1981) .........................................................................................................14

*Thoms v. Maricopa Cty. Cmty. Coll. Dist.*,
   No. 2:21-CV-01781-SPL, 2021 WL 5162538 (D. Ariz. Nov. 5, 2021) ..........................15

*United States v. Seeger*,
   380 U.S. 163, 185 (1965) .................................................................................................14

*Usn Seals 1-26 v. Biden*,
   578 F. Supp. 3d 822 (N.D. Tex., Jan 2, 2022) ............................................................8, 24

*U.S. Navy Seals 1-26 v. Biden*,
   27 F.4th 336 (5th Cir. 2022) ...............................................................................8, 11, 15

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)............................................................................................................2

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) .........................................................................................................13

**STATUTES**

Miss. Code Ann. § 21-13-91 ..............................................................5, 28

Miss. Code § 37-1-2.....................................................................................

Miss. Code § 37-13-91...........................................................................3, 5, 28

Miss. Code § 41-23-37 ............................................................................*passim*

Miss. Code § 97-5-39.........................................................................5, 20, 28

Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq*............................................8

**OTHER AUTHORITIES**

ALABAMA DEPARTMENT OF HEALTH, *2019-2020 School Entry Survey,*
https://www.alabamapublichealth.gov/Immunization/assets/2020schoolsurvey_county.pdf
(last visited Sept. 2, 2022) ........................................................................27

CENTERS FOR DISEASE CONTROL, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten,*
https://www.cdc.gov/mmwr/volumes/71/wr/mm7116a1.htm (last visited Sept. 2, 2022) .......27

MISSISSIPPI DEPARTMENT OF HEALTH, *Medical Exemption Policy,* available at
https://msdh.ms.gov/msdhsite/index.cfm/14,0,71,688,html (last visited Sept 2, 2022) ....10, 15

MISSISSIPPI DEPARTMENT OF HEALTH, *Mississippi Medical Exemption Request Form,*
https://msdh.ms.gov/msdhsite/_static/14,0,71,688.html (last visited Sept. 2, 2022)..........10, 17

NATIONAL CONFERENCE OF STATE LEGISLATURES, *States with Religious and Philosophical Exemptions from School Immunization Requirements,*
https://www.ncsl.org/research/health/school-immunization-exemption-state-laws (last visited Sept. 2, 2022) ........................................................................6

PEW RESEARCH CENTER, *How religious is you state?* https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=alabama (last visited Sept. 2, 2022)...............27

U.S. CENSUS BUREAU, *QuickFacts Mississippi,* https://www.census.gov/quickfacts/MS
(last visited Sept. 2, 2022)……………………………………………………………….25

U.S. CENSUS BUREAU, *QuickFacts QuickFacts Alabama,* https://www.census.gov/quickfacts/AL
(last visited Sept. 2, 2022)……………………………………………………………….27

## **INTRODUCTION**

The issue presented to this Court is purely a question of law, namely, whether the State of Mississippi can exclude from school the children of families with religious convictions that conflict with the State's vaccine requirements, while simultaneously allowing secular families to be exempt from these requirements on medical grounds. Because, on its face, this policy violates the First Amendment, Plaintiffs request preliminary and permanent injunctive relief, as well as summary judgment and declaratory relief.

As a threshold matter, it bears emphasizing that this is not a typical injunction motion that seeks immediate relief until a hearing on the merits. This case is unique in that the material facts are settled, and the matter is ripe for final resolution. Under Supreme Court precedent, Mississippi's statutory scheme of allowing medical exemptions – and discretionary review of those exemption requests – while prohibiting the possibility for religious exemptions is flagrantly unconstitutional under the First Amendment's Free Exercise Clause.

Under Miss. Code § 41-23-37, Mississippi enacted a secular medical exemption to its mandatory immunization requirements (the **"Compulsory Vaccination Law"**). Mississippi's medical exemption scheme involves an individualized discretionary review process whereby state officials can accept or deny exemption requests. However, the government has explicitly excluded families with religious objections from the state-sanctioned vaccine exemption process. Recent Supreme Court cases make clear that this policy violates the Free Exercise Clause. Additionally, in the context of government attempts to control the spread of infectious diseases, recent Fifth Circuit and Supreme Court precedent have made clear that regulatory efforts that treat *any* secular conduct more favorably than similar religious activity triggers strict scrutiny review.

The Compulsory Vaccination Law does not withstand strict scrutiny because it is not narrowly tailored to the government interests it purportedly attempts to achieve (reducing the

1

transmission of infectious disease). Mississippi's desire to curtail infectious diseases is not, as demonstrated by the medical exemptions they grant, so urgent as to preclude secular exemptions to the State's compulsory immunization requirements. Moreover, Mississippi does not require adults who work in the school system to be vaccinated, and does not require proof of immunization for participation in any other activities.

Admittedly, Plaintiffs are amongst the miniscule fraction of Mississippians whose religious beliefs prevent them from vaccinating their children. However, as has been repeatedly affirmed in some of our country's most consequential jurisprudence, constitutional protections unquestionably extend to minority groups. As Justice Jackson declared when striking legislation forcing public school students to salute the American flag, including Jehovah's Witness children, whose religion forbade the salute:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to . . . freedom of worship . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

As outlined more fully below, Mississippi's campaign to eliminate all religious observance in the compulsory immunization arena by instituting an exemption process that permits secular but not religious exemptions violates the Constitution. Plaintiffs thus facially challenge Miss. Code § 41-23-37.

## **STATEMENT OF FACTS**

### *A. Plaintiffs' Sincerely Held Beliefs Prevent them from Vaccinating their Children.*

Plaintiffs possess deeply held religious beliefs that prohibit them from vaccinating their children.[1]  While the particulars of their beliefs differ, Plaintiffs are bound together in two significant regards: (1) their religious convictions that prevent them from vaccinating their children are deeply held and substantially burdened by the Compulsory Vaccination Law, and, (2) their decision to uphold their religious convictions has entailed significant sacrifices and caused irreparable harm.

Every Plaintiff has been negatively impacted by their decision to exercise their religious beliefs.  Pastor Paul Perkins, who is also a headmaster of a Mississippi private school, cannot send his daughter to that same school.  Under Mississippi law, Pastor Perkins would be subject to criminal prosecution if he enrolled his daughter in the school he oversees.  Plaintiffs Brandi Renfroe and Dr. Jeana Stanley work and own homes in Mississippi, but uprooted their families to another state so their children could be educated in Alabama (one of the forty-four states that permits religious exemptions to vaccination requirements).  Plaintiffs William Morgan and Kimberly Harrell anticipate needing to move to another state so their children can continue their educations.  Because their children have been barred from Mississippi's educational system, these Plaintiffs residing in Mississippi homeschool their children as it is the only educational option available to them.

Each Plaintiff attempted to enroll their children in Mississippi schools and were each rejected.  Mississippi requires children between the ages of six and seventeen to be enrolled in school. *See* Miss. Code § 37-13-91.  The Mississippi Supreme Court has held that "the right to a minimally adequate public education created and entailed by the laws of this state is one we can

---

[1] See Plaintiffs' Statements of Religious Beliefs, attached as Exhibits B through H; *see also* Compl., ¶¶15-86.

only label fundamental" and that the "right to a public education is a fundamental right protected by states." *Clinton Mun. Separate Sch. Dist. v. Byrd*, 477 So.2d 237, 240 (Miss. 1985). However, Plaintiffs' children have been barred from Mississippi's educational system because of their parents' religious beliefs. Plaintiffs' children are unable to access the practical and social benefits of a typical education that their secular peers enjoy. In short, without a religious exemption, Plaintiffs are deprived of the State's guarantee of a public education for their children unless they surrender their sincerely held religious beliefs.

### B. Background of Compulsory Childhood Vaccination in Mississippi.

In 1960, the Mississippi Legislature instituted certain vaccine requirements for school-age children and included a limited religious exemption. That religious exemption, however, was removed by the legislature in 1983 after the Mississippi Supreme Court, in *Brown v. Stone*, 378 So. 2d 218 (Miss. 1979), held that the existence of *any* religious exemption violated non-religious families' Fourteenth Amendment rights. *Id.* at 223. There was no such constitutional right, however, to be free from associating with unvaccinated children who possessed a medical exemption (which were available when *Brown* was decided). *Id.* at 219. The *Brown* court also did not rule that vaccinated children have a constitutional right to be free from associating with unvaccinated children or adults at church, the grocery store, or in local sports leagues.

Three years after the *Brown* decision, in 1983, the Mississippi Legislature, in a legislative formality, codified *Brown* and removed the religious exemption for school-aged children.[2] The Legislature did, however, codify secular medical exemptions, which are still available in Mississippi today. *See* Miss. Code Ann. § 41-23-37.

---

[2] Chapter 522, *Mississippi Laws of 1983* (removing religious exemptions from the school immunization requirement but instituting certain medical exceptions).

Notably, when enacting the medical exemption, Mississippi did not, or any time thereafter, enact vaccination requirements for adults, including those who work within the state's education system and schools, or for officials who work in the Mississippi Department of Health. Ensuing United States Supreme Court and federal district court decisions from the 1990's through present have invalidated the *Brown* ruling and Mississippi's resulting vaccination scheme that provides for medical but not religious exemptions.

School attendance is compulsory in Mississippi. Under Miss. Code § 37-13-91, the "custodian of . . . [a] school-age[d] child in [Mississippi] shall cause the child to enroll in and attend a public school or legitimate nonpublic school" and failure to comply with the law subjects the parent or guardian to potential criminal prosecution under Miss. Code § 97-5-39.  Under the Compulsory Vaccination Law, the state Health Officer has been delegated the responsibility to specify which vaccines are mandatory for school children, to oversee the immunization reporting requirements, and to administer the state's medical exemption program.  Under the statute, it is "the responsibility of the person in charge of each school to enforce the requirements for immunization." Miss. Code § 41-23-37.   Failure to enforce the compulsory vaccination requirements is a misdemeanor "punishable by fine or imprisonment or both."  *Id.*

**C.     Developments Since Mississippi's Religious Exemption was Removed.**

Since Mississippi revoked its religious exemption to the Compulsory Vaccination Law, there have been two critical developments that impact this case.  First, abortion and fetal cell entanglement in medical research have increased.   Second, and, more importantly, directly applicable constitutional jurisprudence has been fundamentally revised to require strict scrutiny review for situations virtually identical to the issues presented here.

Among other religious objections parents express, several childhood vaccines are made with aborted fetal cells.  Others depend on fetal cells for testing, design, and/or manufacture.

Almost all vaccines are otherwise made by manufacturers who profit from the use of aborted fetal cells. These aborted fetal cells would be illegal to harvest in Mississippi today under the state's abortion ban, and yet their continued use, and profit derived from an abortion, is condoned through the Compulsory Vaccination Law.

Beginning in the 1970s, commensurate with the institution of compulsory school vaccination requirements, states across the country began instituting or expanding religious exemptions to childhood vaccination laws. To date, forty-four states have legislation allowing school-age children to be exempt from mandatory vaccination laws for religious reasons,[3] and at least two other states have provisions grandfathering in children with a prior religious exemption.

Most importantly, after Mississippi removed its religious exemption and instituted medical exemptions to the Compulsory Vaccination Law, First Amendment jurisprudence fundamentally evolved. There have been five Supreme Court cases that are particularly relevant to the First Amendment issues at hand. Several lower court decisions have applied those decisions in situations very similar to this case.

Before *Emp't Div. v. Smith,* 494 U.S. 872 (1990), courts struggled with what level of judicial scrutiny to apply to free exercise claims. Because of the country's diversity of religious beliefs, almost every government regulation burdened, to some degree or another, a religious belief system. The *Smith* Court confronted this issue and held that laws that only "incidentally" burden religion expression ordinarily are not subject to strict scrutiny under the Free Exercise Clause, reasoning to do otherwise would be "courting anarchy." *Id.* at 888. However, the Court held that

---

[3] *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, *States with Religious and Philosophical Exemptions from School Immunization Requirements,* https://www.ncsl.org/research/health/school-immunization-exemption-state-laws (last visited Sept. 2, 2022).

strict scrutiny would apply to laws that either were not **neutral** (because they targeted religious observance) or were not **generally applicable**.

A couple of years later, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court outlined the parameters of the neutrality and general applicability standards when examining a local ordinance that banned animal sacrifice, a practice of the Santeria faith. Because it appeared that the government had targeted religious observance for exclusion, and because the local government allowed similar secular conduct (absence of restrictions on how hunters were to dispose of an animal carcass), the Court applied strict scrutiny and struck the ordinance. *Lukumi*, 508 U.S. at 547.

More recently, the Supreme Court has protected Free Exercise rights in the face of state regulations related to infectious diseases. In *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (*per curiam*), the Supreme Court ruled that a law is not neutral and generally applicable, and thus invokes strict scrutiny review, if it treats "*any* comparable secular activity more favorably than religious exercise." *Id.* at 1296 (emphasis in original). In *Tandon,* California regulations intended to slow the spread of COVID-19 limited religious gatherings but treated comparable secular gatherings – such as getting haircuts and retail shopping – more favorably. *Id.* at 1297. The Court applied strict scrutiny and granted a preliminary injunction in favor of the religious plaintiffs. The Court employed similar reasoning in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), holding that a New York regulation that prohibited religious gatherings but permitted similar secular gatherings violated the First Amendment where the secular and religious activities in question presented comparable contagion risks. *Id.* at 67.

A couple of months after its *Tandon* ruling, the Supreme Court examined the issue of whether a regulation is generally applicable where it provides for secular exceptions that are

unavailable to citizens with religious beliefs.  In *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1878 (2021), the Court – in a 9-0 decision – held that the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable" where that mechanism is unavailable to religious adherents.  In deciding to apply strict scrutiny, the Court observed that the regulation in question had a procedure that was subject to individualized review and approval at the "sole discretion" of a government official.  *Id.* at 1879.

Because of the COVID-19 pandemic and the variety of ensuing vaccination mandates, the *Tandon* and *Fulton* rulings have unsurprisingly received immediate attention in the federal courts. In *Usn Seals 1-26 v. Biden*, 578 F. Supp. 3d 822 (N.D. Tex., Jan 2, 2022), the federal government's mandatory COVID-19 vaccination requirements for the military were challenged by several Navy Seals who possessed religious objections to vaccination.  The policies at issue allowed both medical and religious exemptions but, in practice, the Navy was not granting religious exemptions while it was approving medical exemptions.  *Id*.  Applying *Tandon* and *Fulton*, the district court granted a preliminary injunction in favor of the Navy Seal plaintiffs, reasoning that, under the First Amendment's Free Exercise Clause, the policies were neither neutral nor generally applicable because they treated secular exemptions more favorably and because they invited "individualized assessment of the reasons why a servicemember is not vaccinated."  *Id.* at 31.  The Fifth Circuit Court of Appeals upheld the preliminary injunction in *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022).  In that case, the Fifth Circuit concluded that processing and granting of medical exceptions, and refusal to accept religious exceptions on the same footing, rendered the policy invalid under both the Religious Freedom Restoration Act of 1993[4] ("**RFRA**") and the First Amendment.  *Id*.

---

[4] 42 U.S.C. §§ 2000bb *et seq.*

The Fifth Circuit has found that such favoritism to secular exemptions and distaste for religious exemptions is a form of prohibited discrimination. *See, e.g., Sambrano v. United Airlines, Inc.*, 2022 U.S. App. LEXIS 4347 (5th Cir. 2022). *See, e.g., Fraternal Order of Police v. Newark*, 170 F.3d 359 (3d Cir. 1999) (holding that rule allowing medical exemptions to police department's "no facial hair" policy, while prohibiting religious exemptions, violated the First Amendment).

In October of 2021, a few months after *Fulton* was decided, the Sixth Circuit Court of Appeals confronted a Western Michigan University COVID-19 vaccination requirement for student athletes that allowed for medical exemptions, and upheld a preliminary injunction against the policy after examining it under strict scrutiny. *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 730 (6th Cir. 2021). The University had rejected all religious exemption requests and the district court issued a preliminary injunction in favor of the student athletes on grounds that the policy violated their free exercise rights. *Id.* Although the policy allowed for the possibility of a religious exemption, the Sixth Circuit Court of Appeals, applying *Fulton*, upheld the preliminary injunction for violation of their free exercise rights on grounds that both the religious and medical exemptions were to be "considered on an individual basis," triggering strict scrutiny, and religious exemptions were universally denied. *Id.* at 733.

### D.  Mississippi's Discretionary Medical Exemption Process.

Mississippi has instituted a discretionary exemption to the Compulsory Vaccination Law that benefits certain individuals (secular), and deliberately excludes others (non-secular). Students are not permitted to seek exemption from the required vaccines for religious reasons. However, students are permitted to seek a medical exemption from the required vaccines.

Through the plain language of the relevant statute, Mississippi has reserved discretion to accept or deny medical exemptions. The Compulsory Vaccination Law states: "A certificate of

exemption from vaccination for medical reasons may be offered on behalf of a child by a duly licensed physician and **may be accepted by the local health officer when, in his opinion,** such exemption will not cause undue risk to the community." Miss. Code § 41-23-37 (emphasis added). It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief. Hence, while the plain language of the statute alone is sufficient to determine the issue of whether Mississippi has instituted an exemption scheme that includes individualized assessment, the process includes even more discretion than what may be apparent from the statute.

Mississippi has instituted a system that includes two levels of personalized discretionary review. The state has delegated private health care providers discretion to determine what broad variety of circumstances are eligible for a medical exemption, and which are not.[5] Acting on behalf of the state, these physicians conduct an individualized assessment of each potential medical exemption. If and when the medical exemption form is signed by a physician, it is then submitted to the Department of Health, where it is then reviewed pursuant to the State's published Medical Exemption guidelines.[6] The Medical Exemption Request Form instructs that requests will be "reviewed on a case by case basis."[7] If the exemption is accepted, that student is permitted to attend school without having received all of the mandated vaccines.

---

[5] *See* Exhibit J, Medical Exemption Request Form; *also available at* https://msdh.ms.gov/msdhsite/index.cfm/14,6296,71,pdf/MedicalExemptionRequest_139.pdf (last visited Sep. 2, 2022).

[6] MISSISSIPPI DEPARTMENT OF HEALTH, *Medical Exemption Policy*, https://msdh.ms.gov/msdhsite/index.cfm/14,0,71,688,html (last visited Sept. 2, 2022). Courts may take judicial notice of information contained in official government websites under Rule 201 of the Federal Rules of Evidence. *See, e.g., Hawk Aircargo Inc., v. Chao,* 418 F.3d 453, 457 (5th Cir 2005).

[7] *See* Exhibit J.

The secular exemption process is unavailable to citizens with religious objections to compulsory vaccination. For example, Plaintiff Brandi Renfroe called the Department of Health and requested that she be able to submit a religious exemption. Health Department officials stated they would not accept her religious exemption request, nor would any school in the state, but that she could pursue a medical exemption. *See* Compl. ¶ 46. However, her children have no medical condition that would permit this.

Mississippi not only refuses to consider religious exemptions, which is sufficient under *Fulton*, 141 S.Ct. 1868 and *Navy Seals*, 27 F.4th 336 to trigger strict scrutiny, the State has taken the additional step to single out religious adherents specifically for worse treatment by publicly announcing that religious exemptions are categorically excluded from consideration. In case there was any doubt, the Health Department's website states that it will consider medical exemptions, but not religious exemptions (exemption "**from required immunizations for religious, philosophical, or conscientious reasons is not allowed** . . . .").[8] It is plain Mississippi's exclusion of religious objections was intentional rather than incidental.

## LEGAL STANDARD

<u>Injunction</u>: The movant seeking a preliminary injunction must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

---

[8] MISSISSIPPI DEPARTMENT OF HEALTH, *Medical Exemption Policy*, https://msdh.ms.gov/msdhsite/index.cfm/14,0,71,688.html (last visited Sept. 2, 2022).

Summary Judgment: Plaintiffs also submit that there are no genuine issues of fact in this matter, and that they are entitled to judgment as a matter of law. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court views the evidence in a light most favorable to the non-movant. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). The non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Consolidation on the merits: Because this matter involves only questions of law, Plaintiffs also seek consolidation of the trial on the merits with the preliminary injunction under FRCP 65(a)(2) – seeking a permanent injunction. The elements of a permanent injunction are essentially the same as those for a preliminary injunction "with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

Regarding the first element in the preliminary injunction context, a heightened standard applies where, as here, a party requests a mandatory injunction seeking to upend the *status quo*. In such cases, the moving party must establish a "clear entitlement to relief." *Justin Indus.*, *Inc. v. Choctaw Secs.*, *L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990). While mandatory injunctions are granted in some circumstances, the Fifth Circuit has stated they are appropriate where the currently existing *status quo* is clearly causing irreparable injury. *See Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir.1974) (when examining a request for a mandatory injunction, "the focus always must be on prevention of injury by a proper order, not merely on preservation of the *status quo*"); *see also Armstrong v. Bd. of Educ.*, 323 F.2d 333, 338 (5th Cir. 1963) (in case implicating constitutional rights, the Fifth Circuit entered an order upending the

12

*status quo* of school segregation); *Marett v. Scott*, Civil Action No. 2:99cv244-D-B, 2000 U.S. Dist. LEXIS 5356, at *12 (N.D. Miss. Apr. 7, 2000) (in case that did not implicate constitutional rights, mandatory injunction issued where the "currently existing *status quo*" was causing irreparable injury); *ExxonMobil Pipeline Co. v. Landry*, No. 15-824-JWD-EWD, 2016 U.S. Dist. LEXIS 8713, at *7 (M.D. La. Jan. 26, 2016) (same).

## ARGUMENT

### I.   PLAINTIFFS POSSESS CLEAR ENTITLEMENT TO INJUNCTIVE RELIEF UNDER THE FIRST AMENDMENT AND HAVE ESTABLISHED THAT THE CHALLENGED LAW FACIALLY VIOLATES THE FIRST AMENDMENT

Plaintiffs possess clear entitlement to relief because the Compulsory Vaccination Law fails the general applicability and neutrality tests on multiple fronts and therefore invokes strict scrutiny review.  The regulation cannot survive strict scrutiny because it is not narrowly tailored to achieve the State's goal of decreasing transmission of infectious diseases.

Before examining the issues of general applicability and neutrality, and whether the law can survive strict scrutiny, several foundational issues should be addressed first.

The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  This clause has been incorporated against the states.  *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

Parents have the right to "direct the religious upbringing of their children" and "when the interests of parenthood are combined with a free exercise claim […] more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment."  *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

The Supreme Court has repeatedly recognized that "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."

13

*Employment Div. v. Smith*, 494 U.S. 872, 877 (1990). "In applying the Free Exercise Clause, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 n.9, (1987). The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981).

"Courts are not arbiters of scriptural interpretation," *id.,* and should not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965).

While the right of free exercise does not relieve citizens of their obligations to comply with a valid and neutral law of general applicability, "[t]he Free Exercise Clause commits government itself to religious tolerance," and a law that is not neutral or generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531-32. Strict scrutiny review is triggered if the law in question either is not generally applicable, or if it lacks neutrality. *See, e.g., Fulton,* 141 S. Ct. 1868, 1877 (lack of general applicability alone triggered strict scrutiny review); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018) (non-neutrality alone invoked strict scrutiny).

### A.    The Compulsory Vaccination Law is not Generally Applicable.

The Compulsory Vaccination Law fails the general applicability test for three independent reasons:

### 1.   The Compulsory Vaccination Law is not generally applicable because it permits secular conduct but prohibits religious observance.

The regulation in question is not generally applicable because it allows secular conduct but forbids similar religious conduct. A law "lacks general applicability if it prohibits religious

conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. 1868, at 1877 (citing *Lukumi*, 508 U.S. at 542-46).

It is undisputed that Mississippi enacted secular exceptions to its childhood vaccination program and openly prohibits religious exemptions. The Mississippi State Department of Health website, in bold font, states: "**[e]xemption from required immunizations for religious . . . reasons is not allowed under Mississippi law**."[9]

While Mississippi forbids even submitting a religious exemption request, the State has granted 1,970 medical exemptions over the past six years.[10] The Fifth Circuit recently upheld a preliminary injunction against the Navy's compulsory COVID-19 vaccination requirements, even though the Navy allowed service members to seek both medical and religious exemptions to the policy. *U.S. Navy Seals*, 27 F.4th 336, 339. The Navy had granted 17 medical exemptions to other Navy Seals but had not granted any religious exemptions. *Id.* at 348. The Fifth Circuit found a likely violation of RFRA and the First Amendment and upheld the injunction. *Id.* at 353.

This case presents more egregious constitutional violations than what was present in *Navy Seals.* The Navy had granted a handful of medical exemptions, and, at least in theory, allowed for religious exemptions to its compulsory vaccination policy. In contrast, Mississippi has granted 1,970 medical exemptions to its Compulsory Vaccination Law in the past six years, but outright prohibits its citizens from seeking religious exemption. *See also Thoms v. Maricopa Cnty. Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL, at *16 (D. Ariz. Nov. 5, 2021) (concluding that a

---

[9] MISSISSIPPI DEPARTMENT OF HEALTH, *Medical Exemption Policy*, https://msdh.ms.gov/msdhsite/index.cfm/14,0,71,688,html (last visited Sept. 2, 2022).

[10] *See* Exhibit K*,* Mississippi Department of Health School Immunization Report, 2021-2022; *also available at* https://msdh.ms.gov/msdhsite/_static/resources/18774.pdf (stating that 418 medical exemptions were granted in 2021; 374 in 2020; 382 in 2019; 333 in 2018; 255 in 2017; and 208 in 2016).

college's COVID-19 vaccine policy was not generally applicable, triggering strict scrutiny under the First Amendment, because "Plaintiffs presented evidence . . . that Defendant has made at least one exception" to the policy).

Further, Mississippi cannot show that an unvaccinated child with a religious exemption undermines the State's asserted interests any more than an unvaccinated child with a medical exemption.

### 2. The Compulsory Vaccination Law is not generally applicable because it allows for individualized discretionary review.

The law in question fails the general applicability test on alternative grounds because the medical exemption system invites "the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 187 (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). "'[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason.'" *Id.* (quoting *Smith*, 494 U.S. at 884).

It is undisputed that Mississippi has instituted a system of customized review for secular exemptions that is unavailable to citizens who possess religious objections to mandatory immunization. Through the plain language of the relevant statute, the State gave itself latitude to accept or deny secular exemptions on an individualized basis. The Compulsory Vaccination Law states: "A certificate of exemption from vaccination for medical reasons may be offered on behalf of a child by a duly licensed physician and **may be accepted by the local health officer when, in his opinion**, such exemption will not cause undue risk to the community." Miss. Code § 41-23-37 (emphasis added).

Further, Mississippi instituted a two-tiered system of customized review – delegated first to private physicians and second to the State Epidemiologist and Deputy State Epidemiologist –

who at each level conduct individualized assessment of every exemption request. Further confirming the discretionary nature of this process, the Medical Exemption Request Form itself states that medical exemption requests will be "reviewed on a case by case basis."[11]

The Sixth Circuit recently upheld a preliminary injunction against a university's COVID-19 vaccination mandate because the policy contained an individualized review process. *Dahl*, 15 F.4th 728, at 736. Even though the policy in question allowed for both medical and religious exemptions, the Sixth Circuit held that the policy was not generally applicable because the university had retained "discretion to extend exemptions in whole or in part." *Id.* In contrast, months before the *Dahl* decision, the Seventh Circuit held that the University of Indiana's vaccine mandate was neutral and generally applicable, and therefore subject to rational basis review, because it provided the possibility of a *non-discretionary* religious exemption to students. *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 592 (U.S. 7th Cir. 2021).

### 3. The statute is not generally applicable because it treats secular conduct more favorably than comparable religious exercise.

Mississippi's mandatory vaccination program is not generally applicable for additional a third independent reason. Government regulations are not "generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. 1294, at 1296 (emphasis in original) (citations omitted). Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Id.* In the context of regulations seeking to minimize the spread of infectious

---

[11] *See* Exhibit J, Medical Exemption Request Form.

disease, comparability "is concerned with the risks various activities pose, not the reasons why" individuals engage in those activities. *Id.*

Here, with regard to regulating the conduct of its secular and religious citizens, Mississippi holds the same interest in preventing infectious disease. Further, the secular and religious activities at issue (non-vaccination) are not only comparable, they are exactly the same. The reasons for opting out of compulsory immunization is the only thing that differs. The government cannot "assume the worst when people [exercise their religion] but assume the best when people [engage in secular activities].'" *Id.* at 1297 (quoting *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (per curiam)).

### B.   The Compulsory Vaccination Law is Not Neutral.

The regulation invokes strict scrutiny review on alternative grounds because it is not neutral. It lacks neutrality for two distinct reasons:

### 1.   The statute is not neutral because it favors secular conduct above comparable religious exercise.

When examining whether a law has passed the neutrality test, "[f]acial neutrality is not determinative." *Lukumi*, 508 U.S. 520, at 534. The government violates its duty of neutrality not only in the rare occasions when it targets religious exercise for exclusion on the face of a regulation; non-neutrality is implied where the government treats *any* secular conduct more favorably than similar religious exercise. *Tandon*, 141 S. Ct. at 1296. In such instances, the regulation simultaneously fails both the general applicability and neutrality tests. *See, e.g.,* *Lukumi*, 508 U.S. at 531 ("Neutrality and general applicability are [interrelated], and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied"); *see also* *Tandon*, 141 S. Ct. at 1296 (government regulations "are not neutral and generally applicable and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever

they treat *any* comparable secular activity more favorably than religious exercise" (*citing Diocese of Brooklyn*, 141 S. Ct. at 67) (emphasis in original)).

The *Tandon* and *Diocese of Brooklyn* rulings are especially relevant because, like here, both cases confronted the tension between First Amendment free exercise rights and government attempts to counteract the spread of infectious disease. The COVID-19 pandemic presented a dramatically greater and more imminent public health risk than what exists in this case. Nonetheless, the *Tandon* Court struck down the regulation in question under the First Amendment because it restricted at-home religious exercise while permitting secular activities that posed similar risks of COVID-19 transmission. *Id.* at 1297. The Supreme Court reached a similar conclusion in *Diocese of Brooklyn*, holding that New York had violated its duty of neutrality under the First Amendment by restricting access to houses of worship while permitting access to secular facilities. *Diocese of Brooklyn*, 141 S. Ct. at 66.

Again, the secular and religious activities at issue here (non-vaccination) are not only comparable, they are precisely the same. It is immaterial that Mississippi also prohibits non-vaccination for other secular reasons – it "is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon*, 141 S. Ct. at 1296. Consequently, considering these factors, the Compulsory Vaccination Law lacks neutrality.

Where a regulation fails the neutrality test, the government cannot exclude religious adherents from otherwise available public benefits. *See, e.g., Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (finding Maine's tuition assistance program was not neutral and striking it under the First Amendment because it paid for private school tuition, provided the schools were not religious); *see also Sherbert v. Verner*, 374 U. S. 398, 404 (1963) ("It is too late in the day to doubt

that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege"); *see also Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 16 (1947) (the government "cannot exclude" individuals "*because of their faith, or lack of it*, from receiving the benefits of public welfare legislation.")).

Here, the government has prohibited Plaintiffs' children from attending school if they persist in exercising their religious beliefs, even though Mississippi has guaranteed a free public-school education and requires that Plaintiffs educate their children. *See, e.g., Clinton School District*, 477 So.2d at 240 (the Mississippi Supreme Court held that "the right to a minimally adequate public education created and entailed by the laws of this state is one we can only label fundamental" and that the "right to a public education is a fundamental right protected by states"); *see also Hill v. Rankin County, Miss. Sch. Dist.*, 843 F. Supp. 1112, 1117 (S.D. Miss. 1993) (holding that that Mississippi Code Section 37-1-2 provides Mississippi schoolchildren the right to a free public education); *see also Goss v. Lopez,* 419 U.S. 565 (holding that when a state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment).[12]   Mississippi goes far beyond merely excluding Plaintiffs from a publicly available benefit.  Plaintiffs are subject to criminal prosecution under Miss. Code § 97-5-39 if they fail to educate their children.  Yet, the State prohibits them from placing their children in the educational system should they maintain their religious beliefs.

**2.    The statute lacks neutrality because it codified the *Brown* decision, a ruling that explicitly targeted religious observance for exclusion.**

The Compulsory Vaccination Law lacks neutrality on separate grounds because it was enacted as a direct consequence of a state court decision whose stated objective was to eliminate

---

[12] To the extent Plaintiffs possess a fundamental right under the Fourteenth Amendment, that right overlaps with their First Amendment rights.

certain religious exercise. In *Brown v. Stone,*[13] the Mississippi Supreme court held that *any* legislation permitting exemption to compulsory vaccination "because of [one's] religious" beliefs violated other citizen's constitutional rights. *Brown,* 378 So. 2d at 223. The *Brown* court, however, held that opting out of vaccination for secular reasons was valid. Such reasoning would never pass constitutional muster today, and, ironically, under *Smith,*[14] *Lukumi,*[15] *Masterpiece Cakeshop,*[16] *Diocese of Brooklyn*,[17] and *Tandon,*[18] the *Brown* court's rationale provides smoking gun evidence of non-neutrality.

A government policy will not qualify as neutral if it is "specifically directed at . . . religious practice." *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407 (2022) (citations omitted). A policy can fail this test if it is facially discriminatory or if a religious exercise is otherwise its "object." *Id.* Thus, a law will be found to violate the Free Exercise Clause if it was enacted "because of," not merely "*in spite of*" its restrictions on religious practice. *Lukumi*, 508 U.S. at 540.

Factors relevant to the assessment of governmental neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (citations omitted). Because "it is virtually impossible to determine the singular motive of a collective legislative body," courts often assign less weight to this element. *Lukumi*, 508 U.S. at 558 (Scalia, J., concurring in part and concurring in the judgment); *see also*

---

[13] 378 So. 2d 218.

[14] 494 U.S. 872.

[15] 508 U.S. 520.

[16] 138 S. Ct. 1719.

[17] 141 S. Ct. 63.

[18] 141 S. Ct. 1294.

*Stormans v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009) ("while the analysis of legislative history is proper in the equal protection context, the law is unsettled regarding the scope of its consideration in the free exercise arena.").

But here the motivation is manifest.  The Compulsory Vaccination Law, as it exists today, was enacted "because of" the Mississippi Supreme Court's extraordinary (and unconstitutional) decision to place proactive restrictions on religious exercise.  The Legislature's subsequent removal of the State's limited religious exemption was a formality – it simply codified what the *Brown* court had effectively already decreed.  The opinion itself provides conclusive evidence that eliminating religious exercise was the primary objective.

The *Brown* court confronted the simple issue of whether the First Amendment's Free Exercise Clause protected religious adherents not covered by the State's limited religious exemption.  Far from shielding a legislative act (the limited religious exemption) from a constitutional challenge, the *Brown* court took the extraordinary additional step and unsheathed a sword against *all* religious adherents who maintained objections to compulsory vaccination, including those who had up to that date been protected under the statute.  In fact, according to *Brown*, religious citizens who dared to attempt religious observance in the mandatory vaccination arena were themselves violating the Constitution.  The court held that the presence of a religious exception "which would provide for the exemption of children of parents whose religious beliefs conflict with the immunization requirements, would discriminate against the great majority of children whose parents have no such religious convictions . . . and would result in a violation of the Fourteenth Amendment."  *Brown,* 378 So. 2d. at 223.  However, unvaccinated secular school children possessing medical exemptions (available at that time) somehow would not violate other children's Fourteenth Amendment rights.

That the *Brown* court explicitly targeted religious observance while shielding secular exemptions, and that the State Legislature thereafter removed the religious exemption, is fundamental to the First Amendment neutrality inquiry.  The Compulsory Vaccination Law, as it exists today, is a codification of the *Brown* holding.  Considering the disparate treatment of religious and secular activity in the plain language of the opinion, and the explicit targeting of religious observance for elimination, the singular object of the decision and the subsequent legislative removal was to eradicate certain religious exercise, in clear violation of subsequent U.S. Supreme Court decisions.  *See, e.g., Lukumi*, 508 U.S. at 542 (the First Amendment's neutrality requirements prohibit government actors from taking action that has "as their object the suppression of religion"); *see also Fulton*, 141 S. Ct. at 1877 (the government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.").  Since 2013, the Mississippi Legislature has proposed bills on an annual basis that would establish a comprehensive religious exemption, but the constitutionality of enacting such legislation in Mississippi has been called into serious question because of the *Brown* decision, acting as a roadblock to passage of these bills.

However, forty-four states have codified religious or philosophical exemptions to childhood vaccination requirements, and not one of those statutes has been declared unconstitutional.  Moreover, an Arkansas federal district court examined a situation very similar to *Brown*, but arrived at the opposite conclusion.  Arkansas previously had a limited religious exemption similar to Mississippi's at issue in *Brown*.  In *Boone v. Boozman*,[19] and a mother who possessed religious objections unrecognized by the Arkansas statute challenged the limited religious exemption on First Amendment grounds.  *Boone v. Boozman*, 217 F. Supp. 2d 938, 951

---

[19] 217 F. Supp. 2d 938.

(E.D. Ark. 2002).  In direct contrast *Brown*, the *Boozman* court held that the limitation of the statutory exemption to a "recognized church or religious denomination" violated the Free Exercise Clause.  *Id.*  Arkansas soon thereafter enacted a religious exemption, that is not limited to certain groups, which remains the law today.

In sum, for numerous independent reasons, Mississippi's Compulsory Vaccination Law is neither neutral nor generally applicable, and therefore triggers strict scrutiny review.

### C.      The Compulsory Vaccination Law will not Survive Strict Scrutiny.

A law burdening religious exercise "that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546 (citations omitted).  Such regulations can "survive strict scrutiny only if it advances "interests of the highest order" and is "narrowly tailored to achieve those interests." *Fulton,* 141 S. Ct. at 1881 (citations omitted).  Moreover, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547.  It bears noting that where the government permits secular exceptions to a policy, it is the **burden of the government** to "show that the religious exercise at issue is more dangerous" than the secular exemptions if it is to deny religious exemptions. *Tandon*, 141 S. Ct. 1294 at 1297.

While Mississippi may have a meaningful interest in preventing the transmission of infectious disease, its interest is apparently not so compelling as to cause it to restrict secular exemptions to mandatory immunization.  Courts have found the asserted compelling interest in preventing the spread of disease as not compelling where the government actor grants secular exceptions to the policy.  *Usn Seals 1-26 v. Biden*, 578 F. Supp. 3d 822 (N.D. Tex., Jan 2, 2022).

Further, Mississippi's interest here is not nearly as urgent as the government's interest in controlling the spread of COVID-19.  Yet, courts across the country – including the U.S. Supreme Court, on several occasions – have struck down government attempts to counteract the pandemic

24

where the regulations in question infringed upon First Amendment rights and were not narrowly tailored.

Even if the State's interests are sufficiently compelling, Mississippi's Compulsory Vaccination Law cannot withstand strict scrutiny because it is not narrowly tailored. In the context of government regulations targeting infectious disease, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest" in reducing transmission of the targeted disease. *Id.* at 1296-97. Where utilization of such less restrictive means is required, the government "may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal." *Lukumi*, 508 U.S. at 578.

Mississippi's Compulsory Vaccination Law cannot withstand heightened scrutiny because it is both over-inclusive and under-inclusive relative to the state interests it purportedly attempts to achieve. Mississippi's compulsory immunization scheme is under-inclusive because it only applies to children in a school setting. The mandate does not apply to non-school attending children (who regularly interact with their peers in other settings) nor to adults in the state, who comprise over 76% of Mississippi's population.[20] Mississippi does not require adults to provide proof of vaccination for any activities, including employment in state government, accessing state parks or government buildings, or entering into any store, library, playground or restaurant. Nor does Mississippi require proof of immunization for children to participate in recreational sports leagues or any other group children's activities. *See BST Holdings, LLC. v. OSHA.*, No. 21-60845,

---

[20] *See* U.S. CENSUS BUREAU, *QuickFacts Mississippi*, https://www.census.gov/quickfacts/MS (stating that 76.5% of Mississippi's population is over the age of 18) (last visited Sept. 2, 2022).

13 (5th Cir., Nov. 12, 2021) ("underinclusiveness of this sort is often regarded as a telltale sign that the government's interest in enacting a liberty-restraining pronouncement is not in fact 'compelling.").

Even if the State's interest in immunizing its citizens could somehow logically be limited exclusively to children in a formal school setting, the law in question is still inescapably underinclusive because it permits medical exemptions.  If children with a medical exemption can safely attend school, there is no reason a child with a religious exemption cannot as well. Mississippi cannot demonstrate that non-receipt of a vaccine for religious reasons poses any more risk to their objectives than does non-receipt of a vaccine for medical reasons.  *See Tandon*, 141 S. Ct. at 1296, 1297 ("Comparability is concerned with the risks various activities pose . . . . Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.  Otherwise, precautions that suffice for other activities suffice for religious exercise too.").

The immunization scheme also fails to capture conduct necessary to achieve the government's apparently limited interest in controlling transmission only within school buildings because the requirements do not apply to adults who are employed in Mississippi's schools, or to school visitors.

Additionally, the Compulsory Vaccination Law is overbroad as Mississippi can achieve its goal of reducing the rates of communicable disease through less restrictive means.  The existence of a religious exemption would have an immaterial impact in the number of individuals vaccinated in Mississippi overall.  It also would be a miniscule, non-material percentage as compared to the number of vaccinated school children.  For example, Alabama, tied with Mississippi as the most

religious state in the country,[21] and a state that is demographically very similar to Mississippi, has a religious exemption to vaccination that is easy to obtain. Yet the total number of religious *and* medical exemptions was less than 0.8 percent of all schoolchildren in Alabama in the 2020 school year[22] and an even more miniscule .1% of the total population of Alabama.[23]  Similarly, the medical and religious exemption rates are also minuscule and insignificant in the surrounding states of Louisiana, Arkansas, and Tennessee,[24] each of which also have an easily obtained religious exemption.

However, instead of regulating with the surgical precision necessary to avoid conflict with its citizens' free exercise rights, Mississippi has deployed a blunt legislative hammer and, in one stroke, obliterated every possibility for religious observance.  Accordingly, because it cannot withstand strict scrutiny review, the Compulsory Vaccination Law is unconstitutional.

## II.      THE REMAINING PRELIMINARY INJUNCTION ELEMENTS FAVOR RELIEF

### A.      *Plaintiffs have Suffered and Continue to Suffer Irreparable Injury.*

Plaintiffs have endured irreparable injury.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  That extends to the loss of "free exercise rights 'for even minimal periods of time.'" *Tandon*, 141 S.Ct. 1294 at 1297.

---

[21] *See* PEW RESEARCH CENTER, *How religious is you state?* https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=alabama (last visited Sept. 2, 2022).

[22] *See* Exhibit L, Alabama Department of Public Health, 2019-20 School Entry Survey; *also available at* https://www.alabamapublichealth.gov/Immunization/assets/2020schoolsurvey_county.pdf

[23] U.S. CENSUS BUREAU, *QuickFacts Alabama,* https://www.census.gov/quickfacts/AL  (last visited Sept. 2, 2022) (stating that Alabama's population is 5,039,877).

[24] CENTERS FOR DISEASE CONTROL, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten – United States, 2020-21 School Year*, https://www.cdc.gov/mmwr/volumes/71/wr/mm7116a1.htm (last visited Sept. 2, 2022).

Here, the violation of Plaintiffs' First Amendment rights alone constitutes irreparable injury as a matter of law. *Id*. However, Plaintiffs have been irreparably harmed on additional fronts. Plaintiffs' children are categorically evicted from the State's educational system, even though Mississippi's Constitution combined with the Fourteenth Amendment guarantees a free public-school education. *See Hill*, 843 F. Supp. at 1117 (holding that that Mississippi Code Section 37-1-2 provides Mississippi schoolchildren the right to a free public education); *see also Goss v. Lopez,* 419 U.S. 565 (1975) (holding that when a state law creates a right to public education, that right becomes protected by the Due Process Clause of the Fourteenth Amendment). Every Plaintiff attempted to obtain a religious exemption to the State's mandatory immunization policy, and all were summarily rejected. Moreover, Plaintiffs are threatened with criminal prosecution under Miss. Code § 97-5-39 should they fail to educate their children. Plaintiff Pastor Paul Perkins is subject to additional criminal prosecution under Miss. Code § 37-13-91 were he to enroll his daughter in the school where he serves as headmaster.

Further, Plaintiffs have endured significant practical and financial hardships for upholding their religious convictions. Recently, the Fifth Circuit recognized that the OSHA vaccine mandate for employers with 100 or more employees "threatens to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Every Plaintiff has suffered professionally for their decision to maintain their religious beliefs. Plaintiffs Dr. Jeana Stanley and Brandi Renfroe uprooted their families and moved from Mississippi to Alabama so their children could be educated in a state that permits religious exemptions. Plaintiffs Kimberly Harrell and William Morgan are preparing to move to another state so their children can obtain a formal education. Plaintiffs William Morgan, Amanda Bosarge, Kimberly Harrell, and Pastor Paul

Perkins, at significant financial and professional costs, have been forced to homeschool their children, the only option Mississippi permits for children absent a medical condition. *See BST Holdings*, 17 F.4th at 618 (determining burdens of certain regulatory compliance and monetary injuries as sufficiently irreparable). Plaintiffs' injuries – past, ongoing, and imminent – cannot be remedied by a later-issued court order.

      **B.**      ***The Balance of Harms and the Public Interest in Protecting Civil Liberties Weigh in Favor of Injunctive Relief.***

The balance of harms and public interest preliminary injunction factors likewise strongly favor an injunction. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction will not disserve the public interest where "it will prevent constitutional deprivations." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.")).

This axiom does not evaporate merely because the State invokes an interest in preventing the transmission of contagious diseases. As outlined above, the Compulsory Vaccination Law not only fails strict scrutiny; Mississippi's lack of a religious exemption is manifestly irrational. Mississippi boasts one of the highest childhood vaccination rates in the country; its interest is not so compelling as to forbid medical exemptions; the State does not require proof of immunization for adults (who constitute more than 76% of the state's population), out-of-state visitors, or for any other activities; and forty-four states, including all of Mississippi's adjacent neighbors, permit a religious exemption to their childhood immunization requirements.

Considering these factors, Mississippi cannot demonstrate that the public interest requires Mississippi families to discard their religious convictions, and their constitutional rights, so their children can benefit from a formal education. Additionally, Mississippi cannot credibly argue the

public interest requires that the government to compound these constitutional and dignitary harms by causing Plaintiffs to continue suffering significant personal and professional sacrifices (including the threat of criminal prosecution) should they maintain their religious beliefs.

## **CONCLUSION**

The facts necessary to resolve this case are undisputed and Plaintiffs possess clear entitlement to declaratory and injunctive relief, and summary judgment in their favor. Mississippi prohibits religious exemptions, but permits discretionary secular exemptions to its mandatory immunization scheme. On its face, this policy violates the First Amendment. Accordingly, Plaintiffs respectfully request this Court to grant the motion for summary judgment, declaratory relief, and a preliminary or permanent injunction against the Compulsory Vaccination Law, to require the State to recognize religious exemptions in the same manner that it recognizes secular exceptions.

Dated: September 2, 2022

Respectfully submitted,

SIRI & GLIMSTAD LLP

/s/ *Walker D. Moller*
Walker Moller, Attorney
Mississippi Bar Number: 105187
501 Congress Avenue
Suite 150 – #343
Austin, TX 78701
Tel: (512) 265-5622
Fax: (646) 417-5967
wmoller@sirillp.com

Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Catherine Cline, Esq.*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967

aaron@sirillp.com
ebrehm@sirillp.com
ccline@sirillp.com

Christopher Wiest, Attorney*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

*pro hac vice* to be submitted

# Exhibit A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

AMANDA BOSARGE, JAQUELYN
BUTLER, KIMBERLY HARRELL,
WILLIAM MORGAN, PASTOR PAUL
PERKINS, BRANDI RENFROE, and DR.
JEANA STANLEY, individually and on
behalf of their minor children,

          *Plaintiffs,*

  -against-

DANIEL P. EDNEY, in his official capacity
as the State Health Officer; LYNN FITCH, in
her official capacity as the Attorney General
of Mississippi; ASHLEY BLACKMAN, in
her official Capacity as Principal of East
Central Lower Elementary School; DR.
ARCHIE R. MITCHELL, in his official
capacity as Principal of Senatobia
Elementary School; ALLISON MERIT, in
her official capacity as Principal of North
Bay Elementary School; DR. ASHLEY
ALLRED, in her official capacity as
Principal of Vancleave Upper Elementary
School; and DOUGLAS L. TYNES, in his
official capacity as the City Prosecutor for
Ocean Springs, Mississippi,

          *Defendants.*

Civil Action No.  1:22cv233 HSO-BWR

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    The issue presented to this Court is whether the State of Mississippi can force families with

religious convictions to vaccinate their children as a condition of enrolling their children in school,

while simultaneously allowing secular families to be exempt from the state's childhood

1

vaccination requirements on medical grounds. Because this policy violates the United States Constitution, Plaintiffs request declaratory and injunctive relief.

Plaintiffs, Amanda Bosarge, Jaquelyn Butler, Kimberly Harrell, William Morgan, Pastor Paul Perkins, Brandi Renfroe, and Dr. Jeana Stanley, for their complaint, against Daniel P. Edney, in his official capacity as the State Health Officer; Lynn Fitch, in her official capacity as the Attorney General of Mississippi; Douglas L. Tynes, in his official capacity as City Prosecutor; and certain school principals in their official capacities, by and through their attorneys, allege as follows:

## INTRODUCTION

1.     According to the Pew Research Center, 82% of Mississippians say that "they believe in God with absolute certainty"[1] and Mississippi is commonly recognized as the most religious state in America.[2]

2.     Plaintiffs possess deeply held religious beliefs that forbid them from vaccinating their children, and their decision to observe their religious convictions has required significant sacrifices. Mississippi's compulsory school attendance law requires children ages 6 through 17 to be enrolled in an education program. *See* Miss. Code § 37-13-91. The Mississippi Supreme Court has held that "the right to a minimally adequate public education created and entailed by the laws of this state is one we can only label fundamental" and that the "right to a public education is a fundamental right protected by states." *Clinton Mun. Separate Sch. Dist. v. Byrd*, 477 So.2d 237, 240 (Miss. 1985). Plaintiffs' children have nevertheless been excluded from Mississippi's

---

[1] *See* PEW RESEARCH CENTER, *Religious Landscape Study*, https://www.pewresearch.org/religion/religious-landscape-study/state/mississippi/ (last visited Sept. 1, 2022).

[2] *See* PEW RESEARCH CENTER, *How religious is you state?* https://www.pewresearch.org/fact-tank/2016/02/29/how-religious-is-your-state/?state=mississippi (last visited Sept. 1, 2022).

educational system because of their parents' religious beliefs and are unable to access the practical and social benefits of a formal education that their secular peers enjoy.

3.    In Mississippi, it is "unlawful for any child to attend any school, kindergarten or similar type facility intended for the instruction of children . . . either public or private . . . unless they shall first have been vaccinated against those diseases specified by the state health officer." Miss. Code § 41-23-37 (the "**Compulsory Vaccination Law**").    This provision has been interpreted expansively to require vaccination for children to be eligible for enrollment at any school in the state, from pre-school and day care through high school.

4.    "It is the responsibility of the person in charge of each school to enforce the requirements for immunization" and "[f]ailure to enforce provisions of [this law] shall constitute a misdemeanor and upon conviction be punishable by fine or imprisonment or both." *Id.*

5.    Despite a majority of Mississippians being religious, Mississippi prohibits religious exemptions for these mandated vaccines.[3]  The fact that Plaintiffs' children are ineligible to enroll in Mississippi schools is not an incidental consequence of neutral, generally applicable legislation. Mississippi previously had a religious exemption to its vaccination requirements, but the state legislature made the calculated decision to remove that exemption after a state court judge declared it invalid.  *Brown v. Stone*, 378 So. 2d 218, 221 (Miss. 1979).

6.    The validity of that state court decision, however, has since been called into serious question by numerous United States Supreme Court and federal court decisions.  *See Employment*

---

[3] Forty-four states allow school-age children to be exempt from vaccinations for religious reasons and at least two others have provisions grandfathering in children with a prior religious exemption.  *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, *States with Religious and Philosophical Exemptions from School Immunization Requirements,* https://www.ncsl.org/research/health/school-immunization-exemption-state-laws (last visited Sept. 1, 2022).

*Div., Dep't of Human Resources of Ore v. Smith*, 494 U.S. 872 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021); *see also U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022); *Fraternal Order of Police v. Newark*, 170 F.3d 359 (3d Cir. 1999); *Boone v. Boozman*, 217 F. Supp. 2d 938 (E.D. Ark. 2002); *Sherr v. Northport-East Northport Union Free Sch. Dist.,* 672 F. Supp. 81 (E.D.N.Y. 1987).

7.      Critically, after stripping the state's citizens' rights to seek a religious exemption, Mississippi enacted a medical exemption system.  Removing one exemption while enacting another confirmed that the exclusion of families with religious beliefs against vaccination was not the result of an absolute priority to ensure every single child is vaccinated, but rather a calculated choice to eliminate religious beliefs.  *See* Miss. Code § 41-23-37 ("A certificate of exemption from vaccination for medical reasons may be offered on behalf of a child by a duly licensed physician . . .").

8.      Other than excluding them from school, Mississippi does not intrude into the lives of unvaccinated children in any other way.  For example, Mississippi does not prohibit unvaccinated children from participating in camp, prohibit them from visiting a public library, or require proof of vaccination for any other activity.

9.      Mississippi has made an unconstitutional value judgment that secular (*i.e.*, medical) motivations for opting out of compulsory immunization are permitted, but that religious motivations are not.

4

10.     Defendants' actions have deprived and will continue to deprive Plaintiffs of their inalienable rights under the United States Constitution.

11.     Defendants committed each act alleged herein under the color and authority of Mississippi law.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 1343(a).  This action arises under the First and Fourteenth Amendments to the United States Constitution.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

14.     This Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure.

## PARTIES

### A.     Plaintiffs

**Pastor Paul Perkins**

15.     Plaintiff Pastor Paul Perkins (**"Pastor Perkins"**) is a citizen of the state of Mississippi and resides in Vancleave, Mississippi.  He is the father of a nine-year-old daughter, T.P.; the Head Administrator of the Grace Baptist Academy in Ocean Springs, Mississippi; and the head pastor at Grace Baptist Church.

16.     Pastor Perkins and his wife prayed extensively and consulted the Bible when deciding whether or not to vaccinate T.P. and they arrived at the firm religious conviction that they

must not. More specifically, because many of the required childhood vaccines were derived from aborted fetal cells, Pastor Perkins believes vaccinating his child would cause him and his family to be complicit in abortion. *See* Pastor Perkins' Statement of Religious Beliefs, attached as Exhibit A. Additionally, Pastor Perkins and his family have religious convictions that form their approach to all medical treatments, including vaccination. The Perkins' family takes a natural approach to dealing with illness, believing that God has created humans with functioning immune systems that were well designed to counteract threats. While the Perkins do not object to all medication, they only seek it out when an intervention is clearly necessary. *Id.* Upholding these convictions has come with sacrifices and risks. When the family served as missionaries in the Philippines, they were at risk of having their visas revoked because of non-compliance with immunization documentation requirements.

17.     T.P. has received no vaccines and, accordingly, is unable to enroll at Grace Baptist Academy where her father is the Head Administrator. Grace Baptist Academy is not a public school – it is a private religious-based tuition school, in which, among other things, religious and secular classes are held. Many of the students who attend Grace Baptist Academy attend Pastor Perkins' church (the school is within the church). T.P. is permitted to attend church with those students, and interacts frequently with those children outside of church, but she is not permitted to attend school with them.

18.     The Perkins want T.P. to attend the school. Pastor Perkins, as the school's Head Administrator, has on several occasions been required to prohibit other unvaccinated children from enrolling at Grace Baptist Academy. Consequently, he knows enrolling T.P. is not an option.

19.     Pastor Perkins is a devout adherent to his faith, which at times has brought about discrimination. When Pastor Perkins and his family were missionaries in the Philippines, they

6

experienced several forms of religious discrimination. Pastor Perkins' work in the Philippines focused on prison ministry. The Philippines is a very religious country, but evangelical Christians like Pastor Perkins represent a small minority of the population. Mindanao Island, on the southern tip of the Philippines, is home to several militant groups who are driven by religious ideology, including affiliates of the Islamic State of Iraq and Syria ("ISIS").

20.     Pastor Perkins' ministry owned land on Mindanao. When Pastor Perkins was attempting to set up a prison recovery program in Mindanao, access to the property was blocked by armed militias. Additionally, upon learning of his religious beliefs, prison administrators often required Pastor Perkins to fulfill "specialized" admission requirements that were not required of members of other religions and denominations. Scheduled ministry times were changed or moved abruptly without prior notice, causing frequent disruptions and cancellations. Pastor Perkins suffered these adverse actions due to his religious beliefs.

21.     The discrimination Pastor Perkins has experienced has not been constrained to the Philippines. In Mississippi, Pastor Perkins and his family have been negatively impacted in a variety of ways for holding true to their religious convictions.

22.     Critically, unless Pastor Perkins agrees to violate his religious beliefs, T.P. is unable to attend the school where her father is the Head Administrator. In fact, if Pastor Perkins were to enroll her at Grace Baptist Academy, he would be subject to potential prison time. *See* Miss. Code § 41-23-37. Pastor Perkins wishes to enroll T.P. at Grace Baptist Academy, and would, but-for the threat of criminal prosecution against him.

23.     As a homeschooler with parents in full-time ministry, T.P. is forced to learn in an ever-changing environment. Her teachers are her parents, and her parents' time is in high demand. Full-time ministry does not follow a set schedule, and the Perkins are called into the community

at all hours of the day, often for extended periods of time. For example, a church member recently passed away and Pastor Perkins and his wife stayed with the surviving spouse, arranging meals, counseling him, and coordinating the funeral service. Pastor Perkins' wife oversees scheduling medical appointments for elderly members of the church, and often accompanies them to the doctor. Consequently, T.P.'s learning schedule is atypical. The Perkins desire a more consistent learning environment for T.P.

24.     Even though T.P. is doing very well academically, the Perkins also want T.P. to have access to a more complete education, where she can interact with children her age in a more structured educational environment.

25.     Although she cannot enroll at her father's school due to her family's religious beliefs and the state's law that does not permit religious exemptions, T.P. is still an active part of the community. On a weekly basis, T.P. frequently engages with children her age outside of a school setting. She is involved with Junior Church and the Patch Club (children's ministries at Grace Baptist Church) and attends Sunday school every week with peers who attend local schools. T.P. is on a local volleyball team and travels frequently throughout Mississippi and the Southeast for competitions against children who attend public and private schools. The family also travels extensively throughout the United States for ministry and vacation, where T.P. has frequent interactions with children her age. While Mississippi law prohibits T.P. from enrolling in school, it does not prohibit her from being an active and present member in society where she is in close contact with children of all ages.

**Kimberly Harrell**

26.     Plaintiff Kimberly Harrell (**"Ms. Harrell"**) is a single mother and nurse practitioner who resides in Brandon, Mississippi.  She adopted her daughter, S.H., in 2016 after meeting S.H.'s biological mother through a church ministry.

27.     Ms. Harrell's professional career has focused on serving Mississippi's underprivileged communities.  Ms. Harrell often works with at-risk families and children who are subject to abuse and neglect.  Through these experiences, and in application of her understanding of the Bible, Ms. Harrell came under increasingly firm conviction to become more proactively engaged with at-risk children.

28.     Ms. Harrell had been mentoring S.H.'s biological mother through a ministry before she became pregnant.  S.H.'s biological mother, for a variety of reasons, did not believe she would be able to provide for her unborn child, and asked Ms. Harrell if she would be willing to step in.  After a brief period of prayer and searching the Scriptures, Ms. Harrell immediately knew she was called to adopt the child.

29.     S.H. received one vaccine in the first week of her life, before Ms. Harrell finalized adoption proceedings.  After fasting and praying for an extended period, Ms. Harrell arrived at a "deep and compelling certainty" that "no matter the consequence," vaccinating S.H. would violate God's will and her Christian beliefs.  *See* Ms. Harrell's Statement of Religious Beliefs, attached as Exhibit B.  In her belief system, Mr. Harrell emphasizes focused prayer and fasting, and is under conviction that God led her to "this specific decision" to decline vaccinating S.H.  *Id.*  Ms. Harrell also objects to the "immoral practices of the use of aborted fetal cells and many other toxins" used in vaccines.  *Id.*  After, much prayer, Ms. Harrell is under firm religious conviction that she must not vaccinate S.H.  Ms. Harrell's understanding of the Bible is that it would be "a sin to have a

9

clear conviction about something but do it anyway." *Id.* (citing Romans 14:23). As a result, since the adoption, S.H. has not received any more vaccines.

30. When S.H. became eligible to enroll in preschool, Ms. Harrell again sought guidance through searching the Bible, fasting, and praying. She had "no peace" about vaccinating S.H. and, accordingly, has homeschooled her daughter for the past two years. *Id.*

31. For a variety of reasons, Ms. Harrell desires for S.H. to attend a Mississippi public or private school. Ms. Harrell attempted to enroll her daughter at Rouse Elementary School in Brandon, Mississippi and was instructed to fill out a proof of immunization form. When Ms. Harrell inquired whether the school would consider her religious exemption request, school officials referred her to the Mississippi Department of Health. Ms. Harrell called the Health Department and a representative advised that "Mississippi does not do any religious exemptions."

32. Ms. Harrell also attempted to enroll S.H. at a private school, Park Place Christian school, in Brandon, Mississippi. After requesting a religious exemption, the school's director of admissions instructed Ms. Harrell that the school was required to follow Health Department guidelines and that the school was not able to accept or even consider a religious exemption request.

33. Ms. Harrell's decision to obey her religious convictions and decline compulsory vaccination has come at significant cost.

34. As a result of homeschooling S.H., Ms. Harrell has been forced to decline numerous professional opportunities. Ms. Harrell has dreamed of opening her own private medical practice, but because of S.H.'s educational needs, she knows that is not an option.

35. Presently, Ms. Harrell is able to obtain sufficient hours as an independent contractor, allowing her to structure her work schedule around S.H.'s educational needs. But while

10

it is necessary for S.H.'s schooling, working as an independent contractor is suboptimal for many reasons. Ms. Harrell does not have healthcare or retirement benefits. Instead of placing excess income into a personal retirement account, Ms. Harrell often expends available resources on S.H.'s education, including curriculum, school material, and tuition for a homeschooling cooperative program in the Jackson metro area.

36.    To ensure S.H. is learning at a commensurate pace as her peers, Ms. Harrell has also incurred substantial out-of-pocket costs to have S.H.'s learning abilities regularly assessed. Ms. Harrell anticipates S.H. may require specialized educational instruction in the future that public schools would be better suited to provide.

37.    S.H. is a motivated child and is doing well in the homeschool environment, due primarily to Ms. Harrell's oversight and significant investments. However, Ms. Harrell often wrestles with the fact that S.H. will miss out on the socialization process that accompanies traditional schooling. Ms. Harrell has been able to supply social opportunities to S.H. but doing so has been demanding on her time and work schedule. To ensure S.H. obtains sufficient social interactions, Ms. Harrell takes her to and from various educational and social activities at all times of the day.

38.    S.H. interacts daily with children who attend Mississippi public and private schools. On a weekly basis, S.H. goes to Sunday school with local children enrolled at schools throughout the Jackson-metro area. Ms. Harrell regularly takes S.H. to community parks during the week, and S.H. has taken ballet and tumbling classes, as well as swimming lessons with other children. As part of her education, Ms. Harrell often takes S.H. to local children's museums (where they are members) and S.H. regularly participates in events at local libraries.

39. Over the past three years, Ms. Harrell has traveled extensively with S.H. throughout the Southeast. S.H. is a very social child. She is eager to make new friends wherever she goes and initiates interaction with other children at every opportunity.

40. Because of the additional financial and practical demands associated with homeschooling, Ms. Harrell is strongly considering moving to a neighboring state so her daughter can attend school and have access to the attendant opportunities and advantages that a conventional school setting provides. However, considering her connections and established support system in Mississippi, Ms. Harrell is very hesitant to take this step.

**Brandi Renfroe**

41. Plaintiff Brandi Renfroe ("**Mrs. Renfroe**") and her husband are lifelong Mississippians and recently inherited a home in Vancleave, Mississippi. Mrs. Renfroe works and pays taxes in Mississippi, as does her husband. The family attends church in Ocean Springs and their closest relationships are with other Mississippi families. However, the Renfroes had to move across the state line to Alabama so their unvaccinated children could attend school.

42. Mrs. Renfroe holds a firm spiritual conviction that vaccinating her children would violate her religious beliefs. For the past 21 years, Mrs. Renfroe has been involved in a Rosary Prayer group based on the Mississippi Gulf Coast. The group has been actively involved in fighting and praying for unborn children, and members have raised significant finances to fund billboards encouraging expecting mothers to preserve life. The group has instituted a standing prayer item to "please protect and save unborn children."

43. As a devout Catholic, Mrs. Renfroe believes that life begins at conception. Consequently, she also vehemently objects to participating in any activity involving abortion, which, in her system of religious beliefs, includes subjecting her children to vaccines that depend

on abortion to exist.  *See* Mrs. Renfroe's Statement of Religious Beliefs, attached as Exhibit C. She also believes childhood vaccines are "a violation of our duty to put our faith in [God] because they preemptively reject and doubt God's design, which is a sin." *Id.*

44.     Initially, Mrs. Renfroe's husband did not share her religious beliefs on vaccination. Because of that, their oldest son, B.R., age 10, received one vaccine when he was 20 months old.

45.     After searching the Scriptures and praying through the issues as a couple, Mr. and Mrs. Renfroe arrived at a spiritual consensus regarding vaccinating their children.  Consequently, their eight-year-old son, S.R., has received no vaccines and B.R. has received no vaccines aside from one at the age of 20 months.

46.     Mrs. Renfroe attempted to enroll B.R. and S.R. at Vancleave Upper Elementary School with religious exemption documentation.  School administrators explained that Mississippi only accepts medical exemptions and referred her to the Mississippi Department of Health to verify.  Mrs. Renfroe called the Department of Health and inquired whether she would be able to enroll her child in school with a religious exemption. Health Department officials confirmed that Mississippi would consider medical exemption requests, but not religious exemptions.

47.     In order to observe their religious convictions, the Renfroes moved to Alabama when their oldest son reached school age. The Renfroes possess strong ties to Mississippi.  The home the family inherited in Vancleave is next to Mrs. Renfroe's brother and his family.   The Renfroes want to move their family back to that home and they will do so if state law permits a religious exemption.

48.     The Renfroe's decision to adhere to their religious convictions has negatively impacted the family in numerous ways.  The moving costs were substantial.  The Renfroes could

not initially find an affordable home in Alabama and had to rent a house and storage space for several years before they were able to find a residence to remodel.

49.     Mr. and Mrs. Renfroe also expend considerable time and money commuting to and from Mississippi for their jobs.  Mrs. Renfroe works as a court reporter primarily in Gulfport, Long Beach, and Bay St. Louis, Mississippi.  She drives from Alabama to Mississippi every day for this work.   On Sundays, the family attends St. Alphonsus Catholic Church in Ocean Springs, Mississippi, where B.R. and S.R. recently received their First Reconciliation and First Communion.

50.     The Renfroes' sons frequently interact with their Mississippi cousins who attend public schools in the Vancleave School District.  The family maintains lifelong friendships with Mississippians whose children attend Resurrection Catholic School in Pascagoula, as well as public schools throughout the Mississippi Gulf Coast.

51.     The Renfroes are also active members of the Singing River Yacht Club in Pascagoula, where Mr. Renfroe, until recently, was the head tennis professional.  The Renfroes' sons have grown up at the club playing tennis, swimming, and fishing with their Mississippi peers. In fact, the boys spend most of their summers engaging in various activities at the club and they participate in a youth baseball league in Pascagoula, Mississippi.  Additionally, Mr. Renfroe is the boys' baseball coach for a travel team based out of Pascagoula and their teammates are children who attend school in Mississippi.

52.     Even though relocating to Vancleave would be ideal, the Renfroes cannot take this step and simultaneously maintain their religious beliefs.

**Amanda Bosarge**

53.     Plaintiff Amanda Bosarge (**"Mrs. Bosarge"**) and her husband reside in Moss Point, Mississippi.  The Bosarges have three children, E.B., age 9; B.B., age 6; and N.B., age 3, who have received no vaccines.

54.     The Bosarges' decision to decline compulsory vaccination is based on their sincerely held Christian beliefs.  Mr. and Mrs. Bosarge served as missionaries in Thika, Kenya with a ministry that focused on serving the Maasai tribe.  Through that experience, and throughout their lives, the Bosarges have learned the importance of seeking God's direction for daily and long-term decisions.  When they are under conviction from the Holy Spirit, they are careful to immediately obey. *See* Mrs. Bosarge's Statement of Religious Beliefs, attached as Exhibit D.

55.     After much thought and prayer, the Bosarges are adamant that vaccinating their children would be to disobey the Holy Spirit's leading. *Id.*  Ms. Bosarge is aware that the fetal cell lines used in the development, testing, and/or manufacturing of many childhood vaccines "were obtained from a dismembered prebirthed child" and she cannot "endorse the use of aborted babies in production of vaccinations by injecting them into [her] body or her children's bodies." *Id.*  Additionally, Ms. Bosarge believes that taking "a vaccine shows a lack of faith in God because it gives a false sense of safety." *Id.*  Ms. Bosarge believes that trusting in vaccines, rather than God-given immunity and faith in God, is an unnecessary "fear-based approach to health." *Id.* After thought and prayer, the Bosarge family has chosen to take a faith-based approach and to trust God for their physical health. *Id.*

56.     Mrs. Bosarge attempted to enroll E.B. at East Central Lower Elementary School and told school administrators that her children were not vaccinated based on the family's religious beliefs.  The administrator was sympathetic to the situation and stated that she was "sure the school

15

could find a solution" to accommodate the family's religious beliefs. However, the school called back a few days later and stated that E.B. could not enroll because she had determined "Mississippi does not allow for religious exemptions." The administrator advised Mrs. Bosarge that she could request a medical exemption; however, E.B. has no medical condition that would permit this.

57. Because their children are ineligible to attend Mississippi schools, Mrs. Bosarge homeschools all three of her unvaccinated children.

58. The Bosarges' inability to comply with compulsory vaccination is impacting the family's finances significantly. Mrs. Bosarge is pursuing further education while homeschooling her children, and often hires babysitters so she can maintain her studies. For obvious reasons, Mrs. Bosarge has fallen behind; consequently, she anticipates that she will incur additional tuition costs. The Bosarges cannot afford tutors or private teachers – their only current alternative to homeschooling.

59. The Bosarges are aware that their children are missing out on opportunities that their secular peers have access to, including the option to learn alongside a group of children their age, participate on a school teams, and take part in other organized activities available in traditional school settings. B.B. is gifted in math and Mrs. Bosarge anticipates she may have to hire a math tutor to ensure B.B. reaches his full potential in the subject. The Bosarges also believe in the value of higher education and are keenly aware that participation in social and academic clubs in a formal school setting often boosts a student's college application score. The Bosarges are concerned that their children's inability to participate in these clubs will negatively impact their ability to be accepted into higher education.

60. The Bosarges live in a desirable public school district and want the option for their children to attend East Central Lower Elementary School. The family believes this option would

16

open many doors for their children and it would allow Mrs. Bosarge to complete her studies and pursue her own career. Under this scenario, the Bosarges would also be liberated financially to save for their children's college tuition.

61. The Bosarges' children have been active in local gymnastics clubs, soccer, and piano lessons. In the evenings and on the weekends, the children play with their neighborhood friends who attend East Central Elementary School. Additionally, the family attends Sunday morning worship services and Wednesday night services on a weekly basis with families whose children are enrolled at schools throughout the Mississippi Gulf Coast.

**William Morgan**

62. Plaintiff William Morgan ("**Mr. Morgan**") is a youth pastor who recently took a teaching and coaching position at North Delta School in Batesville, Mississippi. His four-year-old son, L.M., received some vaccines before the Morgans had extensive consultation with health care professionals and prior to them learning that many of the required vaccines were derived from aborted fetal cells and contain material that the Morgans consider to be impure. For that reason, and others, Mr. and Mrs. Morgan's religious beliefs prevent L.M. from receiving any more vaccines.

63. Mr. Morgan and his wife are Christians who strive to incorporate the teachings of the Bible into every aspect of their lives, including raising their children. The Morgans served as missionaries in and around Jovellanos, Cuba where they partnered with local churches to provide food and medical care in underprivileged communities. Their ministry also focused on serving Cubans with physical handicaps. While Cuba is not as openly hostile to religion as it once was, the Morgans had to be judicious about speaking publicly about their beliefs while serving in these communities.

17

64. Mr. Morgan also served for the past three years as a youth pastor at LifePoint Church in Senatobia, Mississippi before taking the coaching job. Mr. Morgan has a passion for mentoring young men and his career path has been directed by his religious beliefs.

65. The Morgans have searched the Bible and prayed extensively as a couple about whether to vaccinate L.M. and the couple came to the firm conviction that vaccinating L.M. would violate God's will for him. *See* Mr. Morgan's Statement of Religious Beliefs, attached as Exhibit E. More specifically, the Morgans are under firm conviction that injecting substances into their son's body that are dependent on aborted fetal cell lines to exist would violate their religious beliefs, even if the vaccines would benefit their son, because participating in an activity that "profits off of the body parts of willfully aborted children" would be an affront to God. *Id.* Additionally, Mr. Morgan is careful to observe the Bible's instruction to guard one's physical body because the scriptures states that one's body is "God's temple because the Holy Spirit resides within" Christians. *Id.* In Mr. Morgan's system of beliefs, he believes "taking a vaccine that includes genetic matter, animal ingredients, man manipulated pathogens, and chemicals" violates the body as God's temple. *Id.*

66. Mr. Morgan attempted to enroll L.M. at Senatobia Elementary School and requested a religious exemption from Mississippi's childhood vaccination requirements. Days later, school administrators responded via e-mail and instructed that L.M. was ineligible, stating that "there is no exemption from the immunizations due to religious beliefs." *See* Exhibit F.

67. Due to the unavailability of a religious exemption from the vaccination requirements, L.M. is prohibited from attending Mississippi schools, which is impacting the Morgans significantly. Mr. Morgan's wife, who has a college degree and a marketable skillset, has and will be forced to forego professional opportunities in order to homeschool L.M. full-time.

18

The financial impact of being a one income household, in the Morgans' case, has been magnified by Mr. Morgan's decision to become a youth pastor, teacher, and coach. Mr. Morgan has answered the call to mentor Mississippi youths and has declined more lucrative career paths to stay true to this calling. The Morgans also anticipate additional future financial burdens with homeschooling, which include turning a portion of their home into a classroom, hiring tutors, and purchasing updated curriculum to ensure L.M. is learning at the appropriate pace.

68.     The Morgans are also concerned that L.M. will miss out on social opportunities among a class of peers that may become lifelong friends. L.M. has shown interest in sports, and the Morgans believe that team sports can be integral to their son's development and maturation. But unlike his secular peers who are vaccinated, L.M. cannot access the substantial lifelong benefits of participating in school sports with fellow classmates. Mr. Morgan desires to one day coach L.M. on a school team.

69.     As involved parents, the Morgans ensure that L.M. participates in the social opportunities that are available to him. L.M. interacts regularly with Mississippi children at Sunday school and plays frequently with his peers at his home and at local parks. The children L.M. commonly socializes with attend Senatobia Elementary School, Journey Day School, Strayhorn Elementary School, and Magnolia Heights School. The Morgans also travel extensively throughout the Southeast on vacation and to visit family and friends.

70.     The Morgans have deep ties to Mississippi and desire to establish stronger roots. However, because of the challenges described above, the Morgans believe they will eventually be forced to move to Arkansas or North Carolina, two of the forty-four states that allow for religious exemptions, so that their son can receive a formal education.

**Dr. Jeana Stanley**

71.     Plaintiff Dr. Jeana Stanley (**"Dr. Stanley"**) and her husband are lifelong Mississippians and have deep ties and a substantial support system on the Mississippi Gulf Coast, including a home in Biloxi.

72.     After extensive thought and prayer, the Stanleys decided not to vaccinate their children.  They have a firm religious conviction that vaccinating their children would violate God's will for their lives.  *See* Dr. Stanley's Statement of Religious Beliefs, attached as Exhibit G.  Dr. Stanley has several religious-based convictions that prevent her from vaccinating her children.  First, Dr. Stanley believes that God does "not intend [her] to intervene with my body with things like pharmaceuticals and vaccines."  *Id.*  She practices this belief in "her daily life" and with her children.  *Id.*  Second, Dr. Stanley believes abortion "is murdering an unborn child."  *Id.*  Therefore, participating in abortion through vaccination would go "against [her] moral, ethical and spiritual being."  *Id.*   Third, Dr. Stanley believes the "human body was perfectly designed and created by God," *id.,* and believes that to "intervene in a healthy, well body by injecting substances to alter, intervene and manipulate is against God's perfect design."  *Id.* (citing Leviticus 19:28).  Finally, Dr. Stanley states that accepting "vaccine injections would cause [her] deep regret because it would be a betrayal to God's intended direction for [herself] and [her] family."  *Id.*

73.     Dr. Stanley works and pays taxes in Mississippi, as does her husband.  The Stanleys' extended family (including both sets of grandparents) and lifelong friends live on the Mississippi Gulf Coast.  The Stanleys' children, C.S., age 7; H.S., age 6; and E.S., age 5, were baptized at Fatima Catholic Church in Biloxi and attend vacation bible school there.

74.     However, the Stanleys recently purchased a second home and moved five minutes across the state line to Alabama so their unvaccinated children could attend school.  However, if

20

relief were granted and the challenged law were to be enjoined as to allow religious exemptions, the Stanleys would move back to Mississippi and enroll their children in school in Biloxi.

75.    Dr. Stanley states that raising her children outside of Mississippi has been "painful beyond words." *Id.*

76.    Dr. Stanley attempted to enroll her children at North Bay Elementary School in Biloxi and asked if it would accept a religious exemption for her unvaccinated children.  She was rejected.

77.    Despite being forbidden to attend school, the Stanleys' children frequently interact with their Mississippi peers.  The children also spend considerable time with their cousins, who are enrolled at Mississippi public schools.  C.S. recently attended Sea Camp at the Marine Mammal Institute in Gulfport, Mississippi and participated in summer sports camps at Gulfport High Public School and Pass Road Elementary Public School, all with peers who do attend school.  This past school year, the Stanley children went on a field trip with their Alabama classmates to the Marine Mammal Institute and the Lynn Meadows Discovery Center in Gulfport, where vaccination status was not required or checked.  As a family, the Stanleys also visit the Lynn Meadows Discovery Center, go to sporting events at Shuckers stadium, frequent Mississippi Gulf Coast restaurants, and attend events at Mississippi Gulf Coast churches.

78.    The Stanleys' decision to adhere to their religious convictions has been costly in other ways as well.  The Stanleys inherited a family home in Biloxi, Mississippi and have no mortgage on that residence.  Accordingly, they were able to put significant amounts of money aside each month for their children's futures.  While residing in Biloxi, they lived within walking distance of grandparents, cousins, and lifelong friends.  The Stanleys continue to make insurance and tax payments on the Mississippi residence, while servicing a mortgage and other costs on the

Alabama home.  Dr. Stanley now must drive 70 miles roundtrip each day to work.  Mr. Stanley commutes separately five days a week as well.

79.     Dr. Stanley's 66-year-old mother, a Biloxi resident, is the family's primary babysitter.  She too often travels 70 miles roundtrip to babysit the children in Alabama while Dr. and Mr. Stanley are working in Mississippi.  It is noteworthy that Dr. Stanley's mother was a Mississippi school administrator for 38 years and is unvaccinated.  While she was permitted to work within the schools for nearly four decades while being unvaccinated, her grandchildren are excluded from the state's schools for that very reason.

80.     For obvious reasons, the family desires to return to their Mississippi home full-time and to enroll their children in the Biloxi school system, and they will do so if relief is granted in this case.

**Jaquelyn Butler**

81.     Plaintiff Jacquelyn Butler ("**Mrs. Butler**") and her husband reside in Olive Branch, Mississippi.  For religious reasons, the Butlers have declined vaccines for their four-year-old twin daughters, S.B. and M.B.

82.     Mrs. Butler became a Christian when she was six years old.  Since then, she has actively practiced her faith and seeks guidance from the Holy Spirit for life's big and small decisions.  *See* Mrs. Butler's Statement of Religious Beliefs, attached as Exhibit H.  Mrs. Butler believes the Holy Spirit will guide her, "especially when [she is] willing to listen."  *Id.*

83.     After seeking guidance from the Bible and through focused thought and prayer, Mrs. Butler believes that vaccinating her daughters would violate God's will.  She deems the Bible as "God's inerrant and infallible Word."  *Id.*  Mrs. Butler is aware that many childhood vaccines contain animal cells and blood and she believes that injecting vaccines into her daughters' bodies

would violate the Bible's instruction to keep human blood pure. She also believes that preemptively placing foreign substances into a body with a functioning immune system demonstrates a lack of faith in "God's goodness and wisdom." *Id.* Finally, Mrs. Butler's religious beliefs against abortion overlap with her objections to vaccination. Based on her personal religious convictions, she cannot consent to a vaccine that used "aborted fetal cells lines to exist." *Id.*

84. The Butlers' twins interact regularly with children who attend Mississippi public schools, primarily through play dates and visits to local parks. Mr. and Mrs. Butler anticipate that the twins' involvement with children their age will only increase as the twins grow older.

85. Mrs. Butler attempted to enroll her daughters at Desoto Christian Academy and Northpoint Christian Academy. School administrators stated that the twins were ineligible for enrollment and rejected Mrs. Butler's religious exemption request.

86. The Butler family wants to remain in Mississippi, where they have a substantial support system. However, because the twins are ineligible to enroll in Mississippi schools, the Butlers are seriously considering leaving Mississippi in order to have their children educated. If necessary, the Butlers will uproot their family and move to another state that permits religious exemptions, despite the significant costs it will entail. Alternatively, the Butlers will need to commute from Mississippi to a private school in Tennessee. Because the Butlers rely on two incomes, homeschooling is not a realistic option for them. Relief in this case will redress their injuries; permitting religious exemptions will enable the Butlers to enroll their children in school and remain in the community.

## B. Defendants

87. Defendant Daniel P. Edney (**"Dr. Edney"**) is made party to this Action in his official capacity as the State Health Officer for Mississippi. Under Mississippi law, Dr. Edney is

23

tasked with implementing and enforcing, and does implement and enforce, the mandatory immunization requirements of the Compulsory Vaccination Law for school-aged children.

88.    Defendant Lynn Fitch is made party to this Action in her official capacity as the Attorney General of Mississippi.  Under Mississippi law, Attorney General Fitch is the state's "chief legal officer" (*see* Miss. Code § 7-5-1) and is responsible for enforcing, and does enforce, the laws of Mississippi, including the state's mandatory immunization requirements under the Compulsory Vaccination Law.  Attorney General Fitch is charged with implementing and enforcing, and does implement and enforce, the mandatory vaccination program, through among other things threatening to bring criminal charges against anyone who violates the program.

89.    Defendant Ashley Blackman is the Principal Administrator of the East Central Lower Elementary School and is made party to this Action in her official capacity.  Under Mississippi law, she is the "person in charge" of the school and is tasked with implementing and enforcing, and does implement and enforce, the mandatory immunization requirements of the Compulsory Vaccination Law.  Plaintiff Amanda Bosarge attempted to enroll her children East Central Lower Elementary School with a religious exemption but was rejected.

90.    Defendant Dr. Archie R. Mitchell is the Principal of Senatobia Elementary School and is made party to this Action in his official capacity.  Under Mississippi law, he is the "person in charge" of the school and is tasked with implementing and enforcing, and does implement and enforce, the mandatory immunization requirements of the Compulsory Vaccination Law.  Plaintiff William Morgan attempted to enroll his child at Senatobia Elementary School with a religious exemption but was rejected.

91.    Defendant Dr. Ashley Allred is the Principal of the Vancleave Upper Elementary School and is made party to this Action in her official capacity.  Under Mississippi law, she is the

24

"person in charge" of the school and is tasked with implementing and enforcing, and does implement and enforce, the mandatory immunization requirements of the Compulsory Vaccination Law. Plaintiff Brandi Renfroe attempted to enroll her children at Vancleave Upper Elementary School with a religious exemption but was rejected.

92.    Defendant Allison Merit is the Principal of North Bay Elementary School and is made party to this Action in her official capacity. Under Mississippi law, she is the "person in charge" of the school and is tasked with implementing and enforcing, and does implement and enforce, the mandatory immunization requirements of the Compulsory Vaccination Law. Plaintiff Dr. Jeanna Stanely attempted to enroll her children at North Bay Elementary School with a religious exemption but was rejected.

93.    Defendant Douglas L. Tynes is the city prosecutor for Ocean Springs, Mississippi and is made party to this Action in his official capacity. Under Mississippi law, Mr. Tynes is responsible for prosecuting misdemeanors, and does prosecute misdemeanors, occurring in the city limits of Ocean Springs, including violations of the Compulsory Vaccination Law. Plaintiff Pastor Paul Perkins, as Head Administrator of Grace Baptist Academy, desires to, and would, but for the threat of prosecution by Mr. Tynes, enroll his daughter in the school.

## STATEMENT OF COMMON FACTS

### *General Background of Compulsory Childhood Vaccination in Mississippi*

94.    In 1960, the Mississippi Legislature instituted certain vaccination requirements for school-age children and included a religious exemption. The possibility for an exemption, however, was limited, requiring those seeking a religious exemption to be a bona fide member of a "recognized denomination" whose religious teachings required "reliance on prayer or spiritual means for healing" (*e.g.*, Christian Scientists).

95.     In 1979, the limitations of the religious exemption was challenged in the Chancery Court of Chickasaw County by a father who was a member of a denomination not "recognized" by the state.  The father had religious objections to vaccinating his child and brought suit in an effort to have all religious objections recognized under the First Amendment's Free Exercise Clause regardless of whether or not it was "recognized" by the state.

96.     In *Brown v. Stone*, 378 So. 2d 218 (Miss. 1979), the Mississippi Supreme Court rejected the father's arguments and expanded its ruling to issues well beyond those initially presented.  The *Brown* court ruled that *vaccinated children* possessed a Fourteenth Amendment right to be free from associating with their unvaccinated peers, which included the right to not associate with schoolmates who had religious objections to vaccination.  The court concluded that exposing vaccinated children to the "hazard of association in school" with children possessing a religious exemption would violate the vaccinated children's constitutional rights.  *Id.* at 223.  There was no such constitutional right, however, to be free from associating with unvaccinated children who possessed a medical exemption (which were available when *Brown* was decided).  *Id.* at 219. The *Brown* court did not rule that vaccinated children have a constitutional right to be free from associating with unvaccinated children at church, the grocery store, or in local sports leagues.

97.     Venturing well beyond the issue presented, the Court ultimately held that *any* religious exemption – but not the secular medical exemption – was "void." *Id.* However, ensuing Supreme Court and federal district court decisions from the 1990's through present have invalidated the *Brown* court's reasoning.

98.     Arkansas previously had a limited religious exemption similar to Mississippi's at issue in *Brown*. In *Boone v. Boozman*,[4] and a mother who possessed religious objections

---

[4] 217 F. Supp. 2d 938.

unrecognized by the Arkansas statute challenged the limited religious exemption on First Amendment grounds. *Boone v. Boozman*, 217 F. Supp. 2d 938, 951 (E.D. Ark. 2002). In direct contrast to *Brown*, the *Boozman* court held that the limitation of the statutory exemption to a "recognized church or religious denomination" violated the Free Exercise Clause. *Id.* Arkansas soon thereafter enacted a comprehensive religious exemption, which remains the law today.

99.     More recently, in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (*per curiam*), the U.S. Supreme Court went even further than the *Boozman* court's rationale and ruled that a law is not neutral and generally applicable, and thus invokes strict scrutiny review, if it treats "*any comparable secular activity more favorably than religious exercise*." *Id.* at 1296 (emphasis in original). In *Tandon,* California regulations intended to slow the spread of COVID-19 limited religious gatherings but treated comparable secular activities – such as getting haircuts and retail shopping – more favorably. *Id.* at 1297. The Supreme Court employed similar reasoning in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), holding that a New York regulation that prohibited religious gatherings but permitted similar secular conduct violated the First Amendment where the secular and religious activities in question presented comparable contagion risks. *Id.* at 67.

100.     Three years after *the Brown* decision, in 1983, the Mississippi Legislature amended the Mississippi Code and removed the religious exemption for school-aged children.[5] The Legislature did, however, codify medical exemptions, which are still available in Mississippi today. *See* Miss. Code Ann. § 41-23-37.

---

[5] Chapter 522, *Mississippi Laws of 1983* (removing religious exemptions from the school immunization requirement with certain exceptions, and authorizing schools to furnish certificates of immunization compliance to the local health officer).

101.    Notably, Mississippi did not at that time, or any time thereafter, enact vaccination requirements for adults, including those who work within the state's education system and schools.

102.    School attendance is compulsory in Mississippi. Under Miss. Code § 37-13-91, the "custodian of . . . [a] school-age[d] child in [Mississippi] shall cause the child to enroll in and attend a public school or legitimate nonpublic school."

103.    Under the Compulsory Vaccination Law, the state Health Officer has been delegated the responsibility to specify which vaccines are mandatory for school children, to oversee the immunization reporting requirements, and to administer the state's medical exemption program.

104.    Under the statute, it is "the responsibility of the person in charge of each school to enforce the requirements for immunization" established by the Health Officer.  Miss. Code § 41-23-37.  Failure to enforce the compulsory vaccination requirements is a misdemeanor "punishable by fine or imprisonment or both." *Id.*

105.    Misdemeanors committed within the city limits, such as a violation of Miss. Code § 41-23-37, are considered "criminal offenses against the municipality" under Miss. Code Ann. § 21–13–19 and, accordingly, are prosecuted by the relevant City Prosecutor.

***Developments Since Mississippi's Religious Exemption was Removed***

106.    Since Mississippi revoked its religious exemption to the Compulsory Vaccination Law, there have been several critical developments.  Specifically, religious objections to abortion and fetal cell entanglement in medical research have increased dramatically as relevant information became more widely known and understood; and, more importantly, relevant

constitutional jurisprudence has been fundamentally updated to require strict scrutiny review for situations like the situation at hand.

107.    It is now commonly understood that several childhood vaccines were derived directly from aborted fetal cells.  Others depend on these fetal cells for testing, design, and/or manufacture.  Most other vaccines, even if not directly associated with aborted fetal cells themselves, are made by manufacturers who profit from the use of these aborted fetal cells.  These aborted fetal cells would be illegal to harvest in Mississippi today under the state's abortion ban, and yet their continued use, and profit derived from an abortion, is condoned through the Compulsory Vaccination Law.

108.    Beginning in the 1970s, as states enacted vaccination requirements, they also began instituting religious exemptions to childhood vaccination laws, including, among many others, Mississippi's neighboring states of Alabama (1973),[6] Louisiana (1990),[7] Tennessee (1991),[8] Texas (1993),[9] Florida (2002),[10] and Arkansas (2004).[11]  To date, forty-four states have legislation allowing  school-age children to be exempt from mandatory vaccination laws for religious reasons,[12] and at least two other states have provisions grandfathering in children with a prior religious exemption.

***Mississippi's Discretionary Exemption Process***

---

[6]  Ala. Code § 16-30-3.

[7]  La. Rev. Stat. Ann. § 17:170(A); 40:31.16.

[8]  Tenn. Code Ann. § 49-6-5001.

[9]  Tex. Health & Safety Code § 161.004.

[10]  Fla. Stat. Ann. § 1003.22.

[11]  Ark. Code Ann. § 6-18-702.

[12]  *See* NATIONAL CONFERENCE OF STATE LEGISLATURES, *States with Religious and Philosophical Exemptions from School Immunization Requirements*, https://www.ncsl.org/research/health/school-immunization-exemption-state-laws (last visited Sept. 1, 2022).

109.    Mississippi has instituted a discretionary exemption to the Compulsory Vaccination Law that benefits certain individuals (secular), and deliberately excludes others (non-secular).

110.    Students are not permitted to seek exemption from the required vaccines for religious reasons.  However, students are permitted to seek a medical exemption from the required vaccines.

111.    Through the plain language of the relevant statute, Mississippi has reserved discretion to accept or deny medical exemptions.  The Compulsory Vaccination Law states: "A certificate of exemption from vaccination for medical reasons may be offered on behalf of a child by a duly licensed physician and **may be accepted by the local health officer when, in his opinion,** such exemption will not cause undue risk to the community."  Miss. Code § 41-23-37 (emphasis added).  It offers no similar pathway for an exemption where the requirement substantially burdens a sincerely held religious belief.  Hence, while the plain language of the statute alone is sufficient to determine the issue of whether Mississippi has instituted an exemption scheme that includes individualized assessment, the process includes even more discretion than what may be apparent from the statute.

112.    Mississippi has instituted a system that includes two levels of personalized discretionary review.  The state has delegated private health care providers discretion to determine what broad variety of circumstances are eligible for a medical exemption, and which are not.[13] Acting on behalf of the state, these physicians conduct an individualized assessment of each potential medical exemption.  If and when the medical exemption form is signed by a physician,

---

[13]  *See* Exhibit I, Medical Exemption Request Form; *also available at* https://msdh.ms.gov/ msdhsite/_static/14,0,71,688.html.  Courts may take judicial notice of information contained in official government websites under Rule 201 of the Federal Rules of Evidence.  *See, e.g., Hawk Aircargo Inc., v. Chao,* 418 F.3d 453, 457 (5th Cir 2005).

it is then submitted to the Department of Health, where it is then reviewed pursuant to the State's published Medical Exemption guidelines.[14] The Medical Exemption Request Form instructs that requests will be "reviewed on a case by case basis."[15] If the exemption is accepted, that student is permitted to attend school without having received all of the mandated vaccines.

113.    The secular exemption process is unavailable to citizens with religious objections to compulsory vaccination.  For example, Plaintiff Brandi Renfroe called the Department of Health and requested that she be able to submit a religious exemption.  Health Department officials stated they would not accept her religious exemption request, nor would any school in the state, but that she could pursue a medical exemption.  However, her children have no medical condition that would permit this.

114.    Mississippi does not merely refuse to consider religious exemptions, which is sufficient to trigger strict scrutiny under *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) and *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022), the State has taken the additional step to single out religious adherents specifically for worse treatment by publicly announcing that religious exemptions are categorically excluded from consideration.  In case there was any doubt, the Health Department's website states that it will consider medical exemptions, but not religious exemptions (exemption "**from required immunizations for religious, philosophical, or conscientious reasons is not allowed** . . . .").[16] It is plain Mississippi's exclusion of religious objections was intentional rather than incidental.

---

[14]  MISSISSIPPI DEPARTMENT OF HEALTH, *Medical Exemption Policy*, https://msdh.ms.gov/msdhsite/index.cfm/14,0,71,688.html (last visited Sept. 1, 2022).

[15]  *See* Exhibit I, Mississippi Medical Exemption Request Form; *also available at* https://msdh.ms.gov/msdhsite/index.cfm/14,6296,71,pdf/MedicalExemptionRequest_139.pdf (last visited Sep. 1, 2022).

[16]  *See* fn. 14 (emphasis in original).

31

115.     While Mississippi forbids even submitting a religious exemption request, the State

has granted 1,970 medical exemptions over the past six years.[17]

## COUNT

### 42 U.S.C. § 1983 – VIOLATION OF PLAINTIFFS' FIRST AMENDMENT FREE EXERCISE RIGHTS WITH RESPECT TO PLAINTIFFS' SINCERELY HELD RELIGIOUS BELIEFS

116.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully

herein.

117.     The First Amendment of the U.S. Constitution provides that: "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof."  This

clause has been incorporated against the states.  *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

118.     Parents have the right to "direct the religious upbringing of their children" and

"when the interests of parenthood are combined with a free exercise claim [...] more than merely

a 'reasonable relation to some purpose within the competency of the State' is required to sustain

the validity of the State's requirement under the First Amendment."  *Wisconsin v. Yoder*, 406 U.S.

205, 233 (1972).

119.     Courts should not inquire into the validity or plausibility of a person's beliefs;

instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether

they are, in [a believer's] own scheme of things, religious."  *United States v. Seeger*, 380 U.S. 163,

185 (1965).

---

[17] *See* Exhibit J, Mississippi Department of Health School Immunization Report, 2021-2022, *also available at* https://msdh.ms.gov/msdhsite/_static/resources/18774.pdf (stating that 418 medical exemptions were granted in 2021; 374 in 2020; 382 in 2019; 333 in 2018; 255 in 2017; and 208 in 2016) (last visited Sept. 1, 2022).

120. Plaintiffs' sincerely held religious beliefs that prohibit them from vaccinating their minor children have been unconstitutionally burdened by the State of Mississippi. Plaintiffs' attempts to enroll their children in school with a religious exemption request were rejected.

121. Mississippi has pitted Plaintiffs' consciences against educating their children. Mississippi has created a system of public education whereby it guarantees an education to every student. *See, e.g., Hill ex rel. Hill v. Rankin County, Miss. Sch. Dist.*, 843 F.Supp. 1112, 1117 (S.D. Miss. 1993). The Mississippi Supreme Court has held that "the right to a minimally adequate public education created and entailed by the laws of this state is one we can only label fundamental" and that the "right to a public education is a fundamental right protected by states." *Clinton Mun. Separate Sch. Dist. v. Byrd*, 477 So.2d 237, 240 (Miss. 1985). Nevertheless, Plaintiffs' children cannot obtain a formal education without violating their religious convictions.

122. The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 142 S. Ct. 1987 (2022) (quoting *Lyng v. Northwest Indian Cemetery Protective Assn*., 485 U. S. 439, 450 (1988). "In particular, we have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.*

123. However, Mississippi families with secular, medical motivations for declining compulsory immunization can be exempted from the same requirements.

124. The State of Mississippi has made an unconstitutional value judgment that secular (*i.e.*, medical) motivations for opting out of compulsory immunization are permitted, but that religious motivations are not.

33

125.    While Mississippi may have a general healthcare interest in promoting childhood immunization, the First Amendment's Free Exercise Clause prohibits the government from enacting non-neutral and non-generally applicable legislation unless it is narrowly tailored to a compelling government interest.  The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly.  It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (**or abstention from**) physical acts." *Kennedy v. Bremerton Sch. Dist*., No. 21-418, 2022 U.S. LEXIS 3218, at *25-26 (June 27, 2022) (emphasis added).

126.    A government policy will not qualify as neutral if it is "specifically directed at . . . religious practice."  *Id*. at *27.  A policy can fail this test if it "discriminate[s] on its face," or if a religious exercise is otherwise its "object." *Id.*

127.    For multiple reasons, Mississippi's Compulsory Vaccination Law is neither neutral nor generally applicable.  Government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat **any** comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.

128.    Whether two activities are comparable for purposes of the free exercise clause depends on "the asserted government interest that justifies the regulation at issue." *Id.*  Here, with regard to regulating the conduct of its secular and religious citizens, the government holds the same interest in preventing disease.  Further, the secular and religious activities at issue are not only comparable, but they are also exactly the same (seeking exemption from compulsory vaccination).

129.     Additionally, the government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton,* 141 S. Ct. at 1877 (internal citations omitted).  Mississippi's elevation of secular objections above religious objections is not the result of random happenstance, but rather of deliberate exclusion. The Mississippi Legislature intentionally erased a pre-existing religious exemption, and in close temporal proximity enacted a medical exemption to the Compulsory Vaccination Law.

130.     Even if Mississippi could show that it did not target religious conduct for intentional exclusion (it cannot), its mandatory immunization regulations invoke heightened scrutiny because the statute fails the general applicability test.

131.     A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*  While Mississippi may have a general healthcare interest in promoting childhood vaccination, its interest is not so extraordinary as to prohibit an exemption for secular reasons, which poses a similar contagion hazard as a hypothetical religious exemption.  Further, Mississippi does not prohibit unvaccinated children from attending camp, visiting public libraries or museums, or from interacting with their peers in any other way.  Nor does Mississippi require that adult faculty, staff members, or school visitors provide proof of immunization.

132.     Mississippi's vaccination laws fail the general applicability test on additional, alternative grounds because the medical exemption system provides for individualized discretionary review.  "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . ." *Id.* at 1879.

133.     In such instances, the government may not refuse to extend the possibility for an exemption "to cases of religious hardship without compelling reason." *Id.* at 1872.

35

134.    Because its medical exemption process provides for discretionary review at multiple levels, Mississippi's Compulsory Vaccination Law fails the general applicability test. Mississippi has instituted a system of customized review – delegated first to private physicians and second to the State Epidemiologist and Deputy State Epidemiologist – who at each level conduct individualized review of every exemption in order to make a determination.

135.    Therefore, for multiple reasons, Mississippi's Compulsory Vaccination Law invokes heightened judicial scrutiny.

136.    Mississippi's Compulsory Vaccination Law cannot withstand strict scrutiny because it is not narrowly tailored.  In the context of government regulations targeting infectious disease, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest" in reducing disease.  *Tandon*, 141 S. Ct. at 1296-97.  Where utilization of such less restrictive means is required, the government "may no more create an underinclusive statute, one that fails truly to promote its purported compelling interest, than it may create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal."  *Lukumi,* 508 U.S. at 578.

137.    Regarding under-inclusivity, where the government permits secular activities, such as a medical exemption, "it must show that the religious exercise at issue is more dangerous."  *Tandon*, 141 S. Ct. at 1297.

138.    When a law is over-inclusive, its "broad scope . . . is unnecessary to serve the interest, and the statute fails for that reason."  *Lukumi*, 508 U.S. at 578.

139.    Mississippi's Compulsory Vaccination Law cannot withstand heightened scrutiny because it is both over-inclusive and under-inclusive relative to the state interests it purportedly attempts to achieve.  Instead of regulating with the surgical precision necessary to avoid conflict

36

with its citizens' free exercise rights, Mississippi has deployed a blunt legislative hammer and, in one stroke, obliterated every possibility for religious observance.

140.    Mississippi's compulsory immunization scheme is under-inclusive because it only applies to children in a school setting.  The mandate does not apply to non-school attending children (who regularly and unavoidably interact with their peers) nor to adults in the state, who comprise over 76% of Mississippi's population.[18]

141.    The Compulsory Vaccination Law is also under-inclusive because children possessing a religious exemption would pose no greater threat than their secular peers with a medical exemption.  Moreover, the immunization requirements do not apply to adults who are employed in Mississippi's school system, or to school visitors.

142.    Further, the existence of a religious exemption for attending school would have an immaterial impact in the number of individuals vaccinated in Mississippi overall given that it does not apply to adults.  Nor would the existence of a religious exemption materially impact the overall percentage of vaccinated school children.

143.    Given that Mississippi boasts of the highest vaccination rates in the country,[19] allowing a religious exemption for a handful of students, just as secular medical exceptions are permitted, would constitute an actual attempt at narrow tailoring.

---

[18] *See* U.S. CENSUS BUREAU, *QuickFacts Mississippi*, https://www.census.gov/quickfacts/MS (stating that 76.5% of Mississippi's population is over the age of 18) (last visited Sept. 1, 2022).

[19] *See* MISSISSIPPI DEPARTMENT OF HEALTH, *What Parents Should Know About Childhood Immunization*, http://www.msdh.state.ms.us/msdhsite/_static/14,15556,71.html ("Mississippi has one of the most successful childhood immunization programs in the nation . . . . [where] over 99% of children who enter kindergarten" are vaccinated) (last visited Sept. 1, 2021); *see also* CENTERS FOR DISEASE CONTROL, *CDC Morbidity and Mortality Weekly Report*, *Vaccination Coverage and Selected Vaccines and Exemption Rates Among Children in Kindergarten*, https://www.cdc.gov/mmwr/volumes/71/wr/mm7116a1.htm (stating that only **.**1% of Mississippi kindergarteners possess a medical exemption) (last visited Sept. 1, 2022).

144.     Because Mississippi's Compulsory Vaccination Law is simultaneously too narrow and too broad to fulfill the government interests in supposedly attempts to accomplish, the regulation lacks the narrow tailoring necessary to survive strict scrutiny review.

145.     Accordingly, the presence of a medical exemption and the intentional removal of a religious exemption through the Compulsory Vaccination Law, has violated and continues to violate Plaintiffs' rights to free exercise of religion under the First Amendment.

146.     "The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *U.S. Navy Seals*, 27 F.4th at 348 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Because of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

147.      Absent injunctive and declaratory relief against Miss. Code § 41-23-37 and injunctive relief against Defendants, Plaintiffs will have been and will continue to be harmed.

148.     Plaintiffs are entitled to a declaration that Defendants violated their First Amendment rights to free exercise of religion and an injunction against Defendants' actions as they relate to Mississippi's Compulsory Vaccination Law.  Additionally, Plaintiffs are entitled to the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## INJUNCTIVE RELIEF ALLEGATIONS

149.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

150.     Plaintiffs allege that both on its face and as applied, the Compulsory Vaccination Law violates their First Amendment rights and their right to be free from unlawful statutes.

151.     Plaintiffs are being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the Compulsory Vaccination Law.

38

152. Plaintiffs have no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the Compulsory Vaccination Law.

153. If not enjoined by this Court, Defendants will continue to implement and enforce the Compulsory Vaccination Law in violation of Plaintiffs' constitutional rights.

154. Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

155. Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

156. Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to whether Mississippi's Compulsory Vaccination Law, which allows for secular but not religious exemptions, violates the United States Constitution.

157. The case is presently justiciable because the Compulsory Vaccination Law and absence of any religious exemption to the same applies to Plaintiffs and their children, who are currently harmed by being excluded from school.

158. Declaratory relief is therefore appropriate to resolve this controversy.

## PRAYER FOR RELIEF

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the Compulsory Vaccination Law is unconstitutional. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue preliminary and permanent injunctions prohibiting Defendants from enforcing the Compulsory Vaccination Law.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A.      A preliminary and permanent injunction prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf from implementing and enforcing the Compulsory Vaccination Law challenged in this Complaint without providing the option for a religious exemption;

B.      Declare that Miss. Code § 41-23-37 is unconstitutional on its face;

C.      Declare that Miss. Code § 41-23-37 is unconstitutional as applied to Plaintiffs;

D.      Declare that Miss. Code § 41-23-37 violates Plaintiffs' First Amendment right to free exercise of religion;

E.      Grant Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable authority; and

F.      For any such other and further relief as the Court deems equitable and just under the circumstances.

Dated: September 1, 2022.

Respectfully submitted,


SIRI & GLIMSTAD LLP

/s/ *Walker D. Moller*
Walker D. Moller, Attorney
Mississippi Bar Number: 105187
501 Congress Avenue
Suite 150 – #343
Austin, TX
Tel: (512) 265-5622
Fax: (646) 417-5967
wmoller@sirillp.com

40

Aaron Siri, Esq.*
Elizabeth A. Brehm, Esq.*
Catherine Cline, Esq.*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
ccline@sirillp.com

Christopher Wiest*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

*\*pro vac vice* to be submitted

41

## VERIFICATION OF AMANDA BOSARGE

I, Amanda Bosarge, a citizen of the United States and of Mississippi, have read the

foregoing Complaint and know the contents thereof as to myself, that the same is true to my own

knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 1 day of September 2022 in Moss Point, Mississippi.

Amanda Bosarge

**VERIFICATION OF JAQUELYN BUTLER**

I, Jaquelyn Butler, a citizen of the United States and of Mississippi, have read the

foregoing Complaint and know the contents thereof as to myself, that the same is true to my own

knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this   1   day of September 2022 in  Olive Branch , Mississippi.


_Jacquelyn Butler_

Jaquelyn Butler

## VERIFICATION OF KIMBERLY HARRELL

I, Kimberly Harrell, a citizen of the United States and of Mississippi, have read the

foregoing Complaint and know the contents thereof as to myself, that the same is true to my own

knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this __1__ day of September 2022 in _Brandon_, Mississippi.

Kimberly Harrell

## VERIFICATION OF WILLIAM MORGAN

I, William Morgan, a citizen of the United States and of Mississippi, have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 1ˢᵗ day of September 2022 in Senatobia, Mississippi.

William Morgan

## VERIFICATION OF PASTOR PAUL PERKINS

I, Paul Perkins, a citizen of the United States and of Mississippi, have read the foregoing

Complaint and know the contents thereof as to myself, that the same is true to my own

knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September 2022 in Ocean Springs Mississippi.

Pastor Paul Perkins

## VERIFICATION OF BRANDI RENFROE

I, Brandi Renfroe, a citizen of the United States, have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September 2022 in *Grand Bay, Alabama*

*Brandi Renfroe*

Brandi Renfroe

**VERIFICATION OF DR. JEANA STANLEY**

I, Jeana Stanley, a citizen of the United States, have read the foregoing Complaint and know the contents thereof as to myself, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this _1_ day of September 2022 in _____Biloxi, MS_____.

Dr. Jeana Stanley

# Exhibit D

My faith came to me early in life and the Holy Spirit has always been my teacher. When I gave my life to Christ, it was because the Holy Spirit came upon me in the hallway of my high school. I had been living in sin. Immediately my life was completely changed. I stopped sinning, found a church, and began reading a Bible I bought from the local Christian Book Store that was like the pastor's Bible. I did not grow up in a Christian home, so I did not have a whole lot of influence there, but instead I read my Bible and prayed and God has led me along the way.

Today, I am a born-again, Holy Spirit-filled believer in Jesus Christ, the son of the living God. I believe God sent His Son, Jesus Christ, to die for the sin of the world. He took my punishment on the cross of cavalry. Since the day I came to the saving knowledge of Jesus Christ, my life has never been the same. I do not live for myself, but for Him. As the scripture says in 1 Corinthians 6:19-20, I was bought by the blood of Jesus and should glorify God with my body, which is the temple of the Holy Spirit. Also in Galatians 2:20, "I have been crucified with Christ, it is no longer I who live, but Christ lives in me. And the life I now live in the flesh, I live by faith in the Son of God, who loved me and gave himself for me." I seek to live a life that pleases Him, with the Holy Bible and the Holy Spirit as my guide. When my time on earth is done and I have fulfilled the purpose which He has ordained for me, the Lord will call me to my heavenly home where I will reign with him forever. I look forward to worshipping my God freely forever in eternal glory. He is my Creator, I was created to worship Him. My loyalty is to Him first, always.

My faith is who I am. I fast when the Holy Spirit prompts me to. I have seen God do amazing, supernatural miracles through fasting and prayer. I like to get up early in the morning to pray. My husband and I clean the church a lot and I pray in the sanctuary during that time. I pray with my children at night and often we have family devotional time where we read scripture and pray together. I attend church weekly if possible on Sundays and sometimes on Wednesdays when I am not working. I go to a ladies' retreat and my children go to church camp. We also go to a Christian Family Camp in the summer. We tithe to our church and donate to Christian ministries and missionaries. My husband and I have both been to Kenya to preach the gospel. We support missionaries there. I have taught an evangelism class at our church and volunteer in the nursery when needed. When the Holy Spirit speaks to me, I often get prophetic words for people. The Holy Spirit is God himself. It is the essence of God's character and nature. The Father sends the Holy Spirit to dwell within all who belong to Him, to all who accept Jesus Christ as Saviour (John 14:26). The Holy Spirit empowers believers to walk on this earth differently, in a way that pleases God and brings Him glory. The Holy Spirit teaches, comforts, enables, empowers, and encourages believers. The Holy Spirit connects believers to God in a powerful and intimate way.

I love to pray over people. I read my Bible often and listen to it on an app. I have journals full of testimonies from what God has done in and through my life. I plan to do more mission work overseas in the future. I strive to walk with God daily, seeking His direction for daily decisions and long-term direction as well.

I also strive to live a life that is based on faith in God for protection, safety, and health. I believe that the Lord God of Heaven can cure sickness if He so chooses, as is mentioned in James 5:14,

"Is anyone among you sick? Let them call the elders of the church to pray over them and anoint them with oil in the name of the Lord." My husband is an elder in our church. If I or my child is sick, my first step is to call on him and the elders of the church to pray for healing. Taking a vaccine when I am not even sick, or allowing my child to get one, makes me feel like I am stating outwardly that I am not trusting in God for healing and takes the glory away from Him. Exodus 23:25 says, "Worship the Lord your God, and His blessing will be on your food and water. I will take away sickness from among you." I trust God for healing and for discernment and wisdom on treatment when treatment becomes necessary. Ultimately, I look forward to being with God in glory, as is written in Revelation 21:4, "He will wipe every tear from their eyes. There will be no more death or mourning or crying or pain, for the old order of things has passed away." I have no fear of death. I trust God with my life and my death and that of my family members.

Taking a vaccine shows a lack of faith in my God because it gives a false sense of safety. It provides a false notion that I am now protected and immune to disease, something that God alone gives to His children. Mankind continuously strives to sinfully minimize the sovereignty of God by interfering where we should not. We cannot play God and neither should we try to. When the government, doctors, and educators say, "Take this vaccine or you will get severely sick or die, or you can cause everyone else around you to get sick or die," then they are trying to convince me to put my faith in the vaccine instead of God, who alone promises to "take care of all my needs according to his riches in glory in Christ Jesus" (Phillipians 4:19). Vaccines are a fear-based approach to health. I choose a faith-based approach to my physical well-being. According to 1 Samuel 2:6, "The Lord brings death and makes alive; he brings down to the grave and raises up." Also, Psalm 118:8 says, "It is better to take refuge in the Lord than to trust in humans." I trust how God designed our bodies to function and I will not put my faith in a vaccination to "keep me healthy", but in the living God who brings true peace and healing.

Another major objection I have to injecting vaccines into my body or my children's body is the aborted fetal cell line or remnants resulting from "previous research" used in creating the vaccines. 1 Corinthians 6:19-20 says, "Or do you not know that your body is a temple of the Holy Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body." I believe that I am a soul that lives in a human body. When I became a believer, the Holy Spirit came to dwell in this human body with me (2 Timothy 1:14, 1 Corinthians 3:16). This body is a precious temple and I strive to take care of it. I do not eat pork or smoke tobacco or put anything into my body that I believe could compromise my physical well-being.

The aborted fetal cell lines used in vaccines were obtained from a dismembered prebirthed child or children. I believe that life begins at conception, as God says that He Himself formed us all in our mother's womb and created our "inward parts" (Psalm 139:13). Jeremiah 1:5 also states, "Before I formed you in the womb, I knew you, before you were born I set you apart; I appointed you as a prophet to the nations." The Bible also states that God hates the "shedding of innocent blood" in Proverbs 6:16-17). I cannot endorse the use of aborted babies in production of vaccinations by injecting them into my body or my children's bodies. This directly

contradicts my beliefs in the sanctity of human life. Scripture clearly states that I am to abstain from every appearance of evil (1 Thessalonians 5:22). Romans 1:32 says, "Although they know God's righteous decree that those who do such things (murder, invent ways of doing evil, etc.) deserve death, they (wicked people) not only continue to do these very things but also approve of those who practice them." I refuse to be one who "approves" of those who support murdering unborn children for the sake of "science." God blesses and curses for generations. Numbers 14:18 clearly states that God "will by no means clear the guilty, visiting the iniquity of the fathers on the children, to the third and the fourth generation." By participating in the sin of the generations before my own that used these aborted cell lines, I am knowingly partaking in their sin. I do not wish to bring their curse upon me or my family.

I am not perfect and never will be on this side of heaven. Each day I can choose to walk in the flesh or walk in the Spirit. When I do walk in the Spirit, I see him do amazing miracles while he proclaims His truth to the world. He loves his creation. He loves you and me. His love is greater than we could ever know. It's deep. Really deep. In this instance, the Lord has revealed to me that vaccines are against His will for me and the commands in the Bible for my life. And for this revelation of the knowledge of God I say, "Praise Him!"

Amanda Bosarge

# Exhibit H

Jacquelyn Butler
4144 Hollingsworth Cove
Olive Branch, MS 38654
901-634-4362
kittyjs1@comcast.net

I am writing this statement to exempt my child from all vaccines. Based on my sincerely held religious beliefs. I worship the one and only true God that comprises the Trinity: God, Jesus, and the Holy Spirit. I am saved by what Jesus did on the cross and the fact that He rose from the dead on the third day. My purpose here on earth is not my purpose but God's purpose and it is to show the love of God thru my actions, to follow God's commands, to love my neighbor to take care of the things God has given me until I can't. I believe at death that if we believe in Jesus and what he did for us that we will be in heaven with God and I believe for the unbelievers they will be in Hell, separated from God. I have practiced my faith for 54 years, but I remember being active in my faith since I was 6 years old.

The foundation of my faith is the Gospel of Jesus which is His life story from birth to death and the fulfilment of the prophecy of the Messiah. The story shows he is the Son of God, never sinned, did miracle after miracle, died on the cross, and rose from the grave. The Gospel shows us that God loved us enough to give His Son up to die for us so that we can be reunited with Him.

I also believe in the following:

Grace Alone
- God loves the people of the world, even though they are sinful, rebel against Him, and do not deserve His love. He sent Jesus, His Son, to love the unlovable and save the ungodly.

Faith Alone
- By His suffering and death as the substitute for all people of all time, Jesus purchased and won forgiveness and eternal life for them. Those who hear this Good News and believe it have the eternal life that it offers. God creates faith in Christ and gives people forgiveness through Him.

Scripture Alone
- The Bible is God's inerrant and infallible Word, in which He reveals His Law and His Gospel of salvation in Jesus Christ. It is the sole rule and norm for Christian doctrine.

I believe that God gave us free will, but I do believe he knows what we are going to do and allows us to learn from mistakes just like we do with our kids as human parents. The bible says He knows the number of hairs on our heads, it also says He knows our comings and goings. I believe the Holy Spirit is in me. I believe He guides me especially when I am willing to listen. Listening to worship music helps me to focus on God.  My favorite songs are Beautiful Savior, Amazing Grace, and A Mighty Fortress is our God.

Because of my faith, I do my best to pray daily and do devotions so I can be in God's word. We also have an evening routine as a family to do devotions and pray together. When we have a big and sometimes even a little decision in our lives we pray and ask God for guidance on what path we should follow. I have fasted at times along with prayer when something is pressing on my heart. I believe God speaks to us either through His Word in the bible, through a person or a friend, or that feeling we get when we feel like we should or should not make a decision. I think the more we talk to God and sit and listen we can hear Him easier. I was taught to love the sinner and hate the sin. We cannot show God's love if we do not treat people right. We are all sinners and fall short of the glory of God, it is not my place to judge but we are all humans and none of us are perfect.  As members of the church, we go to services, tithe, and take communion on a regular basis.

I have been blessed with several good pastors in my life and I have been able to reach out on many occasions to seek council when needed. Also, multiple people have inspired my faith. From the age of six when we moved my mother made sure we got to church every Sunday and even at the young age of six friends at the church also helped. My first pastor I think is the reason my faith is strong as he was there to teach me the bible from a very young age and gave me a firm foundation to continue to build on as I grew. I have had several wonderful pastors in my life that have helped me continue my faith journey.

Before I started researching vaccines, I received some as an adult, but my last shots were more than 15 years ago. When I was going thru infertility issues, I realized that the vaccines might have been part of the problem for me not getting pregnant and through that research I found that there were aborted fetal cells in the vaccines. We are taught that we should trust our doctors and I was just doing what they told me I should do. Since then, I have learned to research things on my own in the last fifteen years and not just trust what I am told.  I do not believe in abortion as I believe life begins when the egg is fertilized with the sperm. I will no longer take any vaccines or give them to my children since I know now the truth about the ingredients.  Psalm 139:13-16 – "For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made. Wonderful are your works; my soul knows it very well. My frame was not hidden from you, when I was being made in secret, intricately woven in the depths of the earth. Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them."  Consenting to a vaccine that used aborted fetal cell lines to exist is an endorsement of abortion and is against my faith.

I also refuse vaccines for myself and my children because the bible states and informs us that blood represents the life force, and that human blood should be kept pure.  (Genesis 9:4, Leviticus 17:10-11, 17:14, Deuteronomy 12:23, Acts 15:20 and 29). Vaccines contain animal cells and blood, foreign DNA, modified viruses and diseases, and toxins. I think vaccines are spiritually unclean, tainted with sin, and defile our bodies. 1 Corinthians 6:19-20 and 10:31 states that we are to regard our bodies as temples of God's Holy Spirit and that we are to honor God, our Creator and by not defiling them.

I believe injecting sickness and disease into the body circumvents the way God created the body to work.  God created the body to attack and remove sickness and gave us natural filters for

keeping out these things.  Injecting sickness and disease tells God that I do not trust the way He created the body to work and shows a lack of faith in God's goodness and wisdom.  Genesis 1:31 states that God's creation is "very good" and I trust that it is.

Sincerely,

*Jacquelyn Butler*

Jacquelyn Butler

Psalm 119:105 - Your word is a lamp to my feet and a light to my path.

# Exhibit B

4/9/22

I am a Christ follower who believes in the sixty-six books of the Holy Bible as the inspired and infallible Word of God (2 Tim 3:16, Heb 6:18). I humbly state that while I at times have failed my Lord in many ways, I try my best to follow Him and fully believe what the Bible teaches. The Bible teaches that my body is the temple of the Holy Spirit, and that I am not my own, but bought with a price (which was the sacrifice of my Lord, Jesus Christ) and so I cannot in good conscience take that body and subject it to something I believe to be harmful. I know that humans are created in the image of God and we are to honor the Lord with our bodies (1 Corin 6:20). I am to pray and seek the Lord's will in all areas of my life and I have, repeatedly, in this decision regarding the care and keeping of my children (Prov 3:5-6, James 1:5). It is up to me and me alone, under the compelling of the Holy Spirit, to decide what consume, listen to, watch, eat, drink, and take. Anything that can negatively affect my body (or my young children) by my choice is in direct contradiction to the Spirit and therefore sinful.

I feel a deep and compelling certainty and faith that no matter the consequence, vaccinating my daughter is not what the Lord would have me do. The Word of God clearly shows me that it is a sin to have a clear conviction about something but do it anyway (Romans 14:23). The Lord has faithfully guided me in the care of her since she unexpectedly came into my life in 2016. I have had to make sacrifices in my own life to be obedient to this as far as my career and child care and now education options for her. When we approached kindergarten age, because I am now a single parent, I again sought the Lord through prayer and fasting, and again had no peace about vaccinating her. This gave me no other choice but to homeschool her. I do not often venture to guess why God leads me in this specific decision, I am aware of immoral practices of the use of aborted fetal cells and many other toxins in the use of vaccines, but in addition to this, I fear that not only are they morally abhorred, but that they may harm her in some way. Of the 3 biological family members that I am aware of, each have mental/physical impairments. I am aware of certain genetic mutations but again, I don't assume any specific reason that I should not vaccinate her, I simply avoid it in obedience to what the Lord has clearly and repeatedly led me to do.

I also researched vaccinations as I sought the Lord in making this decision and found that many have been manufactured using fetal cell lines obtained through

murdered, aborted children, either in the materials of the injections themselves or in the development and testing of those materials. This is absolutely contrary to the Word of God, which states, "You must not murder" (Exodus 20:13). The Scriptures I base my life on state to "Stay away from every kind of evil" (1 Thessalonians 5:22). I am not against modern medicine and understand that culturally, our society seems to ignore the murder of aborted children for the sake of the greater good in medical advances, but I believe strongly that this is against what my God has commanded.

I also believe that there is also a significant difference between a body in crisis needing help and a body that is healthy accepting a medical procedure. I believe God would accept the former, but not the latter.

The Holy Scriptures that I study and base my life on state that our faith rests not on human wisdom but on the power of God (1 Corin 2:5) and Jesus taught that, "Those who are well do not need a physician, but the sick do."(Matthew 9:12) He repeated this again in Mark 2:17, "When Jesus heard it, he said unto them, 'They that are whole have no need of the physician….". My daughter is a healthy, robust child. She has never required a sick visit. Any time that I have considered vaccines (such as when mandated to enter school) and then seek the Lord's will through prayer and fasting, I do not have any peace to vaccinate her and rather have a strong compelling certainty that I should not.

In closing, the above is a partial explanation of my sincerely held personal religious beliefs. I hope I have described them sufficiently here for this purpose, but there is much more within my faith and in the Holy Bible, as well as how I have sought the Lord within my personal prayer time that guide me in my convictions. With humility, I only seek the free exercise of my religion according to the First Amendment to the United States Constitution, as a citizen of the land protected by that document. Based on what I have shared here, I request that this religious exemption request be approved.

Respectfully and sincerely,

Kimberly Harrell

# Exhibit E

I, William David Morgan, write to request a religious exemption to vaccination for my son. The following paragraphs are my deeply-held beliefs. I believe in God, the Father almighty, creator of heaven and earth. I believe in Jesus Christ, His only Son, our Lord, who was conceived by the Holy Spirit and born of the virgin Mary. He suffered under Pontius Pilate, was crucified, died, and was buried. The third day He rose again from the dead (conquering sin and death). He ascended to heaven and is seated at the right hand of God the Father almighty. From there He will come to judge the living and the dead. I believe in the Holy Spirit, the communion of saints, the forgiveness of sins, the resurrection of the body, and the life everlasting.

I believe that God is omnipotent, omnipresent, omniscient. God is completely sovereign and nothing happens without His permission. No matter what happens in our lives (good, bad, or indifferent) God can use it for His glory. Even what Satan intends for evil, God can use for good. One of my favorite Bible verses is Romans 8:28 – "God allows all things to work together for the good of those who love Him and are called according to His purpose."

Jesus is the sinless Son of God and the Savior of the World. He is the visual representation of the unseen God (Colossians 1:15) and without faith and trust in Jesus, I cannot be reconciled to the Father. Reconciliation is needed to spend eternity in heaven because as a result of the fall of man in the Garden of Eden, I was born a sinner. Sin separates me from God. There is nothing that I can do to save myself or "earn" my place in heaven. Scripture tells me that my best acts are like filthy rags in comparison to God. The only way to be reconciled to the Father and spend eternity in heaven is to be declared righteous. Again, no one is righteous (in right standing with God). However, we have an advocate. We have a Savior. His name is Jesus. Once I put my faith in Jesus as my Lord and Savior and my only hope for eternity I am declared righteous. I am not declared righteous because of anything I have done. Instead, I am declared righteous because of what Jesus has done when He died in my place. Romans 8:1 says that there is no condemnation for those who are in Christ Jesus. Now, I can live out Galatians 2:20 "I have been crucified with Christ. it is no longer I who lives, but Christ who lives in me. Now, the life that I live in the flesh I live by faith in the Son of God, who loved me and gave Himself for me." It's the great exchange – my sin for His righteousness. A life of obedience will be the by-product of this new life.

I also believe that God is three in one (God the Father, God the Son, God the Holy Spirit). The Holy Spirit is one of the three persons in the Trinity. When Jesus ascended into heaven, He promised to send His helper (The Spirit) to dwell within the hearts and minds of Christ followers.

The Spirit leads and guides us as we grow in our understanding of God. He also gives us Spiritual discernment and continually sanctifies us as we conform to the image of Christ. The Spirit gives us the ability to make wise decisions that reflect the will of our Heavenly Father. Also, when we don't know what or how to ask for something the Holy Spirit intercedes for us. We do not have to use outside measures or superstition to know God's will for us. We can rely on the Holy Spirit and the convictions He has laid on our hearts. I think it's interesting that after the Holy Spirit descended upon the apostles at Pentecost in the New Testament, you never read of God's people "casting lots" again in order to know what to do or choose. The Holy Spirit gives us that sound mind.

As a Christ follower I have a major responsibility to be a representative of Jesus. My purpose on this earth is to know God and make Him known, to make disciples, and to walk as Jesus walked. "Go! Make disciples of all nations, baptizing them in the name of the Father, Son, and Holy Spirit, teaching everything that I taught you until the end of the age." If my desire is to be who and what God designed me to be (salt of the earth & a light to the world) it is imperative that I live holy (set apart). Sometimes that means "going against the grain". Sometimes that means *not* doing what the world may deem acceptable or appropriate. Sometimes that means standing for what is right even though I may be surrounded by others who are committed to doing wrong.

After physical death we will all experience eternity - if we have confessed and repented of our sins, surrendered our lives to Jesus, accepting Him as Lord and Savior we will spend eternity with Jesus in heaven. John 14:6 states that Jesus is THE WAY, the truth, and the life - no one comes to the Father except through Him. If I do not confess and repent of my sins I will remain separated from the Lord, dead in my trespasses & sins, and I will spend eternity in hell. As stated, in order to enter heaven I must be righteous (in right standing with God). The only ways to do that are to live a perfect life (which I can't) or to be covered by the blood of Jesus (put on His righteousness). Jesus' blood represents His life, death, and resurrection. I must be so identified with His life, death, and resurrection so that when God the Father looks down He doesn't see Will Morgan, He sees His Son, Jesus.

My mother was instrumental in shaping my faith. She did not merely speak about the teachings of Jesus, she modelled them. She was a walking testimony of how the Lord saved her from sin and self, and she now lives a life filled with Spiritual integrity, maturity, and discipline. It's one thing to speak about the fruit of the Spirit and the attributes of Christ. It's another thing to practice them. One of the best things she taught me was that in order to consistently exhibit Christ's

attributes (be the hands of feet of Jesus) we must understand Jesus' attributes and how He acted and reacted to people. We must study Him and His word daily if we want to be a daily representation of Him to others.

I strive to begin every day in prayer (Psalm 118:24 - This is the day that the Lord has made, let us rejoice and be glad in it). In addition to that I spend quality time in His Word. I am currently reading the Bible from cover to cover for the 2nd time via the Chronological Bible reading plan. I think it is incredibly important to know the Word of God in order to accurately represent Jesus to the world as a witness, and be able to tell the difference between false truth and absolute truth. I typically journal or meditate on what I've read and I strive to read again at night (devotional or independent study of another book of the Bible that I am not currently reading in my Chronological reading). I fast on occasion (food, social media, etc - anything that is drawing my attention away from full devotion to the Lord). I do not drink or smoke. As stated, Prayer is a major part of my life. I strive to remain in communion and prayerful mindset throughout the day. This helps me to be an authentic Christian witness to others. I am of the understanding that everything I say and do has ripple effects on those around me. I want to make sure those ripple effects are in association with God's Word and will. Along with individual worship and study I believe it's important for every Christian to corporately worship as well. I attend Bible study, discipleship, or traditional church services on Tuesday nights, Wednesday nights, and Sunday mornings / nights. It's not about quantity, but I try to stay immersed in the gospel as much as I can.

I try to model an authentic Christian life for my family (my 1st ministry). This entails leading my wife in prayer, loving her and my children as Christ loved the church, doing practical things in the home like reading Bible stories to my children before bed, and being observant for opportunities to share the gospel in everyday things like a sunrise or a bird's song. However, not every act of Christian service within our household is glorious. Some of it is mundane like doing the dishes, helping with laundry, or taking out the garbage. It's not a perfect household by any means, but we strive to serve each other above self and show the love of Christ to each other as best as we can.

My faith prevents me from consenting to vaccination for myself or my children because:

1. 1 Corinthians (6:19-20 and 10:31) tells me that the body is God's temple because the Holy Spirit resides within us. I believe the ingredients in vaccines violate God's command to treat my body as the temple of God. In the Old Testament, the Temple

of God was a physical and sacred place. It was the primary place of worship and Hallowing of the Lord. We are taught in the New Testament, via the gospel of Christ, that we are not limited to a physical building to worship and honor God. Because of Christ's sacrifice on the cross believers are now members of God's "household", built on the foundation of the apostles and prophets, with Jesus being the chief cornerstone. Together, believers make the temple of the Lord. As individuals we act as mobile embassies and ambassadors of the kingdom of God. In other words, our bodies act as an important part of the body of Christ and the "New Covenant Temple" of God. We must act, speak, and make decisions within accordance of what Jesus would do to give an accurate representation of His Kingdom. I believe taking a vaccine that includes genetic matter, animal ingredients, man manipulated pathogens, and chemicals and that is dependent on aborted fetal cell lines to exist, violates the body as God's temple.

2. Also, based on the whole counsel of the Word of God, I believe the use of aborted fetal tissue in either the testing / manufacturing process or the direct ingredients of a vaccine is sin and wrong. The Word of God is clear that abortion is sin. [Even in the popular argument of a case of someone who has been raped (Deuteronomy 24:16 states that parents must not be put to death for the sins of their children, NOR CHILDREN FOR THE SINS OF THEIR PARENTS) - in this case the biological father.] I also believe that profiting off of the body parts of wilfully aborted children is an abomination. Genesis 4:1, 17 and Jeremiah 1:5 reveals that these children were recognized BY GOD as human souls from the point of conception in the same way that we, as parents, recognize our child as a human from the moment we were aware of his / her presence in his / her mother's womb. I believe any vaccine that is at odds with God's infallible Word in either the creation or testing affects my body as being a Temple of God. If I know that a vaccine was created through immoral or non-Biblical practice, and I am okay with that - according to God's Word that's sin. James 4:17 - If anyone knows the right thing to do and does not do it, to him (or her) it is sin.

3. I must also consider that ANYTHING we put our faith & trust in above our faith & trust in Jesus is a false idol. I do not believe vaccines are false idols for everyone.

Typically, idols do not begin as negative things. We typically approach eventual idols with good intentions, but when "they" become more important or more influential in our lives above the gospel of Christ - it's sin and wrong. I must be cautious against placing my faith in anything above God, including vaccines. I believe that taking a vaccine knowing that they go against my religious beliefs would be the same as placing my faith and trust in a false idol.

God is the creator and ruler of the universe. He created all of us for His glory. We are to live in a way that honors Him. Taking a vaccine or allowing my son to receive a vaccine that is contrary to the Word of God does not honor God.

In Christ,

William David Morgan

# Exhibit A

Paul Perkins
11500 Old Pine Walk
Vancleave, MS 39565
pastorgibc@gmail.com

I am a Christian, meaning I was saved (accepted Jesus Christ as my Saviour at age eleven) and have tried to walk with the Lord and serve Him since that time. I have a relationship with the Lord because of Christ. Family and relationships are very important to the Lord, the first institution God made was the family. I was blessed in that I grew up in a Christian home and the upbringing I received impacted my life. As a child, my father was meek, humble, but very strong. He taught me how to work by instilling a work ethic in me so that I would not just be a non-active Christian, but so that I would serve my Saviour with my life. He taught me how to pick my battles (he was in the military and I believe he brought that training into our home) so that when I believed, based upon Scripture, that there was a truth to stand upon, I would stand on that truth firmly and compassionately. My dad taught me to Love the Lord and others more than self. I observed (did not just hear words spoken) the sacrificial life my dad lived. I watched it play out before my eyes and though I didn't understand it or always appreciate it when I was young, as I grew older, matured and learned more about life, I deeply respected and desired to follow his example in my own life.

My wife and I began to ask questions and study vaccines back in the late 90's. It was over the course of the next few years that we realized that aborted fetal tissue was used in some vaccines which caused us to look deeper at all vaccines. My faith compels me to avoid vaccines for myself and my children for all the reasons I describe below.

I believe that God is the Giver/Creator of life and that all life begins at the point of conception (when we become a living soul). I believe that ALL life is precious to God (John 3:16, John 15:12, Gal. 2:20, Eph. 2:4, I John 4:19). I worship the LORD (Jehovah) God, Jesus Christ His Son and believe He is a Triune God. My purpose on earth is to glorify my Lord thru my life. I am thankful that I do not have to be perfect to worship, glorify or serve my Lord. I do understand that the direction of my life and the motivation of my heart is absolutely important. I believe that when the physical body dies, those who have a personal relationship with God thru the salvation offered by Christ and His sacrifice (payment for our sins) on the cross, will spend eternity in heaven with the Lord (II Cor. 5:8). We deserved to pay for what we have done (sin against a holy God), but God loved us unconditionally and sent His Son, Jesus Christ, to make a payment for us that He would accept.

1

To summarize my beliefs: I believe in the Creator God of the Bible. His Son, Jesus Christ and the Holy Spirit, Who indwells believers today. I believe the Bible is our final authority for faith and practice. I believe that Salvation is necessary and possible. Because of my salvation, my life belongs to the Lord.

I want my Faith to be my life. I have fasted at different times over different situations that I was dealing with in my life (for example, in Bible College, I observed a 30 day fast). I pray over every meal and try to watch what I eat believing that my body is the "Temple of the Holy Ghost" and belongs to the Lord. The Holy Ghost is the 3rd part of the trinity. The Holy Spirit is not something we can see, but something we can see the effects of as Jesus said to Nicodemus in John chapter 3. I DO NOT drink alcohol or use any form of tobacco. My wife and I strive to eat healthy and use natural things for a natural approach to dealing with (inflammation, headaches, common cold and even covid). We believe that there is a time and place for Doctors and the medical field (I had both of my hips replaced and needed a doctor), but I haven't been to a doctor for years. I take supplements that are natural. I strive to have daily devotions (a time of meditation and reflection and prayer). I am in church twice on Sunday, every Wednesday evening along with special services like mission's conferences and revival meetings that our church has. If I'm away on vacation, we either visit a different church or live stream our church services. I give tithes and offerings to our church. We partake of communion at our church.

The above listed actions are more of the daily living of my faith, but there is more to it than that. The Bible says that the "…just shall live by faith…". I believe I should diligently strive to make my faith the guiding part of my life decisions. In high school after scoring very high on the ASVAB test and being offered a full scholarship to college, I believed in my heart that the Lord was calling me into ministry work. I walked away from the military career offers and the full scholarship to college and paid my own way through Bible College to get my degree. After much prayer, counsel and searching the Scripture, I made a move across country from Maine to Mississippi and became a volunteer staff at our church while working a job in route sales to support my family. After six years (89-95) of serving in that capacity, the Lord called my wife and I into missions work. I resigned my job, we moved out of our house and after raising support, moved to the Philippines in 1997. We (after years of praying and fasting) adopted our first child, a Filipina from an orphanage there, and served as missionaries in the Philippines until 2007. Our income level was low, we were not there for the money. We were there because we believed the Lord was directing our steps to serve Him there. In 2007, after two weeks of prayer and fasting, we felt the Lord was bringing us back Stateside to serve Him here.

2

We came back to a serve a church that could not immediately guarantee us a salary. We believed the Lord, trusted Him and acted by faith. We trusted the Lord to supply our needs and He did. At times it was working side jobs to have enough income to pay the bills (shingling roofs and doing side construction jobs). Psalms 55:22 "Cast thy burden upon the LORD, and he shall sustain thee: he shall never suffer the righteous to be moved." My faith is the guiding factor in my life. I want to not just "preach" that, but live it.

I have moved from North to South, from Mississippi to the Philippines and back because of my faith. I have learned another language and culture because of my faith. I have walked away from financial gain possibilities because of my faith. So, when we realized that some vaccines were created using the bodies of babies that were aborted, we could not in good conscience accept that. When we began to more seriously consider everything medical as it relates to what we are putting into our bodies, we had to make these changes. I understand that not all vaccines use aborted fetal cell lines or contain them (many do) but there are other ingredients as well that we believe the Lord would not want us to put into our bodies. We made changes in toothpaste (for example) because of the fluoride content found in some and the affect that it has on the human body. The bottom line for us is this: our body is the Temple of the Holy Ghost. We are to be careful what we put into it. Mississippi needs to allow religious exemptions for school age children. Living our faith in this way has led us to have to go against the grain in some areas. It has meant that we stopped carrying an immunization card through Customs/Immigration in the Philippines, knowing they could revoke our visa for non-compliance. We have stayed in Mississippi praying and working with organizations to try and get the law changed through our legislative process. I have emailed and called politicians for years and have NEVER once had an email replied to or a call returned. I am not a perfect Christian. But I believe that the Bible is my final authority for faith and practice. In the Bible I see that God loves all human beings (He created ONE race, the human race) and He is the Giver of life and that life begins at the point of conception. This makes abortion wrong. I cannot go along with the injecting of aborted fetal tissue or other ingredients into my body or the bodies of my children.

As I have stated Vaccines violate my religious beliefs because of the ingredients used in the vaccines. I believe that using aborted fetal tissue is unbiblical for the following reasons: Jer. 1:4-5 says "Then the word of the LORD came unto me, saying, Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee, and I ordained thee a prophet unto the nations." Also the Bible says in Psa. 139:13-16 "For thou hast possessed my reins: thou hast covered me in my mother's womb. I will praise thee; for I am fearfully and wonderfully made: marvellous are thy works; and that my soul knoweth right well. My substance was not hid from thee, when I was made in

3

secret, and curiously wrought in the lowest parts of the earth.  Thine eyes did see my substance, yet being unperfect; and in thy book all my members were written, which in continuance were fashioned, when as yet there was none of them."  These Scriptures show us that God gives/forms life and that life begins before the actual birth of the baby.  God has a plan for the pre-born and knows all about a baby before the parents ever meet that baby at birth.  Not only this, but the Bible says is Psa. 127:3 " Lo, children are an heritage of the LORD: and the fruit of the womb is his reward."  Our children belong to the Lord (all children belong to the Lord).  Because of these Biblical reasons, I would feel complicit, I would feel that I would be saying ok to abortion for the "benefit of others" by being ok with vaccines.

I love our State, Mississippi and believe there is great potential, many freedoms and that the future is bright for us.   I also believe that as citizens of this State, we should have the right to allow our faith to lead and guide us even in this area of vaccinations.  That we should have religious freedom in this area as well and that freedom not keep us back from getting our children educated.

Paul Perkins

# Exhibit C

I believe that there is a loving God. The Bible affirms that God is All-powerful, Almighty and Omnipotent. I believe this because He is the only God who can perform miracles, forgive sin and give us eternal life. I follow and trust in the Lord's Word and I believe we are here on earth to follow God's will. Having a personal relationship with God through faith in Jesus Christ, the son of God, our sins will be forgiven. I believe that Jesus lived a perfect, sinless life, and he was crucified to pay the penalty for our sins. I believe that the Holy Spirit lives in us and in the hearts of believers and intercedes during times of weakness and reminds us of things taught by Christ. I believe that the Bible lends help in understanding God's will and helps us to seek the paths He has created for us to follow His will. He has richly blessed us with everything we need on earth to live a healthy and peaceful life. When we die, I believe that we enter into the Kingdom of Heaven and we are then reunited with our Gracious Lord and loved ones to live for eternity.

My faith plays a big part in my life daily, as well as my entire family. I was born into Catholicism and have been actively involved since then. I continue to exercise my Catholic faith by attending church services as I have my entire life, continuing to learn from the scripture, and continuing to practice all that I have learned about the Lord over my entire life. I am now passing these teachings on to my children, daily. We say prayers each night before we go to sleep, we bless our food, and we pray before a big event or function, test, game, competition, or when we must make hard decisions. Both of my sons made their First Communion last year so they are now able to receive Communion with me. I meditate for 10 minutes daily. I fast when I can for discernment and to enhance my prayer. My family and I attend church and tithe each Sunday as well. We pray the Rosary and Chaplet of the Divine Mercy several times a week. Personally, I have also been participating in a rosary prayer group since 2002 and have been inspired by many of the members. My family and I give thanks daily for our blessings. We make the sign of the cross and say a Hail Mary when passing by Catholic churches. I try to keep my faith present in my every day tasks and chores too. I like to say the Rosary while driving. I wear two crosses daily that represent the births of my two boys. My husband gifted them to me on the days they were born. I have crosses on walls in our home, pictures and paintings of Jesus, the Our Father prayer, Mary and angel statues in our garden. We listen to worship music throughout the day. My children have favorite worship songs that we play in the car and in our home when doing homework or working on small projects.

While I know the Catholic Church and the Pope in particular have made various statements over the years in favor of vaccines, the Pope was not speaking infallibly and as with his opinion on any other matter of the day, it is in no way binding on me as a Catholic. For me personally, the Church's position on vaccines in no way affects my beliefs because my own faith, conscience, and personal relationship with the Lord guide my decisions. While I consider myself a devout Catholic, my faith is truly my own and it is based on my own personal relationship with the Lord who I believe speaks directly to me through prayer and scripture through the Holy Spirit. In fact, even when I heard that the Pope came out in favor of Covid vaccines, I didn't reconsider my beliefs for a moment because I am so certain about God's instruction for me and my family when it comes to vaccines.

With the exception of my oldest getting one Tdap shot, my children have not received any vaccines because my sincere and genuine faith in God forbids me from vaccinating them. In the instance of my oldest son's shot, although I came to my religious beliefs on vaccines twenty years ago, my husband and I did not always share the same religious beliefs. When my son was around 20 months old, my husband took him to a doctor's visit and, unfortunately, allowed fear instilled in him instead of faith in God to guide him, and gave our son the Tdap vaccine against my wishes. Afterwards, we prayed together many times and had many long discussions. Ultimately, my husband has come to share my religious beliefs and we have not given our children any vaccines since then.

Primarily, I believe that our bodies are sacred Temples of the Holy Spirit, created by God, and we are to honor God with our body. This means that our bodies are not our own but of God. God's creations are perfect to begin with and I trust in my God and all he has created as being perfect. Exodus 15:26: He said, "If you listen carefully to the Lord your God and do what is right in his eyes, if you pay attention to his commands and keep all his decrees, I will not bring on you any of the diseases I brought on the Egyptians, for I am the Lord, who heals you." I believe that it is our duty to live by faith in word and deed and that includes having faith in God's perfect design of our bodies and immune systems. The Lord made us the way He intended. Vaccines are a violation of our duty to put our faith in Him because they preemptively reject and doubt God's design, which is a sin. [Bible verse] They are man's attempt to overstep God's authority by outdoing and overriding what He intended, which I refuse to do. I put my faith in the Lord and not man.

Beyond that, vaccines created using aborted fetal tissue or cell lines created from that tissue are against my faith. I firmly believe that life beings at conception. God is eternal and He has always had a plan for each individual human soul He brings into existence, including the timing of each person's conception. "Children are a heritage from the Lord, and the fruit of the womb is his reward." Psalm 127:3. God reveals to us in His Word that not only does life begin at conception, but He knows who we are even before then. "Before I formed you in the womb I knew you. Before you were born I set you apart." - Jeremiah 1:5. Not only is abortion murder because it ends a life, but on a more basic level, it rejects and alters God's will and His intended plan for that person's existence. I refuse to have any part in that level of sin and I refuse to accept any product that relied on abortion and required the DNA, cells, or tissue from these babies in order to exist. Accepting these vaccines goes completely against my beliefs because it supports abortion and deeply violates my conscience.

*Brandi Senseney Renfroe*

Brandi Senseney Renfroe

# Exhibit G

## Jeana Stanley

I am a Christian and I hold a Christian view as part of the body of Jesus Christ. I believe in God and His son Jesus Christ who was crucified, died and was buried and raised from the dead to sit at the right hand of the Father. I believe He will come again to judge the living and the dead. The Good News of the gospel of Jesus Christ is that whosoever believeth in Him shall have everlasting life. I believe in God's Holy Word, the bible. The Holy Spirit is the force emanating from God that dwells inside each of us to accomplish His will.

### I Seek God's Guidance Continuously Through Prayer

I grew up attending church, but as an adult I began seeking guidance directly from God through prayer. In my pursuit of happiness and inner peace, I practice a continual and prayerful relationship with God. I depend on my understanding of God's holy word and through thoughtful communication with Him through prayer to make decisions. I am always open to learn from pastors and religious leaders and to hear their interpretations of scripture but I rely on my personal spiritual convictions and relationship with God for answers. Through my deep trust in God, the reading of His divine word and through prayer I am able to discern God's intentions and follow His divine guidance in all areas of my life. Having evolved over time through prayer and my personal relationship with God, my belief system has become deeply rooted in who I am as a person. It is sincerely grounded through decades of thoughtful and careful consideration and work with referencing man's research and continually turning to God for answers and resolutions.

### My faith is encouraged by my children, my husband and parents

My parents have always encouraged me to have a personal relationship with God, to not follow lockstep in the ways of man, to always question, seek answers in His word and to continue to grow ethically and morally and spiritually. My husband is a devout Christian and also holds these beliefs. My children strengthened my faith by teaching me how important it is to seek answers not from this world, but from God. I have seen and heard of too many that follow man's advice to be injured and lose life. Isaiah 2:22 "Stop trusting humans. Trust God."

I meditate on God's word reading the King James Version of the bible daily. I attend a Christian church with my family so my children can learn and share with other Christian children. I believe My purpose is to live in His word and pass down His words to my children. My family participates in all Christian Holidays and services. I abstain from eating meat on Fridays during Lent, and I participate in communion and tithe.

### I trust God and know His intentions

I put my trust in God for healing and I know the intention God has for my life  and that of my children to avoid physicians, medications (both over the counter and prescription) and vaccines.  As a practicing physical therapist, I am at peace treating many ailments through proper movement, balance and fostering total physicality and well-being. I sincerely believe He does not intend me to intervene with my body with things like pharmaceuticals and vaccines.  I practice this belief at home in my daily life, with my children, my extended family and my friends.  My spouse shares my beliefs. Mark 5:26 "She suffered under many physicians, spent all she had, yet only got worse." Because vaccines are preventative measures for illnesses one may possibly acquire in the future, taking a vaccine means we do not trust His creation in ourselves or His plans for our future. Mark 2:17 "Those who are well have no need for a physician, But those who are sick." Isiah 2:22 "Stop trusting Humans. Trust in God." I will not be afraid and doubt my sincere understanding of God's will in directing my path to healing.

### Abortion is a Sin Against God

Abortion is murdering an unborn child. I could not accept taking aborted human fragments from once living souls and intentionally inject a vaccine made from an abortion into myself or that of my healthy child without sinning against God. It goes against my moral, ethical and spiritual being and all that God teaches me. Jeremiah 1:5 "Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee and I ordained thee a prophet unto the nations."

### Vaccines Defile God's Temple and Alter His Perfect Design of His Creation

The human body was perfectly designed and created by God. To intervene in a healthy, well body by injecting substances to alter, intervene and manipulate it is against God's perfect design. Leviticus 19:28 "Ye shall not make any cuttings in your flesh for the dead, nor print any marks upon you: I am the Lord." 1 Corinthians 6:19 "What? know ye not that your body is the temple of the Holy Ghost is in you, which ye have of God, and you are not your own." 1 Corinthians 3:17 "If any man defiles the temple of God, him shall God destroy; for the temple of God is holy, which temple ye are."

Vaccines contain unclean substances, including organic matter of other living things, preservatives, chemicals, and toxins. Purposefully Injecting these substances into a well, fit body is against God's will. Mark 2:17 - "Those who are well have no need for a physician, but those who are sick." Thessolonians 5:21-22; Psalm31:24; John 14:6; 1 Corinthians 6:19; 2 Timothy 1:7; Isiah 2:22; Mark 5:26. Vaccines are meant to interfere with and alter the immune system which was wonderfully and fully created by God to work uniquely in sync with the attrition of illnesses caused by viruses. 1 Thessolonians 5:21 "Prove all things; hold fast that which is good." In my discernment of God's word, we are to value our bodies which He made in His image and not purposefully defile our body with unclean substances and/or undo His perfect plans for us.

### I believe Vaccines are a Sin Against God

Through a spiritually ever present and prayerful relationship with God, I know that accepting vaccine injections is against what God intends for me and my family. Accepting vaccine injections would cause me deep regret because it would be a betrayal to God's intended direction and purpose for myself and my family. God has instructed me to use discernment to identify truth regarding medical intervention. To accept vaccines for my family would be sinning against God. Mark 2:17; Isiah 2:22.

In closing, through my prayerful relationship with God, I am able to discern with confidence God's will for my life and for my children's upbringing. My sincere personal understanding of God's Holy Word and sincerely held beliefs, long term practice of my beliefs and continual communication through prayer with God, guides me in this matter. Proverbs 3:6 "In all thy ways acknowledge Him, and He shall direct thy paths."

Jeana Stanley

# Exhibit F

## Fwd: Message from KM_C550i

Will Morgan <will.morgan@lifepointsenatobia.com>
Thu 4/28/2022 10:03 AM
To: Walker Moller <wmoller@sirillp.com>

---------- Forwarded message ---------
From: **Will Morgan** <will.morgan@lifepointsenatobia.com>
Date: Thu, Apr 28, 2022 at 10:02 AM
Subject: Re: Message from KM_C550i
To: Weeks, John <jweeks@senatobiaschools.com>

Thank you!

On Thu, Apr 28, 2022 at 8:36 AM Weeks, John <jweeks@senatobiaschools.com> wrote:
Attached is the information for immunization requirements to enroll in school. We have looked and searched trying to find a way to get your child enrolled without the immunizations. But unfortunately, there is no exemption from the immunizations due to religious beliefs.

---------- Forwarded message ---------
From: <do@senatobia.k12.ms.us>
Date: Thu, Apr 28, 2022 at 8:25 AM
Subject: Message from KM_C550i
To: <jweeks@senatobia.k12.ms.us>

****************************************************************************
The foregoing electronic message and any files transmitted with it are confidential and are intended only for the use of the intended recipient named above. This communication may contain material protected by the Family Educational Rights and Privacy Act (FERPA). If you are not the intended recipient, copying, distribution, or use of the contents of this message is strictly prohibited. If you received this electronic message in error, please notify us immediately at 662-562-4897.
Senatobia Municipal School District, 104 McKie St, Senatobia, MS 38668 http://www.senatobiaschools.com

# Exhibit I

# Medical Exemption Request

## Instructions

- The child's pediatrician, family physician, or internist licensed in Mississippi must complete and submit this form to the State Epidemiologist or Deputy State Epidemiologist. Forms completed by a child's out-of-state tertiary care physician will be reviewed on a case by case basis.
- The State Epidemiologist or Deputy State Epidemiologist will complete the Medical Exemption Form 122 and return a copy via mail to the physician and the parent at the addresses indicated below.

Date of Request: _____

Name of Child: _____    Date of Birth: _____
              *Last*                *First*                *MI*

Name of Parent: _____
                        *Last*                              *First*                              *MI*

Address: _____
                *Street*                        *City*                        *State*                *Zip*

**Indicate the exemption status for each vaccine in the table below (an exemption status is required for each vaccine):**

| Vaccine | Indicate Permanent, Temporary or No Exemption | Expiration Date if Temporary |
|---|---|---|
| DTaP | | |
| Hepatitis B | | |
| *Hib | | |
| IPV | | |
| MMR | | |
| *Pneumococcal | | |
| **Tdap | | |
| Varicella | | |

*For child care only          **For 7th grade entry only

Indicate reason for medical exemption (use additional sheets if needed): _____
_____

Print name of child's pediatrician, family physician, or internist licensed in Mississippi (or out-of-state tertiary care physician):

_____

Address: _____
                *Street*                        *City*                        *State*                *Zip*

Telephone Number: _____    Fax Number: _____

---

I declare that:
- The physical condition of this child to be such that the vaccination(s) specified on this form would endanger their life or health and outweighs the risks of death or disability from the vaccine preventable disease.
- I have discussed the benefits and risks of immunizations with the parent/guardian as a condition for exemption.
- I have informed the parent/guardian that if any vaccine-preventable diseases for which the child has not been adequately immunized are occurring in or threatening to occur in the community, the child will, for the safety and benefit of him/herself and other children, be excluded from daycare/school until the infectious disease is no longer present or is no longer a threat to the safety and welfare of the child or other children in the daycare/school.

Signature of child's pediatrician/family physician/internist licensed in Mississippi: _____
  *(Or out-of-state tertiary care physician)*

Mississippi Medical License Number: _____    NPI#: _____
  *(Or out-of-state tertiary care physician license number)*

---

**This document should be submitted to the State Epidemiologist or Deputy State Epidemiologist at the MSDH in Jackson, Mississippi.**
**Mail to: MSDH Epidemiology Office, Post Office Box 1700, Jackson, Mississippi, 39215, or fax to (601) 714-8732.**

**Medical Exemption Request**
**Form No. 139**

**PURPOSE**
To request a medical exemption from one or more required vaccination(s) for childcare or school entry in Mississippi.

**INSTRUCTIONS**

1.    This form must be completed and signed by the child's pediatrician, family physician, or internist who is duly licensed in Mississippi. The same pediatrician, family physician, internist, or tertiary care physician must indicate on the form the medical condition of the child seeking exemption and indicate the exemption status for each of the listed vaccines. Children receiving specialized or tertiary care outside of the state may have medical exemption requests completed and signed by their tertiary care physician. These medical exemption requests will reviewed on a case by case basis.

2.    Each section of the Medical Exemption Request Form must be **fully completed**, to include an indication of the requested exemption status for each vaccine listed and indication of the medical reason for the exemption. The requesting physician will be contacted in the event that the medical exemption request is incomplete and not accepted.

3.    The medical exemption request form should be sent to the Mississippi State Department of Health central office in Jackson:
Mississippi State Department of Health
570 E. Woodrow Wilson, O-420
Attn: Assessment Reports Coordinator
Post Office Box 1700
Jackson, MS 39215-1700
Telephone: (601) 576-7725
Fax: (601) 714-8732

4.    Review of all medical exemption requests will be conducted at the Mississippi State Department of Health by the State Epidemiologist or Deputy State Epidemiologist.

5.    Follow up and request for additional information will be conducted by the State Epidemiologist or Deputy State Epidemiologist for out-of-state medical exemption requests if needed. The parent and the requesting physician will be contacted in the event that the out-of-state medical exemption request is not accepted.

6.    Once the request is reviewed for completeness and accepted, a Certificate of Medical Exemption (Form 122) will be issued. Only the Certificate of Medical Exemption (Form 122) signed and dated by the State Epidemiologist or Deputy State Epidemiologist provides official, documented proof that a child has been issued a medical exemption by the Mississippi State Department of Health. A copy of the Certificate of Medical Exemption (Form 122) will be mailed to the parent and the requesting physician.

**OFFICE MECHANICS AND FILING**
The original copy of the completed and signed Medical Exemption Request (Form 139) and Certificate of Medical Exemption (Form 122) will be housed at the Mississippi State Department of Health.

**RETENTION**
The completed and signed form will be housed at the Mississippi State Department of Health and reviewed periodically to ensure validity.

**This form is <u>NOT</u> an official exemption and should not be misinterpreted as the Certificate of Medical Exemption (Form 122).**

**Exemption from required immunizations for religious, philosophical, or conscientious reasons is not allowed under Mississippi law.**

# Exhibit J

# Mississippi State Department of Health

## School Immunization
## Medical Exemption Report
## 2021-2022



# Mississippi 2021-2022
## School Medical Exemptions By County,
## Children Enrolled in Kindergarten-12th Grade



**Medical Exemptions By County**

- 1
- 2 – 5
- 6 – 15
- 16 – 45
- No Exemptions

**State Total 418**

Source: Mississippi State Department of Health Final School Compliance Report, 2021-2022 school year (Revised 04/18/2022)

# Mississippi 2021-2022
# School Medical Exemptions By Year,
# Children Enrolled in Kindergarten-12th Grade



Source: Mississippi State Department of Health Final School Compliance Report, 2021-2022 school year (Revised 04/18/2022)

# Exhibit L

ALABAMA DEPARTMENT OF PUBLIC HEALTH
2019-2020 SCHOOL ENTRY SURVEY
COUNTY SUMMARY
PUBLIC/PRIVATE SCHOOLS

| DISTRICT | COUNTY | STUDENTS | NOT EXPIRED COL | % | Rel Ex | % | Partial Rel Ex | % | Med Ex | % | Partial Med Ex | % | EXPIRED COL | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NORTHERN | MADISON | 63342 | 59326 | 93.66 | 642 | 1.01 | 5 | 0.01 | 28 | 0.04 | 33 | 0.05 | 3285 | 5.19 |
| | MORGAN | 22396 | 21047 | 93.98 | 148 | 0.66 | 0 | 0.00 | 6 | 0.03 | 11 | 0.05 | 1184 | 5.29 |
| | LIMESTONE | 18193 | 17359 | 95.42 | 183 | 1.01 | 1 | 0.01 | 20 | 0.11 | 14 | 0.08 | 615 | 3.38 |
| | JACKSON | 8244 | 7792 | 94.52 | 88 | 1.07 | 1 | 0.01 | 2 | 0.02 | 6 | 0.07 | 355 | 4.31 |
| | CULLMAN | 13133 | 12396 | 94.39 | 200 | 1.52 | 0 | 0.00 | 10 | 0.08 | 14 | 0.11 | 513 | 3.91 |
| | LAUDERDALE | 14106 | 13356 | 94.68 | 152 | 1.08 | 0 | 0.00 | 14 | 0.10 | 9 | 0.06 | 575 | 4.08 |
| | MARSHALL | 19097 | 17518 | 91.73 | 95 | 0.50 | 0 | 0.00 | 5 | 0.03 | 5 | 0.03 | 1473 | 7.71 |
| | COLBERT | 8691 | 8121 | 93.44 | 49 | 0.56 | 0 | 0.00 | 4 | 0.05 | 3 | 0.03 | 368 | 4.23 |
| | FRANKLIN | 6314 | 5925 | 93.84 | 17 | 0.27 | 0 | 0.00 | 1 | 0.02 | 1 | 0.02 | 370 | 5.86 |
| | MARION | 4957 | 4583 | 92.46 | 38 | 0.77 | 0 | 0.00 | 2 | 0.04 | 2 | 0.04 | 332 | 6.70 |
| | WINSTON | 4095 | 3795 | 92.67 | 46 | 1.12 | 0 | 0.00 | 5 | 0.12 | 2 | 0.05 | 247 | 6.03 |
| | LAWRENCE | 3643 | 3515 | 96.49 | 27 | 0.74 | 0 | 0.00 | 2 | 0.05 | 1 | 0.03 | 98 | 2.69 |
| TOTAL | | 186211 | 174733 | 93.84 | 1685 | 0.90 | 7 | 0.00 | 99 | 0.05 | 101 | 0.05 | 9415 | 5.06 |
| NORTHEASTERN | SHELBY | 39771 | 37962 | 95.45 | 429 | 1.08 | 0 | 0.00 | 20 | 0.05 | 23 | 0.06 | 1337 | 3.36 |
| | ETOWAH | 17596 | 16448 | 93.48 | 143 | 0.81 | 1 | 0.01 | 5 | 0.03 | 5 | 0.03 | 993 | 5.64 |
| | CALHOUN | 18911 | 18050 | 95.45 | 153 | 0.81 | 9 | 0.05 | 18 | 0.10 | 19 | 0.10 | 661 | 3.50 |
| | TALLADEGA | 12231 | 11711 | 95.75 | 59 | 0.48 | 1 | 0.01 | 9 | 0.07 | 4 | 0.03 | 440 | 3.60 |
| | ST.CLAIR | 15169 | 14429 | 95.12 | 191 | 1.26 | 0 | 0.00 | 9 | 0.06 | 8 | 0.05 | 532 | 3.51 |
| | DEKALB | 13066 | 12280 | 93.98 | 84 | 0.64 | 7 | 0.05 | 1 | 0.01 | 5 | 0.04 | 689 | 5.27 |
| | BLOUNT | 10386 | 10063 | 96.89 | 78 | 0.75 | 0 | 0.00 | 17 | 0.16 | 4 | 0.04 | 224 | 2.16 |
| | RANDOLPH | 3730 | 3471 | 93.06 | 18 | 0.48 | 1 | 0.03 | 0 | 0.00 | 2 | 0.05 | 238 | 6.38 |
| | CHEROKEE | 4337 | 4225 | 97.42 | 42 | 0.97 | 0 | 0.00 | 1 | 0.02 | 1 | 0.02 | 68 | 1.57 |
| | CLAY | 2310 | 2182 | 94.46 | 29 | 1.26 | 0 | 0.00 | 1 | 0.04 | 0 | 0.00 | 98 | 4.24 |
| | CLEBURNE | 2695 | 2612 | 96.92 | 19 | 0.71 | 0 | 0.00 | 4 | 0.15 | 0 | 0.00 | 60 | 2.23 |
| TOTAL | | 140202 | 133433 | 95.17 | 1245 | 0.89 | 19 | 0.01 | 85 | 0.06 | 71 | 0.05 | 5340 | 3.81 |
| EAST CENTRAL | MONTGOMERY | 37255 | 33403 | 89.66 | 172 | 0.46 | 0 | 0.00 | 3 | 0.01 | 11 | 0.03 | 3643 | 9.78 |
| | LEE | 25638 | 24260 | 94.63 | 148 | 0.58 | 1 | 0.00 | 20 | 0.08 | 10 | 0.04 | 1199 | 4.68 |
| | ELMORE | 14811 | 13752 | 92.85 | 128 | 0.86 | 1 | 0.01 | 4 | 0.03 | 8 | 0.05 | 918 | 6.20 |
| | CHAMBERS | 4874 | 4591 | 94.19 | 6 | 0.12 | 0 | 0.00 | 1 | 0.02 | 2 | 0.04 | 274 | 5.62 |
| | AUTAUGA | 10364 | 9795 | 94.51 | 79 | 0.76 | 0 | 0.00 | 2 | 0.02 | 7 | 0.07 | 481 | 4.64 |
| | RUSSELL | 10668 | 9444 | 88.53 | 26 | 0.24 | 2 | 0.02 | 1 | 0.01 | 2 | 0.02 | 1193 | 11.18 |
| | TALLAPOOSA | 6216 | 5996 | 96.46 | 35 | 0.56 | 0 | 0.00 | 4 | 0.06 | 2 | 0.03 | 179 | 2.88 |
| | LOWNDES | 1559 | 1475 | 94.61 | 7 | 0.45 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 77 | 4.94 |
| | MACON | 2032 | 1955 | 96.21 | 19 | 0.94 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 58 | 2.85 |
| | BULLOCK | 1646 | 1450 | 88.09 | 2 | 0.12 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 194 | 11.79 |
| | COOSA | 490 | 466 | 95.10 | 5 | 1.02 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 19 | 3.88 |
| TOTAL | | 115553 | 106587 | 92.24 | 627 | 0.54 | 4 | 0.00 | 35 | 0.03 | 42 | 0.04 | 8235 | 7.13 |
| JEFFERSON | JEFFERSON | 111625 | 105547 | 94.55 | 620 | 0.56 | 1 | 0.00 | 27 | 0.02 | 42 | 0.04 | 4971 | 4.45 |
| SOUTHWESTERN | BALDWIN | 40353 | 36986 | 91.66 | 697 | 1.73 | 2 | 0.00 | 26 | 0.06 | 55 | 0.14 | 1575 | 3.90 |
| | DALLAS | 5808 | 5289 | 91.06 | 3 | 0.05 | 0 | 0.00 | 2 | 0.03 | 1 | 0.02 | 513 | 8.83 |
| | ESCAMBIA | 5827 | 5617 | 96.40 | 30 | 0.51 | 0 | 0.00 | 3 | 0.05 | 1 | 0.02 | 176 | 3.02 |
| | MONROE | 3916 | 3821 | 97.57 | 25 | 0.64 | 0 | 0.00 | 0 | 0.00 | 7 | 0.18 | 62 | 1.58 |
| | CLARKE | 4225 | 3994 | 94.53 | 7 | 0.17 | 0 | 0.00 | 2 | 0.05 | 2 | 0.05 | 220 | 5.21 |
| | MARENGO | 3983 | 3708 | 93.10 | 12 | 0.30 | 0 | 0.00 | 3 | 0.08 | 1 | 0.03 | 255 | 6.40 |
| | WASHINGTON | 2740 | 2570 | 93.80 | 4 | 0.15 | 0 | 0.00 | 1 | 0.04 | 0 | 0.00 | 165 | 6.02 |
| | CONECUH | 1394 | 1306 | 93.69 | 6 | 0.43 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 82 | 5.88 |
| | CHOCTAW | 1820 | 1608 | 88.35 | 7 | 0.38 | 0 | 0.00 | 0 | 0.00 | 1 | 0.05 | 204 | 11.21 |
| | WILCOX | 1617 | 1433 | 88.62 | 4 | 0.25 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 180 | 11.13 |
| | Baldwin | 132 | 128 | 96.97 | 2 | 1.52 | 0 | 0.00 | 0 | 0.00 | 1 | 0.76 | 1 | 0.76 |
| TOTAL | | 71915 | 66460 | 92.54 | 797 | 1.11 | 2 | 0.00 | 37 | 0.05 | 69 | 0.10 | 3433 | 4.78 |
| WEST CENTRAL | TUSCALOOSA | 34149 | 31651 | 92.68 | 191 | 0.56 | 1 | 0.00 | 15 | 0.04 | 19 | 0.06 | 2270 | 6.65 |
| | WALKER | 10011 | 9644 | 96.33 | 29 | 0.29 | 0 | 0.00 | 3 | 0.03 | 5 | 0.05 | 330 | 3.30 |
| | CHILTON | 7888 | 7343 | 93.09 | 32 | 0.41 | 0 | 0.00 | 0 | 0.00 | 2 | 0.03 | 511 | 6.48 |
| | PICKENS | 2732 | 2503 | 91.62 | 10 | 0.37 | 1 | 0.04 | 0 | 0.00 | 0 | 0.00 | 218 | 7.98 |
| | BIBB | 3354 | 3188 | 95.05 | 17 | 0.51 | 0 | 0.00 | 1 | 0.03 | 3 | 0.09 | 145 | 4.32 |
| | LAMAR | 2543 | 2525 | 99.29 | 9 | 0.35 | 0 | 0.00 | 1 | 0.04 | 0 | 0.00 | 8 | 0.31 |
| | SUMTER | 1401 | 1300 | 92.79 | 2 | 0.14 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 99 | 7.07 |
| | HALE | 2814 | 2546 | 90.48 | 3 | 0.11 | 0 | 0.00 | 0 | 0.00 | 1 | 0.04 | 264 | 9.38 |
| | FAYETTE | 2325 | 2040 | 87.74 | 8 | 0.34 | 0 | 0.00 | 1 | 0.04 | 0 | 0.00 | 276 | 11.87 |
| | PERRY | 1341 | 1144 | 85.31 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 197 | 14.69 |
| | GREENE | 999 | 806 | 80.68 | 2 | 0.20 | 1 | 0.10 | 0 | 0.00 | 0 | 0.00 | 190 | 19.02 |
| TOTAL | | 69557 | 64690 | 93.00 | 303 | 0.44 | 3 | 0.00 | 21 | 0.03 | 30 | 0.04 | 4508 | 6.48 |
| SOUTHEASTERN | HOUSTON | 18639 | 17404 | 93.37 | 85 | 0.46 | 14 | 0.08 | 17 | 0.09 | 30 | 0.16 | 1089 | 5.84 |
| | COFFEE | 10994 | 10525 | 95.73 | 110 | 1.00 | 0 | 0.00 | 8 | 0.07 | 6 | 0.05 | 345 | 3.14 |
| | DALE | 6742 | 6509 | 96.54 | 42 | 0.62 | 1 | 0.01 | 2 | 0.03 | 9 | 0.13 | 179 | 2.65 |
| | COVINGTON | 6333 | 6180 | 97.58 | 40 | 0.63 | 0 | 0.00 | 8 | 0.13 | 7 | 0.11 | 98 | 1.55 |
| | PIKE | 4798 | 4494 | 93.66 | 13 | 0.27 | 0 | 0.00 | 1 | 0.02 | 2 | 0.04 | 288 | 6.00 |
| | BARBOUR | 7602 | 7085 | 93.20 | 141 | 1.85 | 2 | 0.03 | 7 | 0.09 | 5 | 0.07 | 360 | 4.74 |
| | CRENSHAW | 2600 | 2545 | 97.88 | 14 | 0.54 | 0 | 0.00 | 1 | 0.04 | 1 | 0.04 | 39 | 1.50 |
| | GENEVA | 4166 | 4118 | 98.85 | 18 | 0.43 | 0 | 0.00 | 4 | 0.10 | 2 | 0.05 | 24 | 0.58 |
| | BUTLER | 3719 | 3526 | 94.81 | 14 | 0.38 | 0 | 0.00 | 1 | 0.03 | 2 | 0.05 | 174 | 4.68 |
| | HENRY | 2930 | 2842 | 97.00 | 19 | 0.65 | 0 | 0.00 | 3 | 0.10 | 10 | 0.34 | 56 | 1.91 |
| TOTAL | | 68523 | 65228 | 95.19 | 496 | 0.72 | 17 | 0.02 | 52 | 0.08 | 74 | 0.11 | 2652 | 3.87 |
| MOBILE | MOBILE | 72888 | 68742 | 94.31 | 684 | 0.94 | 2 | 0.00 | 29 | 0.04 | 23 | 0.03 | 3401 | 4.67 |
| All Counties | | 836374 | 785420 | 93.91 | 6457 | 0.77 | 55 | 0.01 | 385 | 0.05 | 452 | 0.05 | 41955 | 5.02 |
| Type | | | | | | | | | | | | | | |
| Public | | 788700 | 743744 | 94.30 | 5892 | 0.75 | 52 | 0.01 | 366 | 0.05 | 415 | 0.05 | 36609 | 4.64 |
| Private | | 47674 | 41676 | 87.42 | 565 | 1.19 | 3 | 0.01 | 19 | 0.04 | 37 | 0.08 | 5346 | 11.21 |
| Total | | 836374 | 785420 | 93.91 | 6457 | 0.77 | 55 | 0.01 | 385 | 0.05 | 452 | 0.05 | 41955 | 5.02 |